UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ANDREW BABICK, JR.,        )
          )
        Petitioner,    )    Case No. 1:03-cv-20
          )
v.        )    Honorable Wendell A. Miles
          )
MARY BERGHUIS et al.,       )
          )    **REPORT AND RECOMMENDATION**
        Respondent.   )
_____)

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Because Petitioner filed his habeas application after the enactment of the Antiterrorism and

Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA), the provisions of that law

govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).

Petitioner is serving two sentences of life imprisonment without the possibility of

parole imposed by the Calhoun County Circuit Court after he was convicted of two counts of first-

degree felony-murder, MICH. COMP. LAWS § 750.316 and one count of arson of a dwelling house,

MICH. COMP. LAWS § 750.72.[1] In his *pro se* petition, Petitioner raises six grounds for relief, as

follows:

> I.    FAILURE TO PROVIDE PUBLIC FUNDS FOR THE DEFENSE TO
> OBTAIN AN ARSON EXPERT DENIED THIS INDIGENT PETITIONER
> HIS SIXTH AMENDMENT COMPULSORY RIGHT TO PRESENT
> WITNESSES, AND HIS FOURTEENTH AMENDMENT DUE PROCESS
> RIGHT TO A FAIR TRIAL.

---

[1] Petitioner was not sentenced on the count of arson of a dwelling house.

II.     UNRELIABLE FIRE MARSHALL INQUIRY TESTIMONY FROM 12-YEAR OLD HOLLY MONY WAS IMPROPERLY ADMITTED IN VIOLATION FOURTEENTH AMENDMENT DUE PROCESS CLAUSE.

III.    NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT WORKED TO DENY PETITIONER HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL.

IV.     FAILURE TO INSTRUCT THE JURY THAT INTOXICATION IS A DEFENSE TO THE CRIME OF "ARSON OF A DWELLING," DEPRIVED PETITIONER OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO HAVE A PROPERLY INSTRUCTED JURY FIND HIM GUILTY BEYOND A REASONABLE DOUBT.

V.      PETITIONER'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS WAS VIOLATED BY CIRCUMSTANCES AFFECTING THE JUROR'S DELIBERATION, INCLUDING BUT NOT LIMITED TO EX-PARTE COMMUNICATION WITH THE JURY, WHICH THE DEFENSE WAS NOT INFORMED OF UNTIL AFTER TRIAL.

VI.     INADEQUATE PERFORMANCE FROM BOTH TRIAL AND APPELLATE COUNSEL RESULTED IN SUFFICIENT PREJUDICE TO DEMONSTRATE A BREAKDOWN OCCURRED IN THE ADVERSARY PROCESS, A BREAKDOWN SO SEVERE IT RENDERED PETITIONER'S TRIAL AND APPELLATE RESULT UNRELIABLE, IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

Respondent filed an answer to the petition on June 13, 2003 (docket #11).  At the request of the

Court, Respondent filed a supplemental answer on August 20, 2003 (docket #29).  Petitioner filed

replies to the Respondent's answer and supplement on July 24, 2003 and October 2, 2003,

respectively (dockets #36, 41).

On December 19, 2005, the Court appointed the Federal Public Defender to represent

Petitioner in this case.  Counsel for Petitioner submitted a brief on May 26, 2006 (docket #57).

Respondent filed an answer on June 15, 2006 (docket #58).  Counsel for Petitioner submitted his

reply on July 18, 2006 (docket #62).  Petitioner submitted a *pro se* supplemental response (docket

#63) on June 14, 2007.  Upon review and applying the AEDPA standards, I find that Petitioner is entitled to habeas corpus relief on grounds of ineffective assistance of trial counsel and prosecutorial misconduct.  Accordingly, I recommend that the petition be granted.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from a house fire in Battle Creek that resulted in the death of two children.  The fire occurred during the early morning hours of September 4, 1995.  On December 4, 1995, Calhoun County Prosecutor John Hallacy addressed a letter to Detective David Adams of the Battle Creek Police Department stating that he must deny authorization of an arrest warrant against Petitioner because "the evidence 'as a whole' is lacking."  (12/4/95 Letter, Exhibit G, docket #2).  Thereafter, the Michigan Attorney General accepted prosecution of the case. Petitioner was charged with arson of a dwelling house and two counts of first-degree felony murder. He was tried before a jury November 5-14, 1996.[2]

Lieutenant Larry Hausman of the Battle Creek City Fire Department testified that the fire department received an alarm for 264 Grove Street at 2:05 a.m. on September 9, 1995.  (Tr. I, 166-68.)  The residence at 264 Grove Street was a two-story wood-frame structure.  (Tr. I, 168-69.) When Hausman arrived at the scene, the front of the building was engulfed in flames and there was also some visible involvement on the right side of the building.  (Tr. I, 168-69.)  The firefighters

---

[2] The trial transcripts will be referred to as follows:

| | |
|---|---|
| Tr. I | Volume 1, November 5, 1996 (docket #17) |
| Tr. II | Volume 2, November 6, 1996 (docket #18) |
| Tr. III | Volume 3, November 7, 1996 (docket #19) |
| Tr. IV | Volume 4, November 8, 1996 (docket #20) |
| Tr. V | Volume 5, November 12, 1996 (docket #22) |
| Tr. VI | Volume 6, November 13, 1996 (docket #23) |
| Tr. VII | Volume 7, November 14, 1996 (docket #24) |

were informed that two children were on the second-floor of the house.  (Tr. I, 172.)  After fighting the fire for five to six minutes, a team of firemen entered the house and found two dead children in the front, upstairs bedroom.  (Tr. I, 173.)  Hausman estimated that the fire had been burning for approximately ten minutes before the fire department arrived.  (Tr. I, 175.)  Hausman further indicated that the "fire load" was very heavy on the front of the structure, but not inside the structure itself. (Tr. I, 175-76.)  As a result, Hausman opined that the fire started on the front of the structure, possibly outside.  (Tr. I, 176.)

Hausman testified that there was a couch on the front porch of the house.  (Tr. I, 180.) Husman was not qualified as an expert in fire cause and origin, but testified based upon his experience and training as a firefighter, that a lit cigarette would smolder on a couch for a couple of hours before the material in the couch would support combustion enough to make open flames. (Tr. I, 181-182.)  He testified that in many cases a cigarette will extinguish itself so that a fire does not occur.  (Tr. I, 182.)  Hausman was skeptical that a fire of that magnitude could have resulted from a cigarette being dropped on the couch.  (Tr. I, 190-91.)  Hausman also testified that the force of the deck gun used by the fire department, which applies a thousand gallons of water per minute, was powerful enough to force open the front door of the house.  (Tr. I, 185-86, 192.)

The prosecution called two experts on fire cause and origin.  Wayne Etue of the Michigan State Police assisted the Battle Creek Fire Department with the investigation of the Grove Street fire.  (Tr. I, 200.)  Etue arrived at the scene at approximately 3:45 a.m. on September 9, 1995. (Tr. I, 200.)  Etue observed heavy fire damage on the front porch and the exterior of the second level. (Tr. I, 204-205.)  Etue testified that fire naturally burns up and out in a "V" pattern.  (Tr. I, 198-200.) On the front porch of the house, Etue found unnatural downward burning into the crack of the wood

floor that was consistent with the use of an accelerant, such as kerosene or gasoline.  (Tr. I, 209.) In the area where the couch had been on the front porch, there was no burning of the wood floor and only minor smoke damage.  (Tr. I, 210.)  In other words, Etue believed that the couch protected the floor.  (Tr. I, 211.)  In Etue's opinion, the couch was not the point of origin because the flooring underneath the couch was not burned.  (Tr. I, 211.)  Etue testified that under ideal conditions, a cigarette left on a couch could start a fire in about forty-five minutes, but it could easily take two hours under non-ideal conditions.  (Tr. II, 26, 41.)  Etue believed that the fire started ten or fifteen minutes before the alarm at 2:05 a.m. (Tr. II, 31.)

Etue testified that the front door had been removed before he arrived.  (Tr. I, 212.) The door was  metal hollow-core with wooden edges.  (Tr. I, 213.)  The door showed extreme heat and fire damage.  (Tr. I, 212.)  Etue opined that the door was closed or mostly closed  at the time of the fire because the wood edge of the door where it was hinged was intact.  (Tr. I, 213.)  Etue testified the cracking in the door frame may have been caused by the deck gun used by the fire department.  (Tr. I, 23-24.)  Etue estimated that seventy-five percent of the damage from the fire was inside the house, in the dining room, living room, stairway, and landing at the top of the stairs. (Tr. II, 19.)  He observed heavy fire damage in the living room and dining room.  (Tr. I, 216.)  The kitchen showed little damage.  (Tr. I, 216.)  Similarly, he observed only smoke and water damage in the basement, which ruled out some accidental causes, such as the electrical panel, hot water heater and furnace.  (Tr. I, 216.)  The door to the front upstairs bedroom where the victims were found was a couple of feet from the stairway landing.  (Tr. II, 22.)  The bedroom door appeared to be slightly ajar during the fire.  (Tr. II, 22, 24.) Etue found some fire damage in the children's bedroom, but no evidence of an accelerant.  (Tr. I, 220.)  The air vent in the bedroom helped to

accelerate the fire and likely carried smoke and poisonous fumes into the bedroom.  (Tr. II, 34-35.)  Etue was told that there had been a functioning smoke alarm in the upstairs hallway near the two bedrooms, but it had come down in the fire.  (Tr. II, 21-22.)

Etue indicated that the burn pattern in the carpet in the entry foyer of the house was consistent with the use of an accelerant.  (Tr. I, 214-15.)  He believed from the burn pattern that an accelerant was poured on the porch going through the front door, up the stairs to the second floor, and pooled on the landing at the top of the stairs.  (Tr. I, 217-19; Tr. II, 27-28.)  He also believed that an accelerant was poured in a separate line from the door through the living room and dining room or vice versa.  (Tr. II, 28-30.)  Based upon the burn pattern, Etue opined that the accelerant was poured, not squirted or splashed.  (Tr. II, 29-30.)  However, Etue could not estimate the amount of accelerant that was used.  (Tr. II, 29.)  Etue took numerous samples from the house to be tested for accelerants.  (Tr. I, 222.)  Out of eighteen samples, only one taken on the front porch came back positive for an accelerant.  (Tr. II, 37.)  According to Etue, it is not uncommon for the fire to completely consume all chemical traces of the accelerant that was used.  (Tr. II, 39.)

Joan Tuttle, a fire inspector with the Battle Creek Fire Department, also testified for the prosecution as an expert in cause and origin of fires over the objection of defense counsel.  (Tr. II, 47.)  She arrived at the scene at approximately 2:50 a.m.  (Tr. II, 59.)  After a thorough investigation, Tuttle identified "pours" of a liquid accelerant on the front porch, through the front door, into the living room and dining room, as well as up the stairs to the landing.  (Tr. II, 54.)  Tuttle did not believe that the couch on the front porch was the origin of the fire.  (Tr. II, 56.)  Tuttle opined that it would take at least two hours for a lit cigarette to ignite a couch.  (Tr. II, 57.)

Detective David Adams testified that he investigated the case on behalf of the Battle Creek Police Department. (Tr. II, 73.) The morning after the fire, Adams observed a small, charcoal grill near the front porch of the house, but did not see any lighter fluid containers. (Tr. II, 74.) Upon further investigation, Adams found that the next-door neighbor was a mechanic and had numerous containers of gasoline and flammable solvents in his garage. (Tr. II, 75.) The garage was no more than twenty yards from the house that burned and was open at the time of the fire. (Tr. II, 76.) However, the neighbor did not notice anything missing or out of place. (Tr. II, 83.) According to Adams, they never determined what container contained the accelerant used in the case. (Tr. II, 82.) Adams testified that the front door was no longer attached to the house when he conducted his investigation. (Tr. II, 84.) Adams believed that the front door was forced open because the door frame was split in the area where it latched. (Tr. II, 86.) He further opined that the door would be easy to force open because it had only a handle lock; however, there was no evidence of burglary tools or that the door had been jimmied. (Tr. II, 100.)

Adams testified that during an interview at police station several hours after the fire Petitioner indicated that he was wearing the same clothing he had on the previous night. (Tr. II, 78.) Adams testified that Petitioner's statement regarding his clothing was inconsistent with information police received from Belinda Sutton and LuQuentine Caldwell, so a search warrant was obtained for Petitioner's residence. (Tr. II, 78, 94.) Police conducted the search with the assistance of a trained canine that sniffs out accelerants. (Tr. II, 79.) Several items of evidence, including a pair of boots and a pair of tennis shoes, were seized and sent for testing. (Tr. II, 80.) Adams testified that the residents of 264 Grove at the time of the fire - Belinda Sutton, Lyndon Caldwell and Jacqueline Caldwell - were not investigated as suspects in this case. (Tr. II, 92.)

- 7 -

Doctor Lawrence Simson performed the autopsy on the two child victims, Ledaryus Fields and Letonio Briggs. (Tr. II, 111.) Simson indicated that both bodies were very badly charred and burned. (Tr. II, 113-14.) He also found deposits of smoke and soot from the back of their throats all the way down into their lungs, which indicated that the children were alive and breathing when the fire started. (Tr. II, 114-15.) Simson also found evidence in the lungs that both children suffered from asthmatic bronchitis, but indicated that the condition was unrelated to their deaths. (Tr. II, 116, 127-28.) Simson concluded that both children died from smoke inhalation and carbon monoxide poisoning, typical of a house fire. (Tr. II, 116.) Simson opined that the children died before the fire reached them. (Tr. II, 123.) He could not give an exact time of death, but testified that it would have been a number of minutes before the carbon monoxide level became lethal. (Tr. II, 122.)

LuQuentine Caldwell, also known as "Quickie", testified that he lived at 264 Grove Street in September 1995. (Tr. II, 132.) The house was owned by his sister, Jacqueline Caldwell. (Tr. II, 132.) Jacqueline's children, Ledaryus Fields and Letonio Briggs also lived in the house. (Tr. III, 12-13.) LuQuentine's uncle, Lyndon Caldwell, and Lyndon's girlfriend, Belinda Sutton also lived with them. (Tr. II, 132-33; Tr. III, 33.) Lyndon and Belinda had one child together and she was pregnant at the time of the fire. (Tr. III, 33.) LuQuentine testified that he arrived at the house at about midnight. (Tr. III, 15-16.) Everyone was home, except for Jacqueline. (Tr. III, 16.) LuQuentine had consumed beer and smoked marijuana that day. (Tr. III, 35.) As LuQuentine walked away from the house, he encountered Petitioner. (Tr. III, 17, 38.) LuQuentine recognized Petitioner because he had seen him at the house on previous occasions trying to buy drugs. (Tr. III, 25-26.) While LuQuentine was talking to Petitioner, he saw Joe Lawrence getting into his van.

(Tr. III, 35, 39.)  In addition, a man named "Montez" was on a bicycle out on sidewalk in front of the house.  (Tr. III, 17-18.)  Petitioner wanted to buy a twenty-dollar rock of cocaine.  (Tr. III, 19.) LuQuentine did not really trust Petitioner, but he eventually sold him a "dime" or ten dollar piece of crack for twenty dollars.  (Tr. III, 20-21.)  After the transaction, LuQuentine went to his grandmother's house at 197 Grove Street, and then to the Elk's Club at about 1:45 a.m. (Tr. III, 23, 45.) He stayed at the Elk's Club until it closed at 2:30 a.m.  (Tr. III, 46.)  LuQuentine did not return to the residence at 264 Grove until after the fire started.  (Tr. III, 24.)  He testified that he did not start the fire and did not know any reason why any other member of the household would have started it. (Tr. III, 25.)  LuQuentine denied that he or the other residents of 264 Grove used drugs.  (Tr. III, 51-52.)  He also denied that Jacqueline, Belinda or Lyndon sold drugs from the residence.  (Tr. III, 48-49.) LuQuentine was granted immunity with regard to any illegal conduct admitted during his testimony.  (Tr. III, 10-11.)

Belinda Sutton a/k/a Belinda Davidson, testified that she had been living at 264 Grove for about six months before the fire occurred.  (Tr. III, 60.)  Belinda denied that she used crack, but admitted to selling it on the street and out of the house on at least two occasions.  (Tr. III, 60-61.) Sutton had seen Petitioner around the neighborhood prior to the fire, but never saw him at the house or had drug dealings with him.  (Tr. III, 62.)  Sutton testified that Jacqueline left the house with a friend at about 10:30 p.m. on September 8, 1995.  (Tr. III, 63.)  LuQuentine arrived around 11:00 p.m.  (Tr III, 68.)  According to Sutton, LuQuentine was a frequent visitor and spent the night a couple of times, but did not live there.  (Tr. III, 66.)  She also indicated that her boyfriend,  Lyndon Caldwell, stayed over with her, but did not live there.  (Tr. III, 78.)  Someone knocked at the door between 11:30 p.m. and 12:00 a.m.  (Tr. III, 66.)  LuQuentine answered the door, but Sutton could see two white men standing outside.  (Tr. III, 66.)  One of the men was Petitioner.  (Tr. III, 67.)

- 9 -

LuQuentine asked Sutton if she had any crack, and she responded "no" and went upstairs to bed in the back bedroom with Lyndon. (Tr. III, 67-68.)

Belinda first testified that Petitioner came back to the house at about 12:30 a.m. (Tr. III, 70.) After the prosecutor refreshed her memory with the police report, Belinda testified that she told police officers that Petitioner came back at 1:30 a.m. (Tr. III, 70-71.) Belinda testified that she was awakened by Petitioner pounding on the front door. (Tr. III, 69-71.) She stated that Petitioner was "mad, angry" and claimed that LuQuentine had sold him some bad crack. (Tr. III, 72.) Petitioner said that he was going to call the police. (Tr. III, 72.) Belinda told Petitioner that LuQuentine was not there, but Petitioner said that he was going to wait there until LuQuentine came back. (Tr. III, 72.) Belinda locked the front door and went back to bed. (Tr. III, 73, 86.) The door only had a lock on the handle that turned. (Tr. III, 86.) She thought that all of the downstairs windows were closed, but did not know if they were locked. (Tr. III, 86-87.)

Belinda testified that she next awoke to the smoke alarm going off. (Tr. III, 74.) She had not heard anyone in the house after she went back to bed. (Tr. III, 88). After the smoke alarm went off, Lyndon tried to go to the children's bedroom, but was forced back by the smoke. (Tr. III, 74.) He returned to the back bedroom and they climbed through a window onto the back porch roof. (Tr. III, 75.) They jumped from the porch roof to the ground. (Tr. III, 91.) They did not sustain any injuries that required medical treatment that night, but Belinda, who was pregnant, went to the hospital the next day for back pain. (Tr. III, 92.) Belinda and Lyndon woke up one of their neighbors and asked him to call the police. (Tr. III, 75.) Lyndon told the firemen that there were children inside the house. (Tr. III, 75-76.) Belinda testified that they had a charcoal grill out front that they used. (Tr III, 79.) Belinda also was granted immunity with regard to any illegal conduct admitted during her testimony. (Tr III, 59.)

Lyndon Caldwell testified that he went to Belinda's house at about 11:00 p.m. on September 8, 1995.  He and Belinda's went up to her bedroom on the second floor to watch television.  (Tr. III, 99-101.)  At about 11:30 p.m., LuQuentine arrived and came up to Belinda's bedroom.  (Tr. III, 102.)  They were interrupted by a knock at the door.  (Tr. III, 102.)  Belinda or LuQuentine answered the door.  (Tr. III, 102-103).  Lyndon did not see LuQuentine again that night.  (Tr. III, 103.)  After Lyndon and Belinda went to bed, they were awoken by someone pounding on the front door.  (Tr. III, 103.)  Belinda answered the door and came back to bed after about five minutes.  (Tr. III, 103.)  The next thing Lyndon recalled was Belinda telling him that the smoke alarm was going off.  (Tr. III, 104.)  Lyndon tried to get to the children in the front bedroom, but he could not get through the smoke.  (Tr. III, 105.)  He and Belinda went through a bedroom window and jumped off the back porch.  (Tr. III, 105-106.)  Lyndon admitted to selling drugs while he was staying at 264 Grove.   (Tr. III, 109.)  Lyndon had seen Petitioner at the house a few times, but denied having any drug dealings with Petitioner.  (Tr. III, 109.)  Petitioner came to see Jacqueline's ex-boyfriend, Clayton Sims, who used to sell drugs out of the house.  (Tr. III, 112.)  Belinda and LuQuentine also sold drugs.  (Tr. III, 113.)  Lyndon was also granted immunity with regard to any illegal conduct admitted during her testimony.  (Tr. III, 101.)

Jacqueline Caldwell testified that she moved into the residence at 264 Grove in the winter of 1994.  (Tr. IV, 10.)  She was buying the house on a $10,000 land contract from Frances Jackson, a distant relative by marriage.  (Tr. IV, 10, 13.)  She was not required to make a down payment and her house payments were $300 per month.  (Tr. IV, 22.)  The State of Michigan made her payments until July 1995, two months before the fire.  (Tr. IV, 22.)  Jacqueline collected ADC and took care of her two sons, three-year-old Ledaryus Fields and two-year-old Letonio Briggs.  (Tr. IV, 11.)  Jacqueline was behind in her house payments in August and September 1995.  (Tr. IV, 11.)

The homeowners insurance was in Jackson's name, so he received any insurance proceeds that were paid out as a result of the fire. (Tr. IV, 12.) Jackson had the house torn down after the fire, but gave the piece of vacant property to Jacqueline. (Tr. IV, 13.) She was not required to pay the balance of the land contract. (Tr. IV, 23.) Jacqueline denied using crack cocaine, but admitted selling it to make raise money for the house payment. (Tr. IV, 14.) According to Jacqueline, Petitioner came to the house a few times to buy dope from her boyfriend, Clayton Sims, or LuQuentine. (Tr. IV, 15, 31.) Jacqueline could not recall whether she had sold drugs to Petitioner. (Tr. IV, 16, 29.) On the night of September 8, 1995, Jacqueline put the boys to bed in her room upstairs. (Tr. IV, 18.) She left them with Lyndon and Belinda. (Tr. IV, 19.) Jacqueline learned about the fire from a relative and got a ride home. (Tr. IV, 27-30.) She did not see Belinda or Lyndon at the fire scene. (Tr. IV, 31.)

Detective Timothy Hurtt testified that he interviewed Petitioner at the Battle Creek Police Department on the evening of September 9, 1995. (Tr. IV, 42.) Petitioner was voluntarily escorted to the station by police officers and advised of his *Miranda* rights. (Tr. IV, 43.) Hurtt videotaped his conversation with Petitioner. (Tr. IV, 44.) Petitioner told Hurtt that he used crack cocaine and had purchased crack at 264 Grove on several occasions over the past six months. (Tr. IV, 53, 67.) Petitioner told Hurtt that he went to 264 Grove on the previous evening to purchase crack. (Tr. IV, 46-47.) According to Hurtt, Petitioner said that he had split a 12-pack of beer around noon and had a couple more beers around 5:00 p.m. (Tr. IV, 50-51.) Petitioner said that he was "buzzed," but able to function. (Tr. IV, 51.) Petitioner indicated that he purchased a rock of crack for $20 from a young man at 264 Grove sometime after midnight. (Tr. IV, 47.) After that, Petitioner said that he went to his sister Treza's house on Corwin Street, about 1.1 miles away. (Tr. IV, 47, 49-50.) Petitioner entered the house through a window because no one was home and the door was

locked.  (Tr. IV, 48.)  Petitioner told Hurtt that he spent the next hour smoking the rock in Treza's

house.  (Tr. IV, 48.)  After that, he walked back to 264 Grove to buy another rock of crack.  (Tr. IV,

50.)  Petitioner stated that a young black woman answered the door and told him that the man he had

purchased the rock from earlier was not there and she did not know when he would return.  (Tr. IV,

51-52.)  Petitioner waited on the porch hoping the man would return because he wanted to talk to

him about the quality of the product he had sold him.  (Tr. IV, 52, 54.)  While Petitioner was waiting

on the porch, he smoked a cigarette and fell asleep on the couch.  (Tr. IV, 52, 54.)  After waiting

about twenty minutes, Petitioner went home.  (Tr. IV, 54, 56.)  Petitioner's wife then attempted to

drive Petitioner back to Grove street at about 3:00 a.m., but the street was blocked due to the fire.

(Tr. IV, 56, 57-58.)

        Hurtt testified that Petitioner seemed upset when Hurtt informed him that two

children died in the fire.  (Tr. IV, 58.)  When Hurtt accused Petitioner of starting the fire, Petitioner

repeatedly insisted that he was not involved in setting the fire.  (Tr. IV, 59, 67-69.)  Petitioner  was

wearing a white t-shirt with blue sleeves, denim jeans and tennis shoes.  (Tr. IV, 44-45.)  He told

Hurtt that he was wearing the same clothes the night before.  (Tr. IV, 45.)  Petitioner voluntarily

surrendered his clothing to Hurtt.  (Tr. IV, 71.)

        The parties later stipulated to the admission of the full videotape of Petitioner's

conversation with Detective Hurtt, which was played for the jury.  (Tr. V, 126-28.)  The conversation

was not transcribed by the court reporter, but Petitioner provided a transcript in the exhibits filed

with his petition.  (Interview Transcript ("IT"), Exhibit N, docket #2).  For the most part, Hurtt's

testimony regarding Petitioner's statement was consistent with the transcript.  Petitioner indicated

that he went back to the house on Grove for the second time to get more crack.  (IT, 17.)  He

repeatedly insisted that he was not upset with anyone at the house; he just wanted more crack.  (IT,

17-19.)  Petitioner also repeated several times that he was not responsible for starting the fire.  (IT, 15-20.).  Petitioner told Hurtt that he learned about the fire that morning, but he did not  know until Hurtt told him during the interview that two children died in the fire.  (IT, 16.)

Jeff Austin of the Lansing Fire Department testified as an expert in handling a canine trained to detect accelerants.  (Tr. IV, 80.)  He testified that his dog, Samantha, is trained to detect sixteen different categories of accelerants and over thirty-three flammable liquids.  (Tr. II, 83.)  Austin and Samantha conducted a search at 264 Grove on September 11, 1995, two days after the fire.  (Tr. IV, 91.)  Samantha reacted positively for accelerants in the following locations: the ground in front of the front step, the top of the front steps, the front door jamb, the living room, step two going up the stairs to the second floor, and step eight on the top of the landing.  (Tr. IV, 88.)  During the search of Petitioner's residence, Samantha reacted only to a pair of shoes.  (Tr. IV, 90.)  Austin testified that there have been previous instances in which an accelerant was detected by Samantha, but was not detected by the crime lab.  (Tr. IV, 85.)  He claimed that lab equipment used to examine fire debris for flammable liquids will detect parts per million, while the canine can detect parts per billion.  (Tr. IV, 84.)  Austin testified that flammable liquids were used to smoke crack cocaine and that Samantha would detect those liquids if they were present.  (Tr. IV, 98-99.)  He also indicated that  if a person walked through a flammable liquid Samantha would react to the shoes.  (Tr. IV, 96.)

Holly Mony, Petitioner's thirteen-year-old niece, testified that she stayed over night at Petitioner's house on September 8-9, 1995.  (Tr. V, 21, 34.)  She and her cousin, Amanda, were sleeping in the living room.  Mony testified that she woke up at about 3:00 a.m. because Petitioner and her aunt were arguing in the next room.  (Tr. V, 21-23.)  Mony indicated that she was close to her uncle's family and was not comfortable testifying against him.  (Tr. V, 18-19)  At trial, Mony testified that she could not recall exactly what Petitioner said that night, but she reluctantly admitted

to testifying at a fire marshall inquiry and at the preliminary examination in this case that Petitioner said that he might have started the fire by dropping a cigarette in a couch or in the house. (Tr. V, 25-26.) Mony was unexpectedly picked-up from camp by a Detective and taken to the Fire Marshall inquiry, so she did not have an opportunity to talk with her family before she testified. (Tr. V, 35-37.) Mony testified that she was angry at Petitioner when she gave her statement to the Fire Marshall because she thought that he had taken her bicycle. (Tr. V, 47.)

Leanora Brun-Conti testified as an expert in trace evidence analysis. (Tr. V, 56.) Brun-Conti analyzed the contents of sixteen bags containing burned debris and two vials of liquids collected from the fire scene. (Tr. V, 57.) She found the presence of an accelerant in item number seven, which was the sample taken from the front porch. (Tr. V, 60.) The accelerant was a "medium to heavy petroleum distillate," such as charcoal lighter or kerosene. (Tr. V, 61.) Brun-Conti also tested various items of clothing and two pairs of shoes. (Tr. V, 62.) She detected a mid-range petroleum product on both the boots and the black tennis shoes. (Tr. V, 62.) However, Brun-Conti indicated that the result may have been caused by the lab when the shoes were placed in heat-sealed packaging. (Tr. V, 62-63, 68.) As a result, she could not give a positive conclusion with regard to the two pairs of shoes.

Cubby Gates, the resident at 254 Grove, testified that there were two vacant lots between his house and 264 Grove where the fire occurred. (Tr. V, 80.) Gates indicated that he kept some flammable liquids in his garage. (Tr. V, 82.) Gates testified that he and Detective Adams looked around his property after the fire and he did not see any containers missing from the garage. (Tr. V, 82.) They did not find any evidence of any cars being tampered with or siphoned. (Tr. V, 82-83.)

Lewis Lawrence, a/k/a Joe Lawrence testified that he went to 264 Grove between 11:30 p.m. and midnight on the night of the fire. (Tr. V, 94.) Lawrence drove his van and parked in front of the house. (Tr. V, 94.) While his friend waited in the car, Lawrence got out and knocked on the door. Quickie came out on the front steps to talk to him. (Tr. V, 93-95.) Lawrence wanted to buy crack, but Quickie indicated that he didn't have anything to sell. (Tr. V, 96-97.) Lawrence testified that while he and Quickie were talking, Petitioner appeared behind him. (Tr. V, 95-96.) Lawrence finished his conversation with Quickie and left. (Tr. V, 96.)

Sally Kuss of Auto-Owners Insurance testified that the insured party on the policy for 264 Grove was Frances Jackson. (Tr. V, 112.) The property was insured for $13,000. (Tr. V, 112.) Jackson filed a claim on September 11, 1995. (Tr. V, 113.) The insurance company paid out a total of $12,405.39 on the claim, including $3,350 for demolition of the home. (Tr. V, 113-14.)

Robert Aldrich, a friend of Petitioner's, testified that Detective Adams called him at work in November or December of 1995 and told him that he wanted to set up a meeting to see if Aldrich had any information concerning this case. (Tr. V, 121.) Adams also told Aldrich that the outstanding warrant against him would be lifted if Aldrich told him what he wanted to know. (Tr. V, 121.) At a meeting at Aldrich's home, Adams repeated that he would take care of his warrant if he provided information. (Tr. V, 122.) Aldrich told Adams that he could not answer his questions because he did not have any information. (Tr. V, 122.) When Adams left, he told Aldrich that he better take care of his warrant because he could get arrested if he got called to court in this case. (Tr. V, 123.) Sheila Aldrich, Robert's wife, testified that she heard Adams tell Robert that he would take care of his warrant if Robert gave him some information in this case. (Tr. V, 118.)

At the conclusion of trial, the jury found Petitioner guilty of two counts of first-degree felony-murder and one count of arson of a dwelling house. (Tr. VII, 9.) At the sentencing hearing

on December 20, 1996, the trial court sentenced Petitioner to life imprisonment without the possibility of parole for each of the felony-murder convictions and entered no sentence for the arson conviction. (Sentencing Transcript, (S. Tr.), 17, docket #25.)

**B.      Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on June 16, 1998, raised the following six claims:

I.      DEFENDANT-APPELLANT'S CONVICTION FOR "FELONY-MURDER" SHOULD BE REVERSED BECAUSE DEFENDANT-APPELLANT'S RIGHT TO A SPEEDY TRIAL UNDER THE 180-DAY RULE, MICH. COMP. LAWS 780.131 ET SEQ.; MSA 28.969(1) ET SEQ. WAS VIOLATED.

II.     DEFENDANT-APPELLANT'S RIGHT OF DUE PROCESS UNDER THE STATE AND FEDERAL CONSTITUTION WAS VIOLATED WHEN NO PUBLIC FUNDS WERE FORTHCOMING SO THAT DEFENDANT-APPELLANT COULD OBTAIN AN ARSON EXPERT.

III.    THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY THAT INTOXICATION IS A DEFENSE TO THE CRIME OF "ARSON OF A DWELLING HOUSE" AND THE LESSER OFFENSE OF "MANSLAUGHTER."

IV.     THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT-APPELLANT'S MOTION FOR NEW TRIAL BASED ON JURY MISCONDUCT.

V.      THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT-APPELLANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE AND IN THE ALTERNATIVE THE TRIAL COURT FAILED TO CONDUCT AN EVIDENTIARY HEARING.

VI.     THE VERDICT OF THE JURY WAS AGAINST THE GREATER WEIGHT OF THE EVIDENCE.

(*See* Def.-Appellant's Br. on Appeal, docket #30.)  By unpublished opinion issued on August 13, 1999, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's

convictions and sentences. *See People v. Babick*, No. 207638, 1999 WL 33437948, at *2 (Mich. Ct. App. Aug. 13, 1999).

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same six claims raised before and rejected by the Michigan Court of Appeals. While criticizing the prosecutor for his lack of cooperation, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed. *People v. Babick*, 610 N.W.2d 916 (Mich. 2000), *partially vacated by People v. Babick*, 614 N.W.2d 588 (Mich. 2000). Justices Kelly and Cavanaugh would have granted the application. The proceedings in the Michigan Supreme Court are described in greater detail in Part I(A) of this report and recommendation. Petitioner filed a petition for writ of certiorari in the United States Supreme Court, which was denied on January 8, 2001.

### C.      Post-Conviction Relief

Petitioner filed a motion for relief from judgment in the Calhoun County Circuit Court raising the following four grounds for relief:

I.      IN VIOLATION OF THE COMPULSORY PROCESS CLAUSE OF THE SIXTH AMENDMENT, THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING THE STATE TO BEAR THE EXPENSE OF THE DEFENSE ARSON EXPERT WITNESS FEES.

II.     UNRELIABLE FIRE MARSHALL INQUIRY TESTIMONY FROM 12-YEAR OLD HOLLY MONY WAS IMPROPERLY ADMITTED IN VIOLATION OF THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE.

III.    NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT DENIED DEFENDANT HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL.

IV.     INADEQUATE PERFORMANCE FROM BOTH TRIAL AND APPELLATE COUNSEL RESULTED IN SUFFICIENT PREJUDICE TO DEMONSTRATE A BREAKDOWN OCCURRED IN THE ADVERSARY

PROCESS, A BREAKDOWN SO SEVERE IT RENDERED DEFENDANT'S TRIAL AND APPEAL RESULT UNRELIABLE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL.

The trial court denied Petitioner's motion on grounds that the issues identified by Petitioner were fully decided on appeal or could have been presented in his appeal of right.  (Circuit Court Ord., docket #32.)  The Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's delayed applications for leave to appeal on December 3, 2001 and May 29, 2002, respectively, because Petitioner "failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)."  (*See* 12/3/01 Mich. Ct. App. Ord., docket #32; 5/29/02 Mich. Ord., docket #31.)

## Discussion

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA").  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and

- 19 -

not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is

- 20 -

presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## I.    Failure to Provide Public Funds for an Arson Expert

Petitioner claims that the state failed to provide public funds for the defense to obtain an arson expert in violation of his Fourteenth Amendment due process rights and his Sixth Amendment right to present witnesses.  Before addressing the merits of Petitioner's claim, I will provide additional factual background and procedural history concerning this issue.  These facts also are relevant to Petitioner's related claims of ineffective assistance of counsel and prosecutorial misconduct.

### A.    Factual Background

Because Petitioner was indigent at the time of his arrest and prosecution, Defense counsel made a pre-trial motion for funds to obtain a private investigator and an arson expert.  The trial court granted each motion in the amount of $500.00, "provided that the State of Michigan provides the funds and not the County of Calhoun."  (9/25/96 Order of the Calhoun County Circuit Court, Exhibit I, docket #2).  The court's order implicated MICH. COMP. LAWS § 775.21, which provides:

> Whenever the Attorney General shall institute criminal proceedings in any court in this state, all costs incurred in such proceedings, except the pay of circuit court judges, prosecuting attorneys, and circuit court stenographers, may be paid by the state with the approval of the state administrative board.

The statute governing the State Administrative Board's discretionary authority to pay such costs, MICH. COMP. LAWS § 600.6419(1), provides that "[t]he state administrative board is hereby vested with discretionary authority *upon the advice of the attorney general* to hear, consider, determine, and allow any claim against the state . . . ." (emphasis added.)

The record shows that defense counsel retained the services of a private investigator, Craig Pifer.  She also contacted at least two potential fire experts (*See* 8/2/96 and 8/28/96 Letters, Exhibit J, docket #2.)  In a letter to the attorney general dated October 9, 1996, defense counsel indicated that she would be forwarding the bills from her experts for reimbursement by the state. The attorney general sent defense counsel a letter in response, stating in pertinent part:

> Please be advised that we are unable, either factually or by law, to accept these bills for payment.  I am assuming that Judge Kingsley was aware of a specific statute dealing with reimbursement of expenses (MCL 775.21 – enclosed for your assistance), and that is why he used the word "provided" in his order rather than "shall."  The Department of Attorney General has neither the authority nor the funding to pay for expert expenses incurred by opposing parties.  Further, it probably creates a conflict of interest to process expenses of a criminal defense through the prosecution office.
>
> MICH. COMP. LAWS 775.21 establishes that whenever costs are incurred in a criminal case instituted by the Attorney General, those costs "may" be paid by the state "with the approval of the state administrative board."  The state administrative board is vested with discretion to approve the expenditure of funds for this type of situation.  Therefore, please do not forward any bills for outside services rendered on behalf of your client to this office; they will be returned.  All such bills must be submitted for approval to the state administrative board by you on behalf of your client.  You should be warned, however, that there is recent precedent where a judge ordered the State of Michigan to pay funds under this provision and the bill was submitted to the state administrative board, which then disallowed the payments. Where such a situation develops, your only recourse is to sue the State of Michigan in the Court of Claims.
>
> I provide this response to you not to interfere with the defense preparation for your client, but rather to protect you from being responsible for bills which the state of Michigan might refuse to pay.

(*See* 10/11/96 Letter, Exhibit K, docket #2).)  Defense counsel eventually secured funds from the county to pay the investigator.  (*See* 7/17/97 Pifer Letter, Exhibit M, docket #2.)

On direct appeal, Petitioner argued that his due process rights were violated when neither the county nor the state provided public funds to pay for Petitioner to have an arson expert.  Without an arson expert, Petitioner maintains that he was unable to prepare an adequate defense to the charges against him.  The Michigan Court of Appeals rejected Petitioner's claim on the ground that Petitioner did not raise the issue of non-payment in the trial court, and, thus, the issue was not preserved for appellate review.  The court of appeals stated:

> Defendant next contends that the trial court abused its discretion by its order authorizing the reimbursement of defendant's expert witness fees by the State of Michigan. Defendant, as an indigent represented by appointed counsel, filed motions for funds for an arson expert and a private investigator. The trial court granted both orders for public funds, each in the amount of $500, with the proviso that the State of Michigan, rather than Calhoun County, provide the funds. However, the attorney general prosecuting the case refused to reimburse defendant's attorney with the funds, citing M.C.L. § 775.21; MSA 28.1258, which states that in a criminal case instituted by the attorney general, court-ordered funds "may" be paid by the state "with the approval of the state administrative board." On appeal, defendant claims that he was denied his right to an expert witness because of defendant's [sic] refusal to consent to the payment of such an expense.

> Rulings on motions for expert witness fees will not be reversed absent an abuse of discretion. *See In re Klevorn*, 185 Mich.App 672, 678; 463 NW2d 175 (1990). An indigent criminal defendant is entitled to waiver of costs for expert witness services reasonably necessary for his defense. MCL 775.15; MSA 28.1252; *People v. Davis*, 199 Mich.App 502, 518; 503 NW2d 457 (1993). However, despite the significance of expert testimony on the fire's origin, defendant did not object to the order nor did defendant request any pretrial relief in response to the attorney general's alleged noncompliance with the trial court's order. Defendant neither attempted to retain an expert nor filed a claim with the administrative law board for reimbursement as provided by M.C.L. § 600.6419(1); MSA 27A.6419(1). Defendant's argument consists of unsubstantiated statements that both the state and Calhoun County erected "roadblock after roadblock" to prevent his attorney from securing an expert. On the contrary, it appears from the record that defendant abandoned his attempt to collect the fees.  Because defendant did not raise or pursue this issue below, it has not been preserved for appellate review. *People v. Grant*, 445

- 23 -

Mich. 535, 546; 520 NW2d 123 (1994); *People v. Carrick*, 220 Mich.App 17, 19; 558 NW2d 242 (1996). *People v. Connor*, 209 Mich.App 419, 422; 531 NW2d 734 (1995).

*People v. Babick*, No. 207638, 1999 WL 33437948, at *2 (Mich. Ct. App. August 13, 1999).

The Michigan Supreme Court subsequently denied Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed by the court, but made the following statement regarding Petitioner's expert witness claim:

> In denying leave to appeal we wish to note that the Attorney General's Office prosecuted this case. The trial court granted the defendant's motion for expert witness funds. The motion was granted ". . . provided that the State of Michigan provides the funds and not the County of Calhoun." Defense counsel sent the assistant attorney general a copy of the trial court's order, but he responded by saying that the attorney general was unable, either factually or by law, to accept the bill for payment, stating that it creates a conflict of interest to process expenses of a criminal matter through the prosecution's office. The Court of Appeals ruled that defendant "neither attempted to retain an expert nor filed a claim with the administrative law board for reimbursement as provided by M.C.L. § 600.6419(1); MSA 27A.6419(1)." Op., p. 917.

> We believe that the failure of the Attorney General's Office to assist the defendant in this regard, while not rising to the level of state interference with defendant's right to effective assistance of counsel, was inconsistent with the higher duty which the prosecutor owes to the public. While we are persuaded to deny leave to appeal, we nonetheless expect the Attorney General's Office to provide assistance under similar circumstances in future cases.

*People v. Babick*, 610 N.W.2d 916 (Mich. 2000). Justice Markman concurred stating, "I agree with the order of this Court to the extent that it concludes that the failure of the Attorney General's Office to assist the defendant in obtaining an arson expert was inconsistent with its duty to the public, but that such failure, nevertheless, did not rise to the level of state interference with the defendant's right to effective assistance of counsel." *Id.* at 917. Justice Kelly dissented and stated as follows:

> I agree that the assistant attorney general in this case did not meet his higher duty to the public. I believe that we should consider stronger action to prevent

similar conduct from recurring. Also, this defendant may have been denied a fair trial.

A jury convicted defendant of two counts of felony murder and one count of arson of a dwelling house. Before trial, he filed a motion for funds to hire a witness expert in arson. The trial court granted the motion and issued an order providing that the state of Michigan, rather than the county of Calhoun, bear the expense.

When defense counsel submitted the order to the assistant attorney general, he responded that it was a conflict of interest for his office to process the expense. Defendant claims to have tried various methods to collect the funds from the state, without success. Consequently, at trial, he did not have the benefit of an arson expert to aid in his defense.

On appeal to this Court, the Attorney General argues that defendant should have filed a claim with the state administrative board, as provided by M.C.L. § 600.6419(1); MSA 27A.6419(1). This is correct. However, M.C.L. § 600.6419(1); MSA 27A.6419(1) also provides that the state administrative board consider claims against the state under $1,000 "upon the advice of the attorney general." Thus, the Attorney General has a role in the procedure.

The assistant attorney general's refusal to provide support to defendant denied him a fair trial. The prosecution presented evidence that accelerants were used. Its reliability went unchallenged. If an arson expert, testifying on behalf of defendant, had rebutted the prosecution's experts, the jury might have accepted defendant's claim that the fire was set accidentally.   The prosecution's duty in a criminal proceeding is to serve justice, not to win at all costs. The assistant attorney general failed to ensure justice was served in this case.

*Id.*  Justice Cavanagh also would have granted leave to appeal.  *Id.*

The attorney general moved for reconsideration, to partially vacate and to withhold publication of the Michigan Supreme Court's order denying leave to appeal.  On July 20, 2000, the supreme court granted reconsideration of, and partially vacated, its May 26, 2000 order.  *People v. Babick*, 614 N.W.2d 588 (Mich. 2000). The supreme court offered the following corrected text to stand as its order, "On order of the Court, the delayed application for leave to appeal from the August 13, 1999, decision of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court."  *Id.*  With regard to

- 25 -

the request that the court withhold publication of the May 26, 2000 order, the supreme court noted

that the order did not include the name of the Assistant Attorney General, and that the Court of

Appeals opinion was unpublished.  The supreme court held that its previous order should remain in

the Michigan Reports as part of the permanent record of the court's activities.  *Id.*  Justice

Cavanaugh would have denied reconsideration, while Justice Kelly wrote a lengthy dissent

reiterating her belief that the assistant attorney general acted in a manner inconsistent with the higher

duty a prosecutor owes the public and that his conduct interfered with Petitioner's ability to present

his defense.  *Id.*  Justice Kelly stated in part:

> Lack of action on the part of defense counsel did not justify the assistant attorney
> general's threat that he would not authorize payment for the order submitted. Such
> threats deter defense counsel from making proper trial preparation and cannot be
> permitted. Defendants must not be put in the position of weighing the need for an
> expert against the difficulties of securing payment, as  predicted by the assistant
> attorney general. Certainly, defense counsel must take potential difficulties into
> consideration. It is troubling, however, that the prosecutor may force such a
> consideration by suggesting, shortly before trial, that he will not authorize public
> funds necessary to secure an expert witness.

*Id.* at 589.

### B.  Due Process Right to Funds for an Arson Expert

Petitioner claims that his due process rights were violated when the state failed to

provide an arson expert for his defense.  Because the Michigan Court of Appeals held that Petitioner

failed to properly preserve his claim for appellate review, it arguably is procedurally defaulted.

When a state-law default prevents further state consideration of a federal issue, the federal courts

ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v.*

*Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  The United States

Supreme Court has held that federal courts are not required to address a procedural-default issue

before deciding against the petitioner on the merits. *Lambrix v. Singletary,* 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Hudson v. Jones*, 351 F.3d 212, 215 -216 (6th Cir. 2003) (habeas court may proceed directly to merits of the claim where procedural default issue presents a complicated question of Michigan law and is unnecessary to its disposition of the habeas claim); *Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001) (when the procedural default issue raises more questions than the case on the merits, the court may assume without deciding that there was no procedural default and decide the issue on its merits), reversed on other grounds, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999) (same). Because Petitioner's claim fails on the merits, I will assume without deciding that Petitioner could show cause and prejudice for the default.

The Supreme Court has recognized the general principle that the government must provide indigent defendants with the "basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971); *see Douglas v. California*, 372 U.S. 353, 357-58 (1963); *Griffin v. Illinois*, 351 U.S. 12, 18-19 (1956) (plurality opinion). Although the government need not purchase for the indigent defendant all the assistance that a wealthier defendant might buy, fundamental fairness requires that indigent defendants have "an adequate opportunity to present their claims fairly within the adversary system." *Ross v. Moffitt*, 417 U.S. 600, 612 (1974). In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held that as part of the basic tools of an adequate defense, an indigent defendant has a due process right to the appointment of a psychiatrist to assist him in his defense when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Id.* at

83.   Shortly after deciding *Ake*, the Supreme Court declined to extend *Ake*'s holding to the appointment of a criminal investigator, fingerprint expert, and ballistics expert and declined to address the question of "what if any showing would [entitle] a defendant to [private non-psychiatric] assistance" as a matter of federal constitutional law. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1 (1985) (emphasis added); *see also Hawkins v. Mullins*, 291 F.3d 658, 671 (10th Cir. 2002) (construing *Caldwell* as declining to extend the *Ake* holding); *Weeks v. Angelone*, 176 F.3d 249, 264-65 (4th Cir. 1999) (same).

        In habeas corpus cases decided before the enactment of the AEDPA, federal circuit courts, including the Sixth Circuit, extended *Ake* to non-psychiatric experts.  For example, in *Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993), the Sixth Circuit held that the petitioner was deprived of the opportunity to present an effective defense when he was denied an independent pathologist in order to challenge the government's position as to the victim's cause of death.  With the enactment of the AEPDA in 1996, the petition for writ of habeas corpus may be granted only if the decision of the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States."  Some federal circuit courts have acknowledged that the Supreme Court has not explicitly extended *Ake* to non-psychiatric experts.  *See, e.g., Conklin v. Schofield*, 366 F.3d 1191, 1206 (11th Cir. 2004) ("[T]he Supreme Court has not yet extended *Ake* to non-psychiatric experts."), *cert. denied*, 544 U.S. 952 (2005); *Hawkins*, 291 F.3d at 671 (The Supreme Court has not "specifically" extended *Ake* to investigators and other experts).  Therefore, it is an open question whether the holding in *Ake* applies to requests for non-psychiatric experts.  *See Briseno v. Cockrell*, 274 F.3d 204, 208-10 (5th Cir. 2001) (recognizing that it remains an unsettled question whether the holding in *Ake* applies to requests for expert assistance outside the field of psychiatry).  Because the Supreme

Court has not explicitly extended *Ake* to require the appointment of non-psychiatric experts, Petitioner cannot show that the failure to provide funds for an arson expert was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

C.      Sixth Amendment Right to an Arson Expert

Petitioner also claims that the state's failure to provide public funds for the defense to obtain an arson expert in violation of his Sixth Amendment right to present witnesses. Petitioner raised his Sixth Amendment claim for the first time in his motion for relief from judgment brought pursuant to M.C.R.. 6.500 *et seq*. The Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's applications for leave to appeal on the basis that he "failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." Under M.C.R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." MICH. CT. R. 6.508(D)(3)(a)-(b). In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been appraised of the procedural rule's existence. *Luberda v. Trippett*, 211 F.3d 1004, 1006-1007 (6th Cir. 2000). Because MICH. CT. R. 6.508(D) was enacted in 1989, the rule was "firmly established" at the time of Petitioner's conviction and appeal. *See Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).

Morever, the Sixth Circuit squarely has held that where the Michigan Supreme Court denies leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D)," the court has provided sufficient explanation that the decision was based on procedural default. *Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002); *see also Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000); *Henley v. Stegall*, No. 01-1230, 2002 WL 172724 (6th Cir. Feb. 1, 2002). Accordingly, Petitioner's Sixth Amendment claim was procedurally defaulted. When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *See House v. Bell*, 126 S. Ct. 2064, 2076 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks v. Straub,* 377 F.3d at 551-52 (6th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005). However, like Petitioner's due process claim, I will assume without deciding that there was no procedural default and decide the issue on its merits. *See Lambrix*, 520 U.S. at 525; *Hudson*, 351 F.3d at 212, 215 -216; *Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178.

Petitioner's claim arises under the Compulsory Process Clause of the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. Courts have interpreted the clause to require that a criminal defendant have "the right to present witnesses and evidence in his defense." *U.S. v. Hamilton*, 128 F.3d 996, 1000 (6th Cir. 1997) (citing *Washington v. Texas,* 388 U.S. 14, 19(1967)); *see also Pennsylvania v. Ritchie,* 480 U.S. 39, 56 (1987) ("Our cases establish, at a minimum, that criminal defendants have . . . the right to put before a jury evidence that might influence the determination of guilt." (footnote omitted)). As explained by the Supreme Court, "[f]ew rights are more fundamental than that of an accused to present

witnesses in his own defense." *Taylor v. Illinois,* 484 U.S. 400, 408 (1988) (citing *Chambers v. Mississippi,* 410 U.S. 284, 302 (1973)). But the right to present relevant evidence is not boundless. *Id.* It "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Rock v. Arkansas,* 483 U.S. 44, 55 (1987) (quoting *Chambers,* 410 U.S. at 295). A defendant's noncompliance with "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt or innocence" may prompt a court to curtail the right to present relevant evidence. *Chambers,* 410 U.S. at 302. Excluding relevant evidence for failure to comply with such rules does not violate an accused's right to present a defense so long as those rules are not " 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " *U.S. v. Scheffer,* 523 U.S. 303 308 (1998) (citation omitted).

Here, the trial court did not exclude Petitioner from calling an arson expert.  To the contrary, the trial court granted Petitioner's motion for funds to retain a private investigator and an arson expert.  Because the state, not the county, was undertaking the prosecution in this case, it was reasonable for the court to require the state to pay the fees.  There is no evidence on the record that defense counsel attempted to pursue the matter in the trial court after she received the letter from the prosecutor refusing to pay the expert fee.  Accordingly, I cannot find that the trial court violated Petitioner's Sixth Amendment rights to compulsory process.  I will consider below whether the prosecutor's letter to defense counsel unconstitutionally interfered with the defense and whether trial counsel was ineffective for failing to pursue an arson expert.

## II.    Failure to Investigate

Petitioner asserts that trial counsel was ineffective when she failed to secure an arson expert for the defense.  He further claims that counsel was ineffective when she failed to investigate

and develop facts that would have rebutted the prosecutor's evidence that Petitioner was at the scene minutes before the fire started.

### A.    Procedural Default

Respondent maintains that Petitioner's claims of ineffective assistance of counsel are procedurally defaulted.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst*, 501 U.S. at 801; *Engle,* 456 U.S. at 107.  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks,* 377 F.3d at 551; *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either show:  (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House*, 126 S. Ct. at 2076*; Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 126 S. Ct. at 2076-77.  A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely

than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner first raised his claims of ineffective assistance of counsel in his motion for relief from judgment brought pursuant to M.C.R.. 6.500 *et seq*.  The Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's applications for leave to appeal on the basis that he "failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)."  Under M.C.R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal.  For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand."  MICH. CT. R. 6.508(D)(3)(a)-(b).  In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been appraised of the procedural rule's existence.  *Luberda v. Trippett*, 211 F.3d at 1006-1007.  Because MICH. CT. R.  6.508(D) was enacted in 1989, the rule was "firmly established" at the time of Petitioner's conviction and appeal.  *See Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).  Morever, where the Michigan Supreme Court denies leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MICH. CT. R.  6.508(D)," the court has provided sufficient explanation that the decision was based on procedural default.  *Burroughs*, 282 F.3d at 414; *see also Simpson*, 238 F.3d at 407; *Henley,* 2002 WL 172724.  Accordingly, Petitioner's claims of ineffective assistance of trial counsel are procedurally defaulted.

When a petitioner has procedurally defaulted in the state courts, the federal habeas court will entertain the defaulted issue only if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *See House*, 126 S. Ct. at 2076; *Murray,* 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52.   To show cause sufficient to excuse a failure to raise claims on direct appeal, petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).   Petitioner alleges that appellate counsel was ineffective for failing to raise the issue in his direct appeal.[3]   Petitioner also raised his claim of ineffective assistance of appellate counsel for the first time in his motion for relief from judgment.   While Petitioner exhausted his claim of ineffective assistance of appellate counsel by raising his claim at each level of the state courts, the issue is procedurally defaulted because review of the claim was denied by the Michigan appellate courts pursuant to Mich. Ct. R. 6.508(D). Nevertheless, Petitioner's claim of ineffective assistance of appellate counsel may serve as cause to excuse a procedural default.  *See Whiting v. Burt,* 395 F.3d 602, 615 n.7 (6th Cir. 2005); *Deitz v. Money,* 391 F.3d 804, 810 (6th Cir. 2004); *Munson v. Kapture,* 384 F.3d 310, 315 n. 2 (6th Cir. 2004), *cert. denied*, 544 U.S. 1002 (2005); *Hicks*, 377 F.3d at 558 n.17.

In order for Petitioner's claim of ineffective assistance of appellate counsel to serve as cause for defaulting his claims of prosecutorial misconduct, he must show that his appellate counsel's failure to raise the instances of prosecutorial misconduct rose to the level of a constitutional violation under *Strickland v. Washington*, 466 U.S. 668 (1984).  *See McFarland v.*

---

[3] Petitioner contends that his appellate counsel was ineffective for failing to raise on direct appeal the issues raised in his motion for relief from judgment, including his claims of ineffective assistance of trial counsel and prosecutorial misconduct.   Petitioner's claims of ineffective assistance of appellate counsel will be discussed contemporaneously with the underlying claims.

*Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).  To establish a claim of ineffective assistance of counsel under *Strickland*, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Strickland*, 466 U.S. at 687-88. Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.  *See McFarland*, 456 F.3d at 699 *(*citing *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).  Thus, in order to decide whether Petitioner can present his claims of ineffective assistance of trial counsel, I must decide whether there is a reasonable probability that the claims would have prevailed at the time appellate counsel failed to raise them.  *See McFarland*, 356 F.3d at 699.  If there is a reasonable probability that Petitioner would have prevailed on appeal had the claim been raised, I must consider whether the claims were so compelling that appellate's counsel's failure to raise them constituted ineffective assistance of counsel that would excuse Petitioner's default.  *Id.* at 700.

     1.  **Failure to retain an arson expert**

     The two-part *Strickland* standard also applies to Petitioner's claim of ineffective assistance of trial counsel.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The Court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even

- 35 -

if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Petitioner's first two claims of ineffective assistance of trial counsel concern counsel's pre-trial investigation. He claims that counsel was ineffective for failing to investigate the time that Petitioner came back to the house for the second time and for failing to retain an arson expert for his defense. It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690). The Supreme Court stated in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.,* at 690-691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *accord Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004), *cert. denied*, 543 U.S. 1177 (2005). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

The Courts have not hesitated in finding ineffective assistance under the *Strickland* standard when counsel fails to conduct a reasonable investigation into one or more aspects of the

case and when that failure prejudices his or her client.  For example, the Supreme Court has applied *Strickland* at least three times to hold that a defense attorney's failure to adequately investigate and present mitigating evidence at the sentencing phase of a death penalty trial constitutes ineffective assistance of counsel. *See Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Williams,* 529 U.S. at 390.  According to the *Wiggins* Court, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentence strategy impossible." *Wiggins*, 539 U.S. at 527-28.

Consistent with the *Wiggins* line of cases, the Sixth Circuit has held, in a variety of situations, that counsel's failure to investigate constituted ineffective assistance in violation of the Sixth Amendment. *See, e.g., Ramonez v. Berghuis*, __ F.3d __, 2007 WL 1730096 (6th Cir. June 18, 2007) (holding that defense counsel was constitutionally ineffective for failing to investigate three potentially important eye witnesses); *Towns v. Smith*, 395 F.3d 251, 258-59 (6th Cir. 2005) (holding that defense counsel's failure to investigate potentially important witness in robbery and felony murder trial was unreasonable, and thus constituted ineffective assistance, in violation of Sixth Amendment); *Combs*, 205 F.3d at 287-88 (holding that defense counsel was constitutionally ineffective for failing to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992) (holding that counsel was constitutionally ineffective for failing to conduct an investigation into certain physical evidence that would have undermined the prosecution's theory that the victim was shot at a distance); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (holding that counsel's failure "to investigate a known and potentially important alibi witness" constituted ineffective assistance because "[c]ounsel did not make any attempt to investigate this known lead,

- 37 -

nor did he even make a reasoned professional judgment that for some reason investigation was not necessary"); *see also Clinkscale*, 375 F.3d at 443 (collecting cases in which counsel's failure to investigate a potentially important witness constituted ineffective assistance).

Petitioner contends that trial counsel's failure to retain an arson expert as part of her investigation of Petitioner's case constituted ineffective assistance of counsel. Petitioner was charged with two counts of first-degree felony murder, which carried a mandatory sentence of life imprisonment without the possibility of parole. The elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in the statute. *People v. Nowack,* 614 N.W.2d 78, 82 (Mich. 2000). Arson is an enumerated felony. MICH. COMP. LAWS § 750.316(1)(b). The elements of arson are: (1) defendant set fire to a building, (2) the building was a dwelling house, and (3) when defendant burned the dwelling, he intended to set a fire knowing this would cause injury or damage to another person or property, and defendant acted without just cause or excuse. *Nowack*, 614 N.W.2d. at 82.

Thus, the critical issues in Petitioner's case were whether the fire was intentionally started and, if so, whether Petitioner started it. Petitioner had two potential defenses. He could allege that the fire was not arson, the "not arson" defense, or that someone else set the fire, the "other perpetrator defense." The two defenses are not mutually exclusive. Defense counsel's August 28, 1996, letter to Petitioner shows that she initially considered both defenses. At trial, defense counsel stopped short of conceding that the fire was arson, but she did not retain an arson expert in preparing for her cross-examination of the state's arson experts or call an arson expert to testify at trial. In light of Holly Mony's testimony, Defense counsel pursued the possibility that Petitioner started the fire

- 38 -

accidentally by dropping a lit cigarette while sleeping on the couch located on the front porch of the residence. Petitioner's defense relied primarily upon the "other perpetrator" defense, i.e., that one or more of the residents set the fire for insurance money. The Court must decide whether, given the particular facts of this case, defense counsel fell below an objective standard of reasonableness by inadequately investigating the "not arson" defense before deciding not to retain an arson expert. The question is not whether counsel should have presented the "not arson" defense. Rather, the Court must focus on whether the investigation supporting her pursuit of the defense was itself reasonable. *Cf. Wiggins*, 539 U.S. at 523.

In assessing the constitutional significance of counsel's investigation of the "not arson" defense, the court must recognize that "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla,* 545 U.S. at 383 (finding attorneys' failure to investigate material they knew that the prosecution would rely on was ineffective). Furthermore, reasonably diligent counsel are not always required to consult an expert as part of pretrial investigation in a case involving the use of expert witnesses by the state. "A defendant's lawyer does not have a duty in every case to consult experts even if the government is proposing to put on expert witnesses. There may be no reason to question the validity of the government's proposed evidence or the evidence may be so weak that it can be demolished on cross-examination." *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) (Posner, J.) (citations omitted) (finding defense counsel's failure to consult scientific experts constituted deficient performance where defense was that defendant was not present at scene of crime), *remand order modified by stipulation,* 268 F.3d 485 (7th Cir. 2001).

In a case that is strikingly similar to this one, the First Circuit found that defense counsel was constitutionally ineffective for failing to consult an arson expert as part of his

investigation of an arson charge. *See Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005). Dugas was charged with arson after a fire at the supermarket that he managed and co-owned. *Id.* at 320. Dugas retained counsel who pursued both the "not arson" and "other perpetrator defenses." While counsel initially considered retaining an arson expert for the defense, he ultimately did not hire an expert to testify for the defense about the state's evidence on arson. *Id.* at 323. He did not consult an expert in preparing his cross-examination of the state's arson experts, nor did he conduct the research required to understand the principles of arson investigation on his own. *Id.* Like this case, "the state's strongest evidence was its expert testimony on arson; the balance of its evidence was relatively weak." *Id.* Defense counsel confined his challenge of the state's arson evidence to cross-examination of the state's arson experts. Through cross-examination, he attempted to raise the possibility that the fire started accidentally. *Id.* at 324. Defense counsel also presented evidence pursuant to the defense theory that another person may have caused the fire. *Id.* After three days of deliberation, the jury found Petitioner guilty of arson. *Id.* at 325.

After Dugas' conviction was affirmed on appeal, he filed a motion for a new trial in the trial court claiming that his trial counsel was ineffective by inadequately pursuing the "not arson" defense, particularly due to the lack of expert consultation. *Dugas*, 428 F.3d at 325. Defense counsel testified at the hearing on Petitioner's motion. Counsel admitted that he had not given the "not arson" defense enough consideration at the time, that he was overly confident in the strength of his case and admitted that he had placed too much reliance on his second theory of the case, the "other perpetrator" defense. *Id.* at 325. The trial court denied Petitioner's motion, finding that trial counsel's decision not to hire an expert was a strategic decision. *Id.* at 326. Because the state court found that counsel's conduct was not objectively unreasonable, it did not address prejudice. *Id.* On habeas corpus review, the district court found that defense counsel's performance was deficient and

that the state's conclusion to the contrary was an unreasonable application of the *Strickland* standard. However, the district court found that Dugas was not prejudiced as the result of his counsel's deficient performance and denied Dugas' habeas petition.

On appeal, the First Circuit concluded that counsel's failure to thoroughly investigate the "not arson" defense and seek expert assistance was constitutionally deficient and that the state court's decision to the contrary was an unreasonable application of *Strickland*. *Dugas*, 428 F.3d 329. The First Circuit cited several reasons in support of its decision, many of which apply with equal force in this case. The court first reasoned that challenging the state's arson case was crucial to Dugas' defense. *Id.* at 329. The court noted that the only other defense, the "other perpretator" defense, "is often difficult to mount and fraught with evidentiary problems." *Id.* Second, the arson evidence was the cornerstone of the state's case. Other than the arson evidence, the state had little evidence to support its case. *Id.* The First Circuit also found that defense counsel lacked knowledge and experience in arson investigation and arson cases, was aware that a layperson would be likely to view the scene as an arson, and had at least some reason to believe that there were problems with the state's arson case. *Id.* at 329-31. The First Circuit squarely rejected the state's argument that counsel's decision to curb his investigation of the arson was an informed, tactical decision. *Id.* at 331. The court vacated the decision of the district court and remanded for further proceedings on the question of prejudice. *Id.* at 343.

Like *Dugas*, I find that trial counsel's failure to thoroughly investigate the "not arson" defense and retain an arson expert in this case was constitutionally deficient for several reasons. First, the issue of arson was central to Petitioner's case. If the prosecutor could not have proven arson beyond a reasonable doubt, Petitioner would have been acquitted of all charges. In her letter to Petitioner dated August 28, 1996, defense counsel appeared to be pursuing both the "not arson"

and "other perpetrator" defenses.  (8/28/96 Letter, Exhibit J, docket #2.)  Counsel informed

Petitioner of her plans to retain a private investigator and an expert in cause and origins of fire.  She

explained that "[b]oth the PI and the arson expert will be very helpful to help us prove that the home

owner had a motive to burn the house for insurance money and to help us in many other ways." *Id.*

Defense counsel told Petitioner that she would discuss cause and origin of the fire with the arson

expert.  Counsel stated that the arson expert was "essential to [Petitioner's] defense." *Id.*  At that

time, counsel had not yet retained an arson expert, but expressed her intent to retain Richard Harris.

Forty-four days after defense counsel wrote her letter to Petitioner, she received the

letter from the assistant attorney general stating that he would not assist with payment for the

investigator or the arson expert.  While the prosecutor's letter may have presented an obstacle to

retaining an arson expert, it was incumbent on defense counsel to pursue the matter with the trial

court.  On direct review of Petitioner's claim that his due process rights were violated when public

funds were not provided for an arson expert, the Michigan Court of Appeals found that defendant

abandoned his attempt to obtain funds for an arson expert:

> [D]espite the significance of expert testimony on the fire's origin, defendant did not
> object to the order nor did defendant request any pretrial relief in response to the
> attorney general's alleged noncompliance with the trial court's order. Defendant
> neither attempted to retain an expert nor filed a claim with the administrative law
> board for reimbursement as provided by M.C.L. § 600.6419(1); MSA 27A.6419(1).
> Defendant's argument consists of unsubstantiated statements that both the state and
> Calhoun County erected "roadblock after roadblock" to prevent his attorney from
> securing an expert. On the contrary, it appears from the record that defendant
> abandoned his attempt to collect the fees.  Because defendant did not raise or pursue
> this issue below, it has not been preserved for appellate review.

*People v. Babick*, No. 207638, 1999 WL 33437948, at *2 (Mich. Ct. App. Aug. 13, 1999).  Because

the issue of ineffective assistance of trial counsel was not raised on direct appeal, the Michigan Court

of Appeals did not address the issue.[4]  Given the seriousness of the charges against Petitioner and the significance of the arson issue, defense counsel's failure to retain an arson expert was objectively unreasonable.

Second, the testimony of the prosecutor's arson experts was the foundation of the state's case.  To prove that the fire was intentionally set, the prosecutor called two witnesses who gave expert testimony on fire cause and origin:  Wayne Etue of the Michigan State Police, Fire Marshall Division; and Joan Tuttle, a fire inspector with the Battle Creek Police Department.  The experts testified that, based on the burn patterns they observed, a liquid accellerant was poured on the front porch and throughout the house.  (Tr. I, 217-19; Tr. II, 27-30, 54.)  However, there was little physical evidence to support their theory.  No accellerant containers were found at the scene of the fire.  Moreover, out of eighteen samples taken by the Michigan State Police, only one sample taken from outside on the front porch tested positive for accellerants.  (Tr. II. 37.)  According to the trace evidence analyst, the sample contained a medium to heavy petroleum distillate, such as charcoal lighter or kerosene.  (Tr. V, 60-61.)  According to the analyst, the substance she detected could have been lighter fluid that was used to light a barbecue.  (Tr. V, 67.)  Belinda Sutton, testified that they used a barbecue in their front yard.  (Tr. III, 79.)  Moreover, while the arson experts opined that accellerants were poured throughout the first floor of the house and up the stairs, the occupants on the second floor of the house did not hear anyone inside the house before the fire started.

The prosecutor also called Jeff Austin, who testified as an expert in handling a canine trained to detect accelerants.  (Tr. IV, 80.)  Austin testified that his dog, Samantha, reacted positively for accelerants on the ground in front of the front step, the top of the front steps, the front door jamb,

---

[4] Petitioner raised his claims of ineffective assistance of trial counsel for the first time in his motion for relief from judgment.  According to the trial court record, Petitioner did not move for an evidentiary hearing on his claims of ineffective assistance in the state courts.

the living room, step two going up the stairs to the second floor, and step eight on the top of the landing. (Tr. IV, 88.) Austin testified that there have been previous instances in which an accelerant was detected by Samantha, but was not detected by the crime lab. (Tr. IV, 85.) He claimed that lab equipment used to examine fire debris for flammable liquids will detect parts per million, while the canine can detect parts per billion. (Tr. IV, 84.) Given the negative lab results, Austin's testimony was significant in establishing the presence of accellerants inside the house. Other than suggesting that the flammable liquids detected by Samantha could have been tracked into the house on the bottom of people's shoes (Tr. IV, 96-98.), defense counsel did little on cross-examination to refute Austin's testimony. Without an expert, counsel could not challenge the accuracy of the dog detection evidence or Austin's representation that Samantha was a thousand times more accurate in detecting accellerants than laboratory testing.

Third, without an arson expert, the defense could not effectively advance its theory that Petitioner may have started the fire accidentally when he dropped a lit cigarette while sleeping on a couch on the front porch of the house. The prosecutor elicited testimony from his two arson experts and Lieutenant Larry Hausman of the Battle Creek Fire Department to refute Petitioner's theory that he may have accidentally started the fire by dropping a lit cigarette while he was sleeping on a couch on the front porch. All three of the witnesses opined that the couch was not the origin of the fire. (Tr. I, 190-91, 211; Tr. II, 56.) Hausman and Tuttle testified that a cigarette likely would smolder on a couch for a couple of hours before catching fire. (Tr. I, 181-82, 190-91; Tr. II, 56-57.) Etue testified that under ideal conditions, a cigarette left on a couch could start a fire in about forty-five minutes, but it easily could take two hours under non-ideal conditions. (Tr. II, 26, 41.) Etue further opined that the couch was not the point of origin for the fire because there was no burning on the floor underneath the couch. (Tr. I, 210-211.) Without their own expert, the defense was

unable to respond to or refute this testimony.   According to the experts, the fire started at about 1:50 a.m. (Tr. II, 31.)  Given Belinda  Sutton's testimony that Petitioner came back to the house at 1:30 a.m., there would not have been enough time for a fire to start in the couch.  As a result, Petitioner's accident theory was completely negated by the state's experts.

Respondent argues that counsel's decision not to retain an arson expert  "was likely a tactical abandonment."  (Supp. Answer, 4, docket #39).  According to Respondent, in light of the "overwhelming" evidence of arson, the issue of arson was not seriously contested.  *Id.*  Rather, Respondent opines that the defense theory was that someone other than Petitioner set the fire.  Respondent argues that this Court should not second-guess counsel's theory of defense.  However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690.  For the reasons cited above, defense counsel's failure to thoroughly investigate the "not arson" defense and hire an arson expert cannot be considered a reasonably informed tactical decision.   Moreover, the evidence of arson was far from overwhelming and rested almost entirely on the opinions of the state's experts.

### 2.        Failure to investigate time line before the fire started

Petitioner also claims that defense counsel also was ineffective for failing to investigate and develop facts that would have rebutted the prosecutor's evidence placing Petitioner at the scene minutes before the fire.  In this case, the most damaging evidence against Petitioner was the combination of the expert's testimony that the fire had started at about 1:50 a.m. and the testimony of Belinda Sutton that Petitioner came to the door at 1:30 a.m. and was angry because Quicky had sold him some bad crack.  (Tr. III, 72.)  At the preliminary examination, Sutton first testified that Petitioner came back the second time at around 12:00 a.m.  (Preliminary Tr. II, 10,

- 45 -

docket #15.)  After the prosecutor refreshed her recollection with the statements that she gave police the day after the fire, Sutton testified that Petitioner came back at 1:30 a.m.  (Preliminary Tr. II, 10-12.)  On cross-examination, defense counsel and Sutton had the following exchange concerning the second time that Petitioner came back the house:

Q:    Now when you were initially asked about when you woke up to go downstairs to answer the door this -- later on, after Quickie had left, you said 12:00 midnight or 12:00 a.m.; correct?

A:    Well it would have been around 1:30.

Q:    Well, you said 1:30 after the prosecutor showed you what you had told the police.

A:    That's because he had to refresh my memory cuz that -- so it was way in Sep -- September.  That was the next day so I knew more the next day than now.

Q:    But initially you testified 12:00 o'clock; right?  And it's only because you looked at a police report you're now saying 1:30; is that correct?

A:    Yes.  That's because that's what I said the next day.

Q:    Did you actually look at the clock at the time of the incident when you went to answer the door?

A:    I knew what was on T.V. so I know around what time it was.

Q:    You were watching television?

A:    No, I wasn't.

Q:    But you figured out the time based on watching television.  I -- I don't understand.  What does the television have to do with it, could you tell me?

A:     The time a show comes on.  It'd have to be around that time.

Q:    So you -- are indicating that television was on in the house at 1:30 in the morning?

A:    Yes, I slept with it on.

Q:    Okay.  Weren't you sleeping upstairs.

A:    Yes.

Q:    Was there a television in your bedroom?

A:    Yeah.

Q:    And when you woke up because of the knock downstairs, you indicated there was a show on.  What was the show?

A:    It was Richard Bey.

Q:    Which was it?

A:    Richard Bey.

Q:    What channel is that?

A:    From 17.

Q:    Okay.  Was it toward the end of the show?  The beginning of the show?

A:    No, it was at the end.

(Preliminary Examination Tr. II, 29-30, docket #15.)

At trial, Sutton first testified that Petitioner came back to the house at about 12:30

a.m. (Tr. III, 70.) The following exchange took place between the prosecutor and Sutton:

Q:    Can you tell me what time it was that you had this conversation the second
       time with Mr. Babick?

A:    Had to be about 12:30.

Q:    12:30?

A:    Around then, can't remember.

Q:    Do you remember talking to police officers the next morning after the fire
       about what time it might have been that you met with Mr. Babick?

A:    I remember talking to them about it, yes.

Q:    If you saw a copy of that police report would that help you remember what
       time that was that you told them you believed it was that you were meeting
       with Mr. Babick?

A:    Yes.  Oh, okay.

Q:    Does that help refresh your memory?

A:    Yes.

Q:    At the time you talked to the police officers and they made this report, did
       you have a good idea what time that was that Mr. Babick came to your house
       that night, the second time?

A:    Yes.

Q:    What did you tell the police officers was the time he showed up?

A:    Told them one-thirty.

Q:    One-thirty.  And how was that you were able to know what time he came
       back?

A:    Cause it was certain TV that came on around that time.

Q:    Do you remember what TV show that you were watching?

A:    Yes.

Q:    But at the time the morning after the fire did you remember?

A:    Yes.

Q:    It was what you used to assess the time for the police officers?

A:    Yes.

Q:    What was the time you told them?

A:    One-thirty.

(Tr. III, 70-71.)

It was clear from Sutton's testimony at the preliminary examination and at trial that

she was relying on the show that was on television to determine the time that Petitioner came back

to the house.  Petitioner's wife questioned Sutton's preliminary examination testimony regarding the

time of the Richard Bey show and attempted to obtain the television show listings for the night of

the fire.  (Affidavit of Traci Lynn Babick, Exhibit O, docket #2.)  Mrs. Babick shared her concerns with defense counsel before the trial, but counsel did not conduct any further investigation regarding the timing of the Richard Bey show.  *Id.*  Mrs. Babick ultimately obtained a copy of the television listing after the trial which shows that the Richard Bey show was on from midnight to 1:00 a.m. (Fox Television Listings, Exhibit S, docket #2.)  Therefore, if Petitioner came to the door while the Richard Bey show was on, he had to be there before 1:00 a.m., not 1:30 a.m. as Sutton testified. Petitioner maintains that had defense counsel conducted a reasonable investigation of when the Richard Bey show was on the air that night she could have rebutted the prosecutor's evidence placing him at the scene of the crime shortly before the fire allegedly started.

The time line was crucial in this case.  The closer in time that prosecutor could place Petitioner to the fire, the stronger the inference that Petitioner was the person who started the fire. Sutton's testimony was the only evidence placing Plaintiff at the scene shortly before the fire started. After Sutton testified at the preliminary examination that she knew Petitioner came back at 1:30 a.m. because of the show that was on television, it was unreasonable for trial counsel not to investigate the time that the Richard Bey show aired.  A simple investigation of the television listings on the night of the fire would have revealed the inconsistency in Sutton's testimony.  By impeaching Sutton with the television listing for that night, defense counsel would have cast serious doubt on Sutton's testimony regarding the time that Petitioner returned to the house.  Petitioner's connection to the fire becomes much more attenuated if he returned to the house an hour or more before the fire. Moreover, the longer time gap between Petitioner's return and the start of the fire would have supported Petitioner's theory that he may have accidentally started the fire by dropping a cigarette on the couch located on the front porch.  The prosecutor's experts testified that it would take as little as forty-five minutes, but more likely two hours or more for a cigarette to ignite a couch on fire.

(Tr. I 181-82; Tr. II, 26, 41, 57.)  Accordingly, trial counsel's failure to investigate the prosecutor's time-line also fell below an objective standard of reasonableness.

To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Therefore, the prejudice inquiry must not focus solely on mere outcome determination; attention must be given to "whether the result of the proceeding was fundamentally unfair or unreliable." *Id.* at 369.

In this case, Petitioner clearly was prejudiced by his trial counsel's failure to conduct a proper pre-trial investigation.  Both the lack of an arson expert and trial counsel's failure to rebut the prosecutor's time-line leading up to the fire were devastating to the defense.  The evidence against Petitioner was weak, as evidenced by the county prosecutor's decision not to bring charges against Petitioner.  "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  *Strickland,* 466 U.S. at 696.  As previously discussed, the state's case hinged upon the opinion testimony of their arson experts, which went virtually unrebutted.  As discussed above, there was very little physical evidence of arson at the scene.  In addition, there was virtually no other physical evidence linking Petitioner to the fire.  Several items were seized from Petitioner's home and sent to the lab for testing.  Two pairs of Petitioner's shoes tested positive for a mid-range petroleum distillate, such as lighter fluid or charcoal.  (Tr. V, 61-62.)  However, the analyst could not give conclusive results because the positive result may have been caused by the lab when the shoes were placed in heat-sealed

packaging. (Tr. V, 62-63, 68.) As the result of trial counsel's errors, the result of the proceeding was fundamentally unfair. I find, therefore, that Petitioner likely would have prevailed on appeal had his appellate counsel raised his first two claims of ineffective assistance of trial counsel.

### 3.    Ineffective assistance of appellate counsel

Having concluded that Petitioner likely would have prevailed on appeal if counsel had argued the ineffective assistance of trial counsel for failure to conduct adequate pre-trial investigation, I must decide whether appellate counsel's failure to raise the issues on appeal was sufficiently unreasonable to violate Petitioner's constitutional rights. *McFarland*, 356 F.3d at 710. Failure of appellate counsel to raise an issue can amount to constitutionally ineffective assistance. *E.g., Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003); *Lucas v. O'Dea,* 179 F.3d 412, 419 (6th Cir. 1999); *Mapes v. Coyle,* 171 F.3d 408, 427-29 (6th Cir. 1999). However, counsel has no obligation to raise every possible claim, *see Jones v. Barnes,* 463 U.S. 745, 751-54 (1983), and the decision of which among the possible claims to pursue is ordinarily entrusted to counsel's professional judgment, *see Smith v. Murray,* 477 U.S. 527, 536 (1986). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith*, 477 U.S. at 536 (quoting *Jones*, 463 U.S. at 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. The Supreme Court has observed that it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2002). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289.

I find that appellate counsel's ineffectiveness was the cause for Petitioner's failure to raise the ineffectiveness of trial counsel on appeal. While appellate counsel raised six claims on direct appeal, defense counsel's failure to investigate was the most, or at least one of the most, significant error that occurred in Petitioner's case and clearly should have taken precedence over the majority of claims presented on appeal. While appellate counsel claimed on appeal that Petitioner's due process rights were violated when the state failed to provide public funds for an arson experts, trial counsel's failure to pursue those funds and retain an arson expert was equally as serious. Moreover, given the lack of evidence against Petitioner, counsel's failure to investigate the time line before the fire was a critical error that should have been raised on direct appeal. Because I already concluded that the ineffectiveness claim was meritorious and likely would have resulted in reversal of Petitioner's conviction on appeal, there is no question that appellate counsel's errors were prejudicial. Because Petitioner has shown cause and prejudice for his failure to raise the claim on direct appeal, his claim of ineffective of trial counsel is not barred from review by this Court.

B.    Merits Review

Turning to Petitioner's underlying claim of ineffective assistance of trial counsel, I first must determine the applicable standard of review. As set forth above, Petitioner raised his claim in his motion for relief from judgment, which was rejected at each level of the state courts on procedural grounds. Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court

actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Durr v. Mitchell*, 487 F.3d 423, 432 (2007) (deferential review under the AEDPA applies only when the state court has adjudicated a claim on the merits); *Wiggins*, 539 U.S. at 534 (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts). Because Petitioner's claim of ineffective assistance of trial counsel was never "adjudicated on the merits," it must be reviewed de novo. *See Howard v. Bouchard*, 405 F.3d 459, 475 (6th Cir. 2005) (applying *de novo* standard to claim that was defaulted pursuant to MICH. CT. R. 6.508(D)), *cert. denied*, 126 S. Ct. 1032 (2006).

In the course of the procedural default analysis, I applied the two-part *Strickland* test to Petitioner's claims of ineffective assistance of trial counsel for failure to conduct an adequate investigation and found that his trial counsel was constitutionally ineffective for failing to thoroughly investigate the "not arson" defense and retain an arson expert, and for failing to investigate Sutton's testimony regarding the time that Petitioner returned to the house. In addition, I found that counsel's performance rendered the proceedings fundamentally unfair. Accordingly, I recommend that the Court grant Petitioner relief on his first two claims of ineffective assistance of trial counsel.

III.    **Use of False Evidence to Obtain Arrest Warrant**

First, Petitioner claims that the prosecutor used false evidence to obtain an arrest warrant.[5]  Specifically Petitioner contends that the affidavit submitted by the prosecutor contained the following false statement: "The forensic laboratory of Michigan State Police analyzed samples of flooring taken from the home and determined that it contained "medium to heavy distillate – these include charcoal lighter fluids and kerosene." (*See* Arrest Warrant Affidavit, Exhibit H, docket #2.) Petitioner maintains that none of the floor samples submitted to the state police lab tested positive for accelerants.  Petitioner further claims that the prosecutor used the false evidence at trial to argue that Petitioner, who was upset with "Quickie" for cheating him out of ten dollars on a drug deal, grabbed  a can of lighter fluid and set the house on fire.

Wayne Etue, an expert in the determination of fire cause and origin with the Michigan State Police, testified that out of eighteen samples taken from the flooring of the house, only one taken from the front porch came back positive for an accelerant.  (Tr. II, 37.)  Therefore, while the prosecutor's statement contained in the arrest warrant affidavit is arguably exaggerated, it was not completely false.  Moreover, while there was little physical evidence supporting the presence of accelerants, the prosecutor presented other evidence at trial to support his theory that liquid accelerants were used to start the fire.  Both of the prosecutor's experts, Wayne Etue and David Adams, opined that a liquid accellerant was used to start the fire.  (Tr. I, 214-19; Tr. II, 27-30, 54.) The prosecutor also presented evidence that a police dog trained to detect accelerants alerted to

---

[5] Like Petitioner's claims of ineffective assistance of counsel, petitioner's claims of prosecutorial misconduct are procedurally defaulted because they were raised for the first time in Petitioner's motion for relief from judgment. With regard to this claim of prosecutorial misconduct, the Court will assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Lambrix,* 520 U.S. at 525; *Hudson*, 351 F.3d at 212, 215 -216; *Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178.

several locations in the house.  (Tr. IV, 88.)  Prosecutors are allowed to argue reasonable inferences from the evidence.  *See Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000).  In light of the evidence presented at trial, it was not improper for the  prosecutor to offer the theory that Petitioner used lighter fluid to start a fire at the house because he was dissatisfied with the drugs sold to him by LuQuentine Caldwell.  Because the prosecutor did not engage in misconduct, appellate counsel was not ineffective for failing to raise this claim of prosecutorial misconduct on direct appeal.

IV.   **Interference with Defense**

Petitioner claims that the prosecutor engaged in misconduct when he interfered with the defense by refusing to comply with the trial court's order regarding payment for an arson expert.

A.   Procedural Default

Petitioner raised his claims of prosecutorial misconduct for the first time in his motion for relief from judgment.  As discussed above, the claims raised for the first time in Petitioner's motion for relief from judgment are procedurally defaulted because the Michigan appellate courts relied upon MICH. CT. R. 6.508(D) in denying Petitioner's applications for leave to appeal.  When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence.  *See House*, 126 S. Ct. at 2076*; Murray,* 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52.  To show cause sufficient to excuse a failure to raise claims on direct appeal, the petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal.  *Murray*, 477 U.S. at 488.

Petitioner alleges that appellate counsel was ineffective for failing to raise this issue in his direct appeal.  Petitioner also raised his claim of ineffective assistance of appellate counsel for the first time in his motion for relief from judgment.  While Petitioner exhausted his claim of ineffective assistance of appellate counsel by raising his claim at each level of the state courts, the issue is procedurally defaulted because review of the claim was denied by the Michigan appellate courts pursuant to Mich. Ct. R. 6.508(D).  Nevertheless, Petitioner's claim of ineffective assistance of appellate counsel may serve as cause to excuse a procedural default.  *See Whiting*, 395 F.3d at 615 n.7; *Deitz,* 391 F.3d at 810; *Munson,* 384 F.3d at 315 n.2, 316; *Hicks,* 377 F.3d at 558 n.17.

In order for Petitioner's claim of ineffective assistance of appellate counsel to serve as cause for defaulting his claim of prosecutorial misconduct, he must show that his appellate counsel's failure to raise the claim on direct appeal was constitutionally ineffective under the *Strickland* standard.  *See McFarland*, 356 F.3d at 699.  Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.  *See McFarland*, 456 F.3d at 699 *(*citing *Greer*, 264 F.3d at 676).  Thus, in order to decide whether Petitioner can present his claims of ineffective assistance of counsel, I must decide whether there is a reasonable probability that the claim would have prevailed at the time appellate counsel failed to raise it.  *See McFarland*, 356 F.3d at 699.  If there is a reasonable probability that Petitioner would have prevailed on appeal had the claim been raised, I must consider whether the claim's merit was so compelling that appellate counsel's failure to raise it constituted ineffective assistance of counsel that would excuse Petitioner's default.  *Id.* at 700.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). A prosecutor may violate a defendant's due process rights if he interferes with the defense's presentation of witnesses. *See Chambers v. Mississippi,* 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."); *see also United States v. Foster,* 128 F.3d 949, 953 (6th Cir. 1997) ("[Go]vernmental conduct which amounts to a substantial interference with a witness'[s] free and unhampered determination to testify will violate due process.")

Because the state attorney general's office prosecuted this case after the Calhoun County Prosecutor declined to do so for lack of evidence, a statute became applicable that allowed the court to order the state to pay trial costs. MICH. COMP. LAWS § 775.21.[6] Defendant obtained two $500 orders for costs, one for a private investigator and one for an arson expert. Before trial, defense counsel sent a letter to the assistant attorney general prosecuting the case indicating that she would be forwarding the bills from her experts for reimbursement by the state. In a letter dated less than a month before trial began, the assistant stated that his office was "unable, either factually or by law, to accept these bills for payment." According to the assistant, it would be a conflict of interest to process expenses of a criminal defense through the prosecution office. He advised defense counsel

---

[6] For the full background facts and procedural history surrounding Petitioner's request for funds to pay for an arson expert in this case, see Part I(A) of the Discussion.

to submit the order to the State Administrative Board.  He also gave defense counsel the following warning, "You should be warned, however, that there is recent precedent where a judge ordered the State of Michigan to pay funds under this provision and the bill was submitted to the state administrative board, which then disallowed the payments. Where such a situation develops, your only recourse is to sue the State of Michigan in the Court of Claims."

What the assistant attorney general's letter did not mention is that the State Administrative Board considers claims under $1,000 against the state "upon the advice of the attorney general."  MICH. COMP. LAWS § 600.6419(1).  Therefore, it was within the assistant's discretion whether to allow payment of $500.00 each for the investigator and arson expert. Respondent argues that under *People v. Loyer,* 425 N.W.2d 714 (Mich. Ct. App. 1988), it is a conflict of interest for an assistant attorney general to secure public funds for expert witnesses for an indigent defendant.  However, there is a critical difference between the circumstances presented in this case and those in *Loyer.*  At one point, M.C.L. § 775.15 required an indigent defendant to disclose information about his potential witnesses so that the prosecutor could give the trial court an opinion about the materiality of each witness. Defendants with means did not have to make similar disclosures. In *Loyer,* the Court of Appeals declared MICH. COMP. LAWS § 775.15 unconstitutional on equal protection grounds. *Loyer,* 425 N.W.2d at 722.  Unlike the statute in *Loyer,* neither MICH. COMP. LAWS  § 775.21 nor MICH. COMP. LAWS § 600.6419(1) require an indigent defendant to disclose information to the prosecution or has been found unconstitutional.

While Respondent touts the assistant's cooperation in obtaining payment for Petitioner's private investigator, it took more than three years for the State Administrative Board to pay the fees for the private investigator retained by defense counsel.  Pursuant to MICH. COMP. LAWS

§ 600.6419(1), the State Administrative Board contacted the assistant regarding the bill.  According to Respondent, the assistant orally verified the bill and recommended payment.  Three years later, the assistant again was contacted by the State Administrative Board regarding the bill for Petitioner's investigator.  The assistant then wrote a letter to the State Administrative Board objecting to the trial court's order, but reluctantly recommending payment.  The letter stated in part:

> While I have a problem with the judge ordering that this bill be paid by the state, the judge has actually created a no-win situation for the state where, if we object to the bill, we could create a viable issue on criminal appeal which might jeopardize a murder conviction.  If we approve it, the state must pay the bill.  It is my opinion that it is better here to pay this reasonable and relatively minor bill and thereby avoid any inflated, legal issues.

(Respondent's Answer, 12, docket #11.)

In this case, the defense was not required to disclose information to the prosecution in order to obtain funds for his arson expert.  The prosecutor did not oppose Petitioner's motion for funds or object to the trial court's order granting the motion.  Therefore, in light of the trial court's order granting Petitioner's motion for funds for a private investigator and an arson expert, the prosecutor was obligated to recommend payment of the bills to the State Administrative Board.  His failure to do so was a blatant effort to frustrate the defense.  The prosecutor's misconduct was further illustrated by the gratuitous threat in his letter to defense counsel that she may have to sue the State of Michigan in order to obtain reimbursement for the fees.  The prosecutor's conduct was improper regardless of whether defense counsel was ineffective for failing to pursue an arson expert after she received the prosecutor's letter.  As Michigan Supreme Court Justice Marilyn Kelly stated:

> Lack of action on the part of defense counsel did not justify the assistant attorney general's threat that he would not authorize payment for the order submitted. Such threats deter defense counsel from making proper trial preparation and cannot be permitted. Defendants must not be put in the position of weighing the need for an

> expert against the difficulties of securing payment, as predicted by the assistant attorney general. Certainly, defense counsel must take potential difficulties into consideration. It is troubling, however, that the prosecutor may force such a consideration by suggesting, shortly before trial, that he will not authorize public funds necessary to secure an expert witness.

*People v. Babick*, No. 207638, 614 N.W. 2d 588 (Mich. 2000). Because the prosecutor intentionally interfered with the defense and his conduct had a detrimental effect on defense counsel's trial preparation, there is a reasonable probability that the claim would have prevailed at the time appellate counsel failed to raise it. *See McFarland*, 356 F.3d at 699.

Having found a reasonable probability that Petitioner would have prevailed on appeal had the claim been raised, I must consider whether the claim's merit was so compelling that appellate counsel's failure to raise it constituted ineffective assistance of counsel that would excuse Petitioner's default. *McFarland*, 356 F.3d at 710. As discussed above, failure of appellate counsel to raise an issue can amount to constitutionally ineffective assistance. *E.g., Joshua*, 341 F.3d at 441; *Lucas,* 179 F.3d at 419; *Mapes,* 171 F.3d at 427-29. The decision of which among the possible claims to pursue is ordinarily entrusted to counsel's professional judgment, *see Smith,* 477 U.S. at 536. To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. The Supreme Court has observed that it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith*, 528 U.S. at 289. In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289.

I find that appellate counsel's ineffectiveness was the cause for Petitioner's failure to directly raise the prosecutor's misconduct on appeal. The prosecutor's interference with defense counsel's efforts to retain an arson expert was an egregious violation of Petitioner's right to a fair trial. Separate claims of prosecutorial misconduct and ineffective assistance of trial counsel were obvious corollaries to the claim raised by appellate counsel that Petitioner's due process rights were violated when public funds were not provided for an arson expert. Appellate counsel's failure to assert prosecutorial misconduct clearly was unreasonable. I concluded that this claim of prosecutorial misconduct was meritorious and likely would have resulted in reversal of Petitioner's conviction on appeal. Consequently, there is no question that appellate counsel's error in failing to raise the claim was prejudicial. Because Petitioner has shown cause and prejudice for his failure to raise the claim on direct appeal, his claim of ineffective assistance of trial counsel is not barred from review by this Court.

      B.    <u>Merits Review</u>

Petitioner's claims of prosecutorial misconduct were rejected by the state courts on procedural grounds pursuant to MICH. CT. R. 6.508(D). Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie*, 326 F.3d at 727. Where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Durr*, 487

F.3d at 432 (deferential review under the AEDPA applies only when the state court has adjudicated a claim on the merits); *Wiggins*, 539 U.S. at 534 (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples*, 340 F.3d at 437 (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).   Because Petitioner's claim of ineffective assistance of trial counsel was never "adjudicated on the merits," it must be reviewed de novo.  *See Howard*, 405 F.3d at 475 (applying *de novo* standard to claim that was defaulted pursuant to MICH. CT. R. 6.508(D)).

In the course of the procedural default analysis, I found that the prosecutor engaged in misconduct when he refused to comply with the trial court's order for payment of an arson expert by the state.  I also find that under the circumstances of this case, the prosecutor's interference with the defense's retention of an arson expert denied Petitioner a fundamentally fair trial.  In addressing Petitioner's claims of ineffective assistance of counsel above, I discussed at length the importance of an arson expert to Petitioner's case.  The prosecutor's case rested heavily on the opinion testimony of his two arson experts.  In addition to testifying that the fire was an arson, the prosecutor's experts refuted Plaintiff's theory that he may have started the fire accidentally by dropping a lit cigarette.  Knowing that he would present this testimony, the prosecutor intentionally flouted the trial court's order authorizing funds for an arson expert at the state's expense and threatened defense counsel that she may be required to sue the state in order to recover the fees.  I also discussed how the errors that occurred in this case were particularly prejudicial in light of the overall lack of evidence against Petitioner.  Accordingly, I recommend that the Court grant Petitioner relief on this claim of prosecutorial misconduct.

V.   **Reference to Pre-Trial Silence**

Petitioner claims that misconduct occurred when, in making his closing argument, the prosecutor emphasized Petitioner's pre-trial silence and assertion of his right to an attorney during his interview with Detective Hurtt.  He further claims that trial counsel was ineffective for requesting that his entire statement, which included his request for counsel, be admitted into evidence.

A.   Procedural Default

Because Petitioner's claims of prosecutorial misconduct are procedurally defaulted, he must either show: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House*, 126 S. Ct. at 2076*; Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52.  Petitioner claims that his appellate counsel was ineffective for failing to raise his claims of prosecutorial misconduct on direct appeal. Accordingly, he must show that his appellate counsel's failure to raise the instances of prosecutorial misconduct rose to the level of a constitutional violation.  *See McFarland*, 356 F.3d 688, 699 (6th Cir. 2004).  Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *See McFarland*, 456 F.3d at 699 *(*citing *Greer,* 264 F.3d at 676).  Thus, in order to decide whether Petitioner can present his claims of prosecutorial misconduct, I must decide whether there is a reasonable probability that the claims would have prevailed at the time appellate counsel failed to raise them.  *See McFarland*, 356 F.3d at 699.  If there is a reasonable probability that Petitioner would have prevailed on appeal had the claim been raised, I must consider whether the claim's merit

- 62 -

was so compelling that appellate's counsel's failure to raise it constituted ineffective assistance of counsel that would excuse Petitioner's default. *Id.* at 700.

During the presentation of the prosecutor's case-in-chief, Detective Hurtt testified regarding his interview with Petitioner on September 9, 1995.  (Tr. IV, 41-76.)  At that time, the prosecutor did not elicit any testimony from Hurtt regarding Petitioner's invocation of his right to silence and request for a lawyer.  At the request of defense counsel, the parties later stipulated to admit the full videotape of Petitioner's conversation with Detective Hurtt into evidence. (Tr. V, 126-27.)  The complete videotape was played for the jury.  (Tr. V, 128.)  The conversation was not transcribed by the court reporter, but Petitioner provided a transcript of the interview.  (Interview Transcript (Int. Tr.), Exhibit N, docket #2).  Near the end of the interview, Petitioner indicated that he "need[ed] to talk to a lawyer or something then." (Int. Tr., 20.)  When Hurtt asked Petitioner if he was asking for a lawyer, Petitioner responded, "Yes, Cause you guys ain't listening to me so I need to talk to somebody else.  You got it in your head that I did it and that's all you're trying to get me to say that I did it and I ain't gonna cause I didn't do it."  (Int. Tr., 20.)

In his closing argument, the prosecutor emphasized Petitioner's request for a lawyer during the interview with Detective Hurtt, and argued that Petitioner invoked his right to counsel when he realized that "he could not talk his way out of trouble:"

> Now, what was the most important thing that the Defendant said in his – in his video interview?  Very most important thing out of everything, three-quarters of the way through the interview, through the videotape the Defendant said I need a lawyer and every person under our constitution is entitled to make that statement.  He didn't stop there.  He said I need a lawyer.  Why?  I need a lawyer, quote, because you guys ain't listening to me, unquote.
>
> Ms. Thurmer:  Your Honor, we need to approach.
> The Court:  You may approach, certainly.

- 63 -

(Bench conference at about 9:50 a.m.)
The Court: All right. Mr. Blummer, you may continue.

Thank you, Judge. What's so important about this statement, I want a lawyer. Why? Because you guys ain't listening to me. What did Andrew Babick do at that interview? Well, nobody ever accused Andrew Babick of being stupid. We accused him of being a double murderer and arsonist. We never accused him of being stupid. Andrew Babick knew that [sic] were multiple witnesses who would put him at the scene of that fire. So when he went to the police station, he thought he could talk his way out of trouble.

* * *

Once he realized he was not going to talk his way out of trouble, that's when he pushed the button. He said so, 'cause you guys ain't listening to me.' That's why he gave them the interview. That's why he lied his way through all of the critically important questions.

(Tr. VI, 28-29.)

Petitioner's claim implicates the Supreme Court's holding in *Doyle v. Ohio*, 426 U.S. 610 (1976). In *Doyle*, the defendants were arrested for selling marijuana. They were given *Miranda* warnings and made no post-arrest statement about their involvement in the crime. At trial, the defendants took the witness stand and offered an exculpatory explanation for their participation in an alleged drug transaction. On cross-examination, the prosecutor impeached their testimony by repeatedly asking them why they had not explained their conduct at the time of their arrest. The Court held that *Miranda* warnings carry an implicit assurance "that silence will carry no penalty," and, thus, it would be fundamentally unfair and a violation of due process to use the defendants' post-arrest, post-Miranda silence for impeachment purposes. *Doyle*, 426 U.S. at 618.

Ten years later in *Wainwright v. Greenfield*, 474 U.S. 284, 290 (1986), the Supreme Court noted that, "[t]he critical importance of the implied promise that is conveyed to an arrested person by the *Miranda* warnings has been repeatedly confirmed in subsequent decisions." In

- 64 -

*Wainwright*, the respondent was given *Miranda* warnings three times following his arrest. In each instance, he invoked his right to remain silent and stated that he wished to speak to an attorney before answering any questions. *Wainwright*, 474 U.S. at 286. The respondent later pleaded guilty by reason of insanity. During closing arguments, the prosecutor reviewed police officer testimony as to the occasions on which respondent had exercised his right to remain silent and implied that the respondent's invocation of his right to remain silent and request for an attorney demonstrated a degree of comprehension that was inconsistent with his insanity defense. *Id.* at 287. The Supreme Court held that the prosecutor's use of the respondent's post-arrest, post-*Miranda* silence as evidence of sanity violated the Due Process Clause. *Id.* at 295. The Court observed that "*Doyle* and subsequent cases have, thus, made clear that breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires." *Id.* at 291. The Court also noted that post-*Miranda* "silence" includes not only muteness, but statements of a desire to remain silent and of a desire to remain silent until an attorney has been consulted. *Id.* at 295.

A year after *Wainwright* was decided, the Supreme Court found no due process violation under circumstances where the prosecutor made a brief reference to the defendant's post-arrest silence. In *Greer v. Miller*, 483 U.S. 756 (1987), the defendant and two other men were charged with kidnaping, robbery and murder. The defendant testified on direct examination that he had taken no part in the crime, but that the other men had come to him after the murder was committed seeking his advice. *Id.* at 758. At the beginning of the defendant's cross-examination, the prosecutor asked him: "Why didn't you tell this story to anybody when you got arrested?" *Id.* at 759. Defense counsel immediately objected and, out of the jury's hearing, requested a mistrial on

the ground that the prosecutor's question violated the defendant's right to remain silent after arrest. The judge denied the motion, but immediately sustained the objection and instructed the jury to "ignore [the] question, for the time being." The prosecutor did not pursue the issue further, nor did he mention it during his closing argument. The judge's final instructions to the jury included a caution to "disregard questions . . . to which objections were sustained." *Id.* The Court held that no *Doyle* violation occurred because the prosecutor was stopped before he called attention to the defendant's silence or used his silence for impeachment purposes. *Id.* at 764-65.

Notwithstanding the lack of *Doyle* error, the Supreme Court went on to consider whether the prosecutor attempted to violate the rule of *Doyle* by asking an improper question in the presence of the jury. *Greer*, 483 U.S. at 765. The Court concluded that the prosecutor's conduct did not deny the respondent a fair trial, stating: The sequence of events in this case -- a single question, an immediate objection, and two curative instructions -- clearly indicates that the prosecutor's improper question did not violate Miller's due process rights. *Id.* at 766.

In this case, the prosecutor's references to Petitioner's post-*Miranda* invocation of his right to counsel was a blatant and egregious violation of the *Doyle* rule. In his closing argument, the prosecutor intentionally emphasized Petitioner's request for an attorney, by stating that it was the most important thing that Petitioner said during his entire interview. Unlike the brief question at issue in *Greer*, the prosecutor in this case argued at length that Petitioner only asked for a lawyer after it became clear that the police did not believe his "lies" about what had occurred on the night of the fire. While defense counsel asked the trial court for a side bar when the prosecutor began commenting on Petitioner's request for a lawyer, the trial court inexplicably allowed the prosecutor to continue with his argument. Accordingly, the prosecutor strategically used Petitioner's request

for counsel to impeach Petitioner's statements that he was innocent, in violation of his Fifth Amendment rights.   The fact that defense counsel requested the admission of Petitioner's full statement, which included Petitioner's request for a lawyer, did not give the prosecutor carte blanche to violate Petitioner's constitutional rights during closing arguments.

The Supreme Court distinguishes between two types of constitutional errors: structural error and trial error. *See Arizona v. Fulminate,* 499 U.S. 279, 306-10 (1991).  "A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is *per se* prejudicial," whereas "trial error occurs during the presentation of the case to the jury, and may be quantitatively assessed in the context of all other evidence." *Yohn v. Love,* 76 F.3d 508, 522 (3d Cir. 1996) (citations omitted). The Supreme Court explained that "*Doyle* error fits squarely into the category of constitutional violations which we have characterized as trial error." *Brecht v. Abrahamson,* 507 U.S. 619, 629, 637-38 (1993). The *Brecht* rule applies even when the "federal habeas court is the first to review for harmless error."  *Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir. 1999).  Under *Brecht,* a *Doyle* error only warrants reversal if the mistake "had substantial or injurious effect or influence in determining the jury's verdict."  *Brecht,* 507 U.S. at 637.  A "reasonable possibility" that the error influenced the outcome is not enough to warrant relief. *Id.* Rather, the defendant must show a "reasonable probability" that the error affected the verdict. *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).

Under the circumstances of this case, I cannot say that the error was harmless. Petitioner did not testify at trial; therefore, his statement to police was the jury's only opportunity to hear directly from Petitioner.  As discussed above, Petitioner consistently stated throughout the police interview that he did not start the fire.  The prosecutor intentionally negated Petitioner's statements by arguing that he requested counsel after the police did not believe his lies.  The trial

court allowed the prosecutor to continue with his argument after a side bar and did not give a curative instruction. Given the lack of physical evidence against Petitioner, the prosecutor's conduct was particularly prejudicial. For these reasons, there is a reasonable probability that the error affected the verdict. Accordingly, I conclude that Petitioner likely would have prevailed on appeal had his appellate counsel raised this claim of prosecutorial misconduct. I further conclude that appellate counsel was ineffective for failure to raise this claim of prosecutorial misconduct on direct appeal. Given the flagrancy of the prosecutor's references to Petitioner's request for counsel during closing arguments, appellate counsel's failure to raise the issue on direct appeal was unreasonable. In light of the weak evidence in this case, the prosecutor's misconduct was particularly damaging to the defense. Petitioner has shown cause and prejudice for his failure to raise the claim on direct appeal; therefore, his claim of prosecutorial misconduct is not barred from review by this Court.

B.    Merits Review

Petitioner's claims of prosecutorial misconduct were never "adjudicated on the merits;" therefore, the Court must review his claim *de novo*. *See McKenzie*, 326 F.3d at 727; *Howard*, 405 F.3d at 475. I concluded above that the prosecutor's references to Petitioner's request for counsel violated his Fifth Amendment rights under the Supreme Court's decision in *Doyle* and that the error was not harmless. Accordingly, I recommend granting habeas corpus relief on this claim of prosecutorial misconduct.

C.    Ineffective Assistance of Trial Counsel

Petitioner also claims that his trial counsel was ineffective for requesting that the entire video taped interview be admitted into evidence and played for the jury.[7] To establish a claim

---

[7] Petitioner's claim of ineffective assistance of trial counsel is procedurally defaulted because it was raised for the first time in Petitioner's motion for relief from judgment. Because the claim is without merit, I will assume without deciding that there was no procedural default by Petitioner and decide the merits of the case." *See Lambrix,* 520 U.S.

of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *See Strickland*, 466 U.S. at 687-88.  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered a trial strategy."  *Id.* at 689.  "Judicial scrutiny of a counsel's performance must be highly deferential" and every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Bell v. Cone,* 535 U.S. 685, 698 (2002) (citing *Strickland,* 466 U.S. at 689).

Trial counsel requested that the entire videotape be admitted at trial after the prosecutor selectively examined Detective Hurtt regarding his interview with Petitioner. (Tr. IV, 42-51.)  The prosecutor did not elicit from Hurtt Petitioner's repeated statements that he was not upset with anyone at the house and that he was not responsible for starting the fire.  (IT, 15-20.)  While in hindsight it may have been preferable to have admitted a redacted version of the video without Petitioner's request for counsel, Petitioner cannot show prejudice from the mere admission of the complete videotape.  It was not until the prosecutor's comments during his closing argument that

_____

at 525; *Hudson*, 351 F.3d at 212, 215 -216; *Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178.

Petitioner clearly was prejudiced. Accordingly, Petitioner was not denied the effective assistance of counsel as the result of counsel's stipulation to admit the entire videotaped interview.[8]

## VI.    Admission of Holly Mony's Previous Testimony

Holly Mony, Petitioner's thirteen-year-old niece, was staying at Petitioner's house on the night of the fire. (Tr. V, 21, 34.) Money testified that she woke up at about 3:00 a.m. because Petitioner and her aunt were arguing in the next room about a fire. (Tr. V, 21-23.) Mony stated that she could not recall exactly what Petitioner said during the argument. The prosecutor attempted to refresh Mony's recollection with previous testimony that she had given at the Fire Marshall inquiry and at the preliminary examination. (Tr. V, 22-25.) When Mony continued to testify that she could not recall what Petitioner said, the prosecutor impeached her with her prior inconsistent statements. (Tr. V, 25-24.) Over the objection of defense counsel, the prosecutor asked Mony if she previously testified that Petitioner knew two kids died in a fire and that he might have started the fire by dropping a cigarette. (Tr. V, 25-31.) Mony responded that she really did not remember making that statement. (Tr. V, 31.) The prosecutor continued:

> You remember the question about the -- how did the conversation about the fire come up? And your answer was: She was like  -- referring to your aunt -- she was like what, what's the matter, why you -- why, you know. Why are you excited? He was like -- he came in, and he was like running, like he came in really fast. He was like -- he was like shocked or something. She's like what's the matter. He said a house burned down. Like I think he said like I think it happened 'cause I dropped a cigarette. He said I dropped a cigarette and I didn't -- I couldn't find it. I didn't smell nothing so I thought it went out or something.
>
> Do you remember that?
> MONY:      Kind of.

---

[8] While trial counsel's performance did not rise to the level of a constitutional violation in this specific instance, it is further evidence of trial counsel's weak performance in Petitioner's case as a whole.

(Tr. V, 32.)  Petitioner contends that while the prosecutor was permitted to refresh Mony's memory by asking her to read portions of her testimony from the Fire Marshall inquiry, it was error, after Mony claimed not to remember, to allow the prosecutor to impeach Mony by reading her previous testimony from the Fire Marshall inquiry into the trial record.  Petitioner also claims that the prosecutor engaged in misconduct when he improperly impeached Ms. Mony.  In addition, he asserts that trial counsel was ineffective for failing to challenge the admission of the Fire Marshall inquiry transcript and for not objecting to the prosecutor's use of the evidence for the truth of the matter asserted.[9]

### A.    Trial Court Error

Plaintiff's claim concerns an issue of state evidentiary law.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th

---

[9] Petitioner's claim is procedurally defaulted because it was raised for the first time in his motion for relief from judgment.  Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Lambrix,* 520 U.S. at 525; *Hudson,* 351 F.3d at 212, 215 -216; *Cone,* 243 F.3d at 971; *Binder,* 198 F.3d at 178.

Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

The admission of Ms. Mony's testimony clearly did not rise to the level of a due process violation.  The prosecutor was permitted to use the Fire Marshall inquiry and preliminary examination transcripts to refresh Ms. Mony's recollection with regard to her previous testimony.  When she claimed lack of memory, it was permissible for the prosecutor to impeach her with her prior inconsistent statements. Defense counsel was free to question Ms. Mony concerning the circumstances surrounding her testimony at the Fire Marshall inquiry and the preliminary examination.  Petitioner, therefore, was not denied a fair trial as the result of the prosecutor's examination of Ms. Mony.

B.    Prosecutorial Misconduct and Ineffective Assistance of Trial Counsel

Petitioner also raises claims of ineffective assistance of counsel and prosecutorial misconduct related to this issue.  Petitioner contends that the prosecutor engaged in misconduct when he improperly impeached Ms. Mony by reading, verbatim, her testimony from the Fire Marshall inquiry.  He further claims that his trial counsel was ineffective for failing to challenge the admission of the Fire Marshall inquiry transcript pursuant to the ground that it was uncertified and for not objecting to the prosecutor's use of the evidence for the truth of the matter asserted.  As discussed above, the prosecutor was permitted to refresh her memory with regard to those statements or impeach Ms. Mony with her prior inconsistent statements.  Accordingly, the prosecutor did not engage in misconduct during his examination of Ms. Mony.  Likewise, defense counsel's performance was not deficient.  Defense counsel made two objections when the prosecutor began to impeach Ms. Mony with her prior inconsistent statements, but they were overruled by the trial

court.  (Tr. V, 25-27.)  Moreover, counsel was not ineffective for failing to object to the Fire Marshall inquiry transcript because it was not admitted as evidence at trial.  Rather, it was used for the limited purpose of refreshing Ms. Mony's memory, and when she claimed lack of memory, to impeach her with her prior inconsistent statements.   Thus, Petitioner is not entitled to habeas corpus relief on his claims of ineffective assistance of counsel and prosecutorial misconduct.

**VII.   Failure to Instruct that Intoxication is a Defense to the Crime of "Arson of a Dwelling"**

The trial court instructed the jury in this case that voluntary intoxication with drugs and alcohol was not a defense to the crime of first-degree felony murder or second-degree murder. (Tr. VI, 94-95.)   Petitioner argues that because there was sufficient evidence of intoxication to warrant the trial court's instruction that intoxication was not a defense to the murder charges, it was incumbent upon the Court to *sua sponte* instruct the jury that intoxication is a defense to the crime of arson of a dwelling.  He also claims that his trial counsel was ineffective for failing to request an intoxication instruction.

A.   Procedural Default

Respondent contends that Petitioner is not entitled to review of his claim because it was procedurally defaulted in the state court.  Petitioner raised this claim on direct appeal, but the Michigan Court of Appeals conducted only a limited review of the issue because it was not properly preserved:

> Defendant next alleges that the trial court erred in failing to instruct the jury that voluntary intoxication is a defense to the underlying felony of arson of a dwelling house and the lesser offense of manslaughter. However, defendant did not object or request that such instructions be given. Therefore, our review is limited to the issue whether relief is necessary to avoid manifest injustice to defendant. *People v Messenger*, 221 Mich App 171, 176; 561 NW2d 463 (1997); *People v Haywood*,

- 73 -

209 Mich App 217, 230; 530 NW2d 497 (1995). Moreover, no error results from the omission of an instruction if the charge as a whole covers the substance of the omitted instruction. *Messenger, supra* at 177-178; *People v Harris*, 190 Mich App 652, 664; 476 NW2d 767 (1991).

We find no manifest injustice under the present circumstances. "Voluntary drug intoxication could be a defense to felony murder to the extent that the underlying felony is a specific intent crime . . . and that the intoxication precluded the defendant from being able to form the specific intent required to commit the underlying offense." *People v Hughey*, 186 Mich App 585, 590; 464 NW2d 914 (1990). In this case, there was no evidence that defendant was intoxicated to the extent that he could not form an intent to commit arson. One witness testified that he sold crack cocaine to defendant; at that time, shortly before the fire, defendant told the witness that he was "buzzed," but not drunk, from drinking beer. Another witness testified that defendant came home and stated that he had started a fire. Defendant, conversely, did not present any evidence that his state of intoxication affected his ability to form the intent to commit arson. Under these circumstances, the jury instructions as given did not result in a manifest injustice to defendant. *Haywood*, *supra*.

(MCOA Op. at 3-4.)

In order to preserve his claim for appeal under Michigan law, a defendant must request that the trial court give an omitted instruction. *See* Mich. Ct. R. 2.516(C); Mich. Comp. Laws § 768.29; *People v. Sabin*, 620 N.W.2d 19, 21 (Mich. App. 2000). The Michigan Court of Appeals expressly relied upon this rule in denying review of Petitioner's claim. A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). The rule was firmly established and regularly followed at the time of Petitioner's trial in 1996. *See*, *e.g.*, *People v. Puroll*, 489 N.W.2d 159, 160 (Mich. Ct. App. 1992); *People v. Haisha*, 314 N.W.2d 465, 468 (Mich. Ct. App. 1982). Petitioner's failure to comply with the state's independent and adequate state procedural rule, i.e., requesting the jury instruction, caused him to default his claims in state court. *See*

*Wainwright*, 433 U.S. at 87-88; *Lancaster*, 324 F.3d at 437.  Further, even when the state court

reviews the issue under a manifest injustice standard or to prevent a miscarriage of justice,

Petitioner's failure to object is still considered a procedural default.  *See Paprocki v. Foltz*, 869 F.2d

281, 284-85 (6th Cir. 1989); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (citing *Harris*,

489 U.S. at 264 n.10).

Accordingly, review by this Court is barred unless petitioner can show cause and

prejudice.  *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485.  However, where the procedural

default issue raises more questions than the case on the merits, the Court may assume without

deciding that there was no procedural default or that Petitioner could show cause and prejudice for

that default.  *See Lambrix,* 520 U.S. at 525; *Hudson*, 351 F.3d at 212, 215 -216; *Cone*, 243 F.3d at

971; *Binder*, 198 F.3d at 178.

B.   Trial Court Error

Typically, a claim that a trial court gave an improper jury instruction is not cognizable

on habeas review.   Instead, Petitioner must show that the erroneous instruction "so infected the

entire trial that the resulting conviction violates due process."  *Henderson v. Kibbe*, 431 U.S. 145,

155 (1977); *see also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis

for habeas relief unless they have "so infused the trial with unfairness as to deny due process of

law"); *Durr*, 487 F.3d at 446 (on habeas review, errors in jury instructions are not reviewable unless

they deprive defendant of constitutional due process); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th

Cir. 2000) (same).  If Petitioner fails to meet this burden, he fails to show that the jury instructions

were contrary to federal law.  *Id.*

In a recent case, *Hill v. Mitchell*, 400 F.3d 308, 322 (6th Cir. 2004), *cert. denied*, 126 S. Ct. 744 (2005), the Sixth Circuit held that the state court was not objectively unreasonable in determining that trial court did not commit plain error in failing to *sua sponte* instruct jury to consider cocaine intoxication in deciding the petitioner's guilt or sentence.  Applying the deferential AEDPA standard, the Sixth Circuit cited the lack of any Supreme Court holding that due process requires instructions on intoxication as a defense to a murder charge or that the absence of such an instruction establishes that the state failed to meet its burden of establishing the intent element of the offense.  *Id.*  Petitioner similarly argues that his due process rights were violated when the trial court failed to *sue sponte* instruct the jury that intoxication is a defense to the underlying charge of arson of a dwelling.  In the absence of clearly established Supreme Court authority supporting his claim, Petitioner is not entitled to habeas corpus relief.

### C.    Ineffective Assistance of Trial Counsel

Petitioner also asserts that his trial counsel was ineffective for failing to request an instruction on intoxication and the lesser included offense of manslaughter, and for failing to object to the trial court's instructions to the jury that voluntary intoxication is not a defense to felony murder without instructing them that voluntary intoxication is a defense to the underlying felony, arson of a dwelling.  As previously discussed, Petitioner's claims of ineffective assistance of trial counsel are procedurally defaulted because they were raised for the first time in his motion for relief from judgment.  Because Petitioner's claim is without merit, I will assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Lambrix,* 520 U.S. at 525; *Hudson*, 351 F.3d at 212, 215 -216; *Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178.

To succeed on his claim of ineffective assistance of counsel, a petitioner must show that: (1) the attorney's performance was deficient, falling below an objective standard of reasonableness; and, (2) the attorney's deficient performance prejudiced the defendant. *Strickland,* 466 U.S. at 688. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered a trial strategy." *Id.* at 689. "Judicial scrutiny of a counsel's performance must be highly deferential" and every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Bell,* 535 U.S. at 698 (citing *Strickland,* 466 U.S. at 689).

Counsel was not required to present every possible defense. One of counsel's greatest responsibilities at trial is to choose from among possible defenses the defense or defenses most likely to benefit his client. *See, e .g., Florida v. Nixon,* 543 U.S. 175 (2004) (it is reasonable for defense counsel enter guilty plea in capital case to concentrate on penalty phase, thereby avoiding counterproductive course which might result from presenting inconsistent defenses). Here, it was reasonable for trial counsel to make a strategic decision not to draw the jury's attention to Petitioner's use of alcohol and crack cocaine, particularly when there was weak evidence that Petitioner was legally intoxicated at the time the fire started. In addition, Defense counsel may have wanted to avoid the suggestion that Petitioner committed the arson and would be guilty of the offenses but for the fact of his intoxication. Defense counsel's decision not to request an intoxication instruction fell within the range of permissible strategy options. Consequently,

Petitioner was not denied the effective assistance of trial counsel. Because I find that trial counsel's performance was not deficient in this regard, appellate counsel was not ineffective for failing to raise the claim on direct appeal.

### VIII.    Jury Deliberations

In his fifth ground for habeas corpus relief, Petitioner claims that his due process rights were violated by events that occurred during the jury deliberations, including ex-parte communication with the jury.

Petitioner moved for a new trial after becoming aware of certain events that took place during the jury deliberations. Petitioner's motion was accompanied by an affidavit of one of the jurors, Mary Kreiter. (*See* Kreiter Affidavit, Exhibit P, docket #2.) Mrs. Kreiter indicated that the jury deliberated over a two-day period for about ten hours. (Kreiter Aff., ¶ 2.) Mrs. Kreiter avers that after deliberating, she did not feel that there was sufficient evidence to convict Petitioner. (Kreiter Aff., ¶ 3.) According to Mrs. Kreiter, the other jurors badgered her to the point that she started to cry and shake. (Kreiter Aff., ¶¶ 4-5.) Another juror told Betty Morris, the Jury Assembly Room Coordinator, that Kreiter was crying. Morris told the juror that "this trial has already taken longer than they thought it would." The juror then relayed Morris' comment to Kreiter. (Kreiter Aff., ¶ 6.) Kreiter indicated that she felt pressured by the juror and Ms. Morris. (Kreiter Aff., ¶ 6.) While she was crying, Mrs. Kreiter also spoke to the Bailiff, Rose Beebe. (Kreiter Aff., ¶ 7.) Kreiter asked Beebe to tell the judge that she was being badgered by the other jurors. (Kreiter Aff., ¶ 7.) Beebe told her to write a note to the judge. (Kreiter Aff., ¶ 8.) The other jurors discouraged her from writing a note and continued to pressure and intimidate her until she changed her vote to guilty. (Kreiter Aff., ¶¶ 9-11.).

Shortly after lunch on November 13, 1996, the trial court received a note from the jury foreman indicating that the jury was not able to reach a unanimous verdict. The jury was brought into the courtroom and instructed to go back and continue their deliberations. Approximately three hours later, the jury returned a unanimous verdict of "guilty." The jury was polled and all of the jurors affirmed their verdicts of "guilty." Mrs. Kreiter avers that when the trial court polled the jury, she was afraid to tell him that her true vote was "not guilty" because she was afraid of retaliation by the other jurors and the victims' family. (Kreiter Aff., ¶¶ 12-13, 19.) On November 16, 1996, three days after the verdict, Mrs. Kreiter wrote a letter to the trial judge explaining how she was pressured to vote "guilty." (Kreiter Aff., ¶ 14, Exhibit A.) She met with the judge on December 3, and defense counsel on December 5, 1996. Mrs. Kreiter indicates that she came forward voluntarily "because I feel my vote was coerced and the verdict was unjust." (Kreiter Aff., ¶ 21.) The Court notified counsel regarding his meeting with Mrs. Kreiter. After meeting with Kreiter, defense counsel moved for a new trial.

A hearing was held on Petitioner's motion on January 27, 1997. The trial court did not conduct an evidentiary hearing, but relied upon Mrs. Kreiter's affidavit in concluding that, under Michigan law, Mrs. Kreiter's affidavit was not sufficient to impeach the jury's verdict. (New Trial Transcript, 10-11, docket #26.) On direct appeal, Petitioner claimed that the trial court abused its discretion in denying his motion for a new trial based upon jury misconduct. Finding that the trial court properly denied Petitioner's motion for a new trial, the Michigan Court of Appeals stated:

> Defendant further alleges that the trial court abused its discretion in denying defendant's motion for new trial based on alleged jury misconduct. We disagree.
>
> First, although juror Mary Kreiter may have been pressured, or felt pressured, by her co-jurors to agree on a verdict, "[g]enerally, jurors may not impeach their own

- 79 -

verdict by subsequent affidavits showing misconduct in the jury room." *People v Budzyn,* 456 Mich 77, 91; 566 NW2d 229 (1997).  See also *Hoffman v Spartan Stores, Inc,* 197 Mich App 289; 494 NW2d 811 (1992).

Second, we agree with the trial judge, who in denying defendant's motion for a new trial, ruled that the "jury coordinator's" alleged comment that "this trial has already taken longer than I thought it would" was less egregious than the bailiff's comment found not to constitute error requiring reversal in *People v Tutha,* 276 Mich 387; 267 NW 867 (1936).[10]

For these reasons, we hold that the trial court did not abuse its discretion in denying defendant's motion for a new trial based on alleged juror misconduct.

(MCOA Op. at 4.)

The Sixth Amendment, which is applicable to the state through the Fourteenth Amendment provides that a criminal defendant is entitled to a fair trial by a panel of impartial jurors. *See Irvin v. Dowd*, 366 U.S. 717 (1960).  Notwithstanding a defendant's right to an impartial jury, it is a well established rule of common law that a jury verdict may not be impeached by the testimony of one or more jurors.  *See Tanner v. United States*, 483 U.S. 107, 117 (1987); *Mattox v. United States*, 146 U.S. 140, 149 (1892).  The rule is supported by the important policy consideration of protecting jury deliberations from public scrutiny.  *Tanner*, 483 U.S. at 119-20.  Exceptions to the common law rule have been recognized in narrow circumstances where the jury has been exposed to an extraneous or "external" influence.  *Id.*

Examples of Supreme Court cases applying the common law exception for extraneous influences include *Mattox*, in which the Supreme Court held admissible the testimony of jurors that during deliberations one of the bailiffs in charge of the jury told them that the defendant had murdered other victims before, and testimony that the jurors had read a newspaper article during

[10] In *Tutha*, the court officer stated to the jury foreman, "that the judge was not here, and the sooner you make up your minds the sooner you will get out of here."

- 80 -

deliberations characterizing the evidence against the defendant as exceptionally strong. *See Mattox*, 146 U.S. at 142-43, 149.  The *Mattox* Court stated that "a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." *Id.* at 149.

Similarly, in *Parker v. Gladden*, 385 U.S. 363 (1966) (per curiam), the Supreme Court considered testimony that some of the jurors overheard a bailiff's comments that the defendant was a wicked, guilty man and that if there was anything wrong with convicting the defendant, the Supreme Court would correct it.  Although the Court did not directly address the admissibility of the juror testimony, it noted that the bailiff's "expressions were private talk, tending to reach the jury by outside influence." *Id.* at 364 (internal quotation marks omitted).  The Supreme Court held that the case was controlled by the Sixth Amendment, which guarantees an accused the right to trial by an impartial jury and to be confronted by the witnesses against him. *Id*.  The Court noted that the statements made by the bailiff were not subjected to confrontation or cross-examination, which "are among the fundamental requirements of a constitutionally fair trial." *Id.* at 364-65.  The Supreme Court further concluded that the bailiff's comments "involve[d] such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* at 365.  (internal citations omitted.)

The fact that Juror Kreiter was pressured by the other jurors to enter a verdict of "guilty" clearly was an internal matter, and, thus, may not be used to impeach the jury verdict.  As the Sixth Circuit has stated:

> Whether the jury understood the evidence presented at trial or the trial judge's instructions following the presentation of the evidence, *whether a juror was pressured into arriving at a particular conclusion*, and even whether jurors were intoxicated during deliberations, are all internal matters for which juror testimony may not be used to challenge a final verdict.

*Doan v. Brigano*, 237 F.3d 722, (6th Cir. 2001) (citing *Tanner*, 483 U.S. at 117-22) (emphasis added). Moreover, the comment of the Jury Assembly Room Coordinator that "this trial has already taken longer than they thought it would," is not the type of "external" influence that would warrant an exception to the general rule. In this case, the Jury Assembly Room Coordinator did not speak directly to Kreiter. Rather, the comment regarding the duration of the trial was related to Krieter by another juror for purposes of pressuring her to change her vote to guilty. Moreover, unlike *Parker* and *Mattox*, the comment at issue in this case did not bear on the substance of the case, nor did it convey any direct opinion regarding Petitioner's guilt or bad character. As a result, the comment does not present a confrontation concern and does not present the same inherent prejudice. Accordingly, I cannot find that the decision of the Michigan Court of Appeals was unreasonable application of clearly established Supreme Court precedent.

### Recommended Disposition

For the following reasons, I recommend that the Court grant a conditional writ of habeas corpus, giving the State of Michigan ninety days in which to provide Petitioner a new trial or release Petitioner: (1) trial counsel was constitutionally deficient when she failed to secure an arson expert for the defense and failed to investigate the time line before the fire started; (2) the prosecutor engaged in misconduct and denied Petitioner a fair trial by refusing to comply with the trial court's order granting funds for an arson expert at the state's expense; and (3) the prosecutor violated Petitioner's Fifth Amendment rights under *Doyle v. Ohio*, 426 U.S. 610 (1996), by commenting during closing argument on Petitioner's post-*Miranda* request for counsel.

Date:  August 14, 2007                     /s/ Ellen S. Carmody
                                                         ELLEN S. CARMODY
                                                         United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).