UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ANDREW BABICK, JR.,

       Petitioner,

                                    Case No. 1:03-cv-20

v

                                      Hon. Wendell A. Miles

MARY BERGHUIS, WARDEN,
BROOKS CORRECTIONAL FACILITY,

       Respondent.

_____/


ORDER ON RESPONDENT'S OBJECTION TO MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION


On August 14, 2007, United States Magistrate Judge Ellen S. Carmody issued a Report and Recommendation ("R & R") recommending that Andrew Babick, Jr.'s petition for writ of habeas corpus be conditionally granted on the grounds of ineffective assistance of trial counsel and prosecutorial misconduct.  This matter is now before the court are respondent's objections to the R & R.  Although he has filed a brief in response to the respondent's objections, petitioner has not asserted his own objections to the R & R.

The court, having made a *de novo* review upon the record of those portions of the R & R to which specific objection has been made, rejects the conclusion reached by the Magistrate Judge and instead concludes that the petition must be denied.

The court agrees with the R & R's analysis and conclusions on those issues to which no objection has been made.  Therefore, in this decision the court will address only those particular conclusions to which an objection has been made, with limited exception noted below.  First,

however, the court will discuss certain additional facts and procedural history not addressed in the R & R.

# I

## Additional Facts and Procedural History

In her R & R, the Magistrate Judge at one point states that at trial, the parties "stipulated to the admission of the full videotape of Petitioner's conversation with Detective [Timothy] Hurtt, which was played for the jury." R & R at 13. Use of the word "stipulated" implies that the parties reached an agreement to present the full videotape of petitioner's interrogation. However, the record does not indicate that the parties reached such an agreement. Instead, it indicates that the prosecution had no intention of asking that the videotape be shown to the jury, insofar as the interview contained what the prosecution deemed petitioner's "self- serving statements." Transcript of Jury Trial, Vol. 4 (doc. no. 20) at 7. It was defense counsel who successfully sought to have the video played for the jury, "[i]n its entirety." Id. at 7-8.[1]  Defense counsel did so only after Detective Hurtt had already testified during the prosecution's case, describing aspects of the interview damaging to petitioner. Because petitioner did not testify in his own defense, the taped interview gave the jury its only opportunity to hear directly from the petitioner that he did not start the fire. The tape thus enabled the defense to place petitioner's repeated denials before the jury, without subjecting him to the rigors of cross-examination by the

---

[1]The Magistrate Judge ultimately correctly recognizes that it was the defense, and not the prosecution, which sought to have the entire videotape played. See R & R at 67 (acknowledging "[t]he fact that defense counsel requested admission of Petitioner's full statement, which included Petitioner's request for a lawyer").

prosecution.

During a portion of the videotape, petitioner – who was clearly informed at the outset that the interview was being recorded – continued issuing denials even when the police do not appear to have been in the interview room.[2]  In addition to placing his denials (which were interspersed with his invocations of his right to counsel) before the jury, through his videotaped interview petitioner was also able to place before the jury the fact that he had four young children between the ages of three and 11; that he fixed dinner for his children on the evening before the fire; that on the morning after the fire he had to get up at 6:00 a.m. order to take his son to a football game; that one of the children killed in the fire was the same age as one of petitioner's children; and that petitioner told police he would not hurt a child.  The defense in fact repeatedly pointed to petitioner's statements and emotional behavior during closing arguments regarding the videotape.  See Transcript of Jury Trial, Vol. 6 (doc. no. 23) at 54 ("you heard in Mr. Babick's video that he said right out I wouldn't hurt kids.  I love kids.  He was shocked when they said he might have killed kids of his own age.  His reaction was emotional, and he denied repeatedly having anything to do with being inside the house and hurting anyone"); id. at 61-62 ("I don't

---

[2]While he was sitting alone in the interrogation room, petitioner performed the following soliloquy:

> There's nobody that can pin this shit on me, I didn't fuckin' do shit.  Oh my God, I can't believe that.  I didn't set no fuckin' fire.  I didn't set no fire.  I'm fuckin' crackin' for no fuckin' reason.  They're making me out to be fuckin' guilty, fuck that shit.

> What's goin' on?  Two kids (inaudible), everything (inaudible).   Who could've started it?  (Sighs) Think, think, think.  Think.  They're just saying that shit.

Petition, Exhibit N (doc. no. 2) at 20.

know how many other ways Mr. Babick could have told the police that he didn't do this.  He was

very emotional, you can see it on the tape, because the Defendant brought it to you, it was a

Defense exhibit.  He was very emotional.  He told you that – he told the police repeatedly I

didn't do this, I wouldn't hurt any kid, I wouldn't set a fire, I didn't do this. . . . ").  Jurors had

access to the video and the ability to play it during deliberations.  Id., Vol. 7 (doc. no. 24) at 3-5.

In her R & R, the Magistrate Judge concludes that petitioner's trial counsel was not

constitutionally ineffective in seeking the admission of petitioner's entire videotaped interview,

insofar as it enabled the defense to place before the jury petitioner's repeated denials that he was

responsible for the fire, even though these denials were interspersed with petitioner's invocations

of his right to counsel.  Petitioner has not objected to this conclusion, and the court agrees with

the Magistrate Judge that petitioner has not overcome the presumption that trial counsel's action

was the product of reasonable strategy.[3]  Use of the videotape reflects a reasonable defense

strategy to have the jury evaluate petitioner's story and demeanor without the risk of cross-

examination.  Because the most damning factual elements petitioner's statement had already

been exposed through testimony during the prosecution's case, the defense had little to lose by

displaying, through the videotape, those aspects of the interview which trial counsel presumably

believed were more favorable to the petitioner.

Although no copy of the actual videotape has been provided with the state court record, a

_____

[3]Although petitioner has not objected to the Magistrate Judge's conclusion that he cannot
show prejudice from the "mere admission" of the complete videotape, R & R at 69, as discussed
below in Section II.B of this decision, the Magistrate Judge also concluded that the prosecutor's
closing argument comments on petitioner's request for a lawyer during the interview did violate
petitioner's constitutional rights.  The respondent has objected to the latter conclusion, and the
court addresses that objection in Section II.B of this decision.

transcript of petitioner's videotaped statement has been provided with the petition.  Exhibit N (doc. no. 2).  Petitioner's repeated denials and invocations of his right to counsel were merely the culmination of the interview.  Earlier in the interview, petitioner had already provided police with a number of facts confirming his presence at the crime scene during the relevant time period.  After being given his <u>Miranda</u> warnings, petitioner admitted that he went to the house in question – on Grove Street – a couple of times a week in order to buy crack.  Petitioner had been going to the house for around six months.  Petitioner admitted that he had gone to the house at least three times on the previous night .  On the first occasion, petitioner left his own house at around midnight and walked over to the Grove Street house, where he purchased some crack from a male seller.  Petitioner then walked over to his sister's house, located about one block from his own house, to smoke his crack.  Although petitioner's sister was not home, he climbed through the window to get into her house.  After spending no more than an hour at his sister's house, petitioner walked back to the house on Grove Street to buy more crack.  On this second occasion, petitioner had to knock on the door five or six times before a female answered.  Petitioner asked for the male who had earlier sold him crack, and was told that he was not there.  Petitioner sat in a chair on the porch and waited for about twenty minutes.  While waiting, petitioner smoked a cigarette and admitted "dozing off."  He eventually left and returned to his own house.

Petitioner's story did not stop there, however; petitioner admitted having returned to the Grove Street house a third time that night.  Upon returning home after his second visit, petitioner awakened his wife in order to obtain car keys from her so that he could drive back to the house instead of having to walk.  Petitioner's wife refused to give him the car keys, but she agreed to

drive him back to the house even though her driver's license was suspended. Upon arriving at the house, petitioner and his wife saw police cars and fire trucks. They did not stop because petitioner's wife was worried about being caught driving with a suspended license. Instead, they returned home.

Some of petitioner's admissions during his videotaped interview were highly damning, insofar as he placed himself at the Grove Street house not only near the time the fire was believed to have started, but also after the fire was discovered. Importantly, however, the jury had already heard of petitioner's admissions through the prosecution testimony of Detective Hurtt. Detective Hurtt testified that he walked the relevant distances petitioner claimed to have walked on the night in question. The distance between the Grove Street house and petitioner's sister's house was approximately 1.1 (one and one-tenths) miles. Detective Hurtt walked the distance at a normal pace, which took him approximately 17 minutes. Transcript of Jury Trial, Vol. 4 (doc. no. 20) at 49-50. This would establish the following general time line of events: (1) petitioner leaves his house at approximately midnight, and walks to Grove Street, taking just over 17 minutes (his house being only one block from his sister's); (2) petitioner purchases crack at the Grove Street house; (3) petitioner walks back to his sister's house, taking another 17 minutes; (4) petitioner spends approximately one hour at his sister's house smoking crack; (5) petitioner walks back to Grove Street, taking another17 minutes; and (6) petitioner spends approximately 20 minutes at the Grove Street house waiting for his seller to return. Not counting the amount of time petitioner actually spent completing his purchase of crack on his first visit to the Grove Street house, this would place petitioner at the Grove Street house for the second time at approximately 2:11 a.m. Trial testimony showed that the 911 call reporting the

fire came just before at 2:05 a.m., which was when the fire department arrived on the scene. Transcript of Jury Trial, Vol. 4 (doc. no. 20) at 167.

If petitioner had been precise in estimating the time at which he left his house and the time he spent both at his sister's house and sitting on the porch at the Grove Street house, he would literally have been at that house when the fire department arrived. However, if petitioner was slightly off in his estimates, he could easily have had time to start the fire and leave before the fire department arrived. The fire was believed to have started not more than approximately 10 to 15 minutes earlier.[4]

Because petitioner admitted having returned to the Grove Street house a third time by car, this suggested that some additional urgency – or perhaps guilty knowledge – was present which had not been present earlier when petitioner had been willing to walk on his various missions. In addition, petitioner's statement that he awakened his wife and persuaded her to reluctantly drive with a suspended license also serves to confirm the testimony of his niece Holly

---

[4]The significance of the retracing of petitioner's movements in accordance with his own statements was not lost on the prosecution, which emphasized it heavily during closing arguments:

> "By all of the evidence that we have got including the Defendant's own statements he was on that porch at about ten minutes to two in the morning. . . . The Defendant was there when the fire started. If he didn't start it himself he bumped into whoever did as he was leaving the front porch of that house. The Defendant put himself on the front porch of the house at the minute that fire started."

> "We have a suspect who by his own admission, by all of the evidence we've got in this case was present at that location and exactly the moment this fire started."

Transcript of Jury Trial, Vol. 6 (doc. no. 23) at 17, 22.

Mony, who testified that she heard petitioner and his wife arguing at approximately 3:00 a.m. on the night in question.   Finally, petitioner's statement that he smoked a cigarette during his second visit to the Grove Street house not only puts him at the house very close to the time when the fire was believed to have started, but also confirms that he had with him the means to start a fire while he was there – assuming, of course, that cigarettes do not light themselves and that some other mechanism, such as a cigarette lighter or matches, is needed to ignite one.

During his videotaped statement, petitioner claimed to have fallen asleep, or almost fallen asleep, while sitting in a chair and smoking a cigarette on the porch during his second visit to the Grove Street house.   However, at trial the prosecution's witnesses negated the possibility of a smoldering cigarette as a source of the fire.   Larry Haussmann, a lieutenant with the Battle Creek Fire Department, testified that it could take up to a couple of hours for a smoldering cigarette left in furniture to catch fire.   Transcript of Jury Trial, Vol. 1 (doc. no. 17) at 181-182.   In addition, Wayne Etue, a sergeant in the fire marshal division of the Michigan State Police, testified that although there was a sofa on the front porch of the house, part of the sofa did not burn, indicating that it was not a point of origin.   Id. at 210-211.   (He also testified that under normal circumstances, and assuming that it did not extinguish itself, a smoldering cigarette could take up to two hours to result in a fire.   Transcript of Jury Trial, Vol. 1 (doc. no. 18) at 40-41.   He did admit, however, that "under ideal conditions" a cigarette left in the sofa between the cushions could cause the sofa to become engulfed in flame within approximately 45 minutes.   Id. at 26.)[5]

_____

[5]Sgt. Etue took a series of photos of the scene.   Transcript of Jury Trial, Vol. 1 (doc. no. 17) at 205.   (People's Exhibits 2 through 9).   There was a clear patch on the porch where a couch was located; this showed only minor smoke damage.   Id. at 210.   The couch protected this portion of the front porch.   The springs and part of the couch's framing did not burn.   Id.  at 210-
(continued...)

Finally, Joan Tuttle, a fire inspector with the Battle Creek Fire Department, also testified that in her opinion the sofa was not a point of origin of the fire.   Transcript of Jury Trial, Vol. 2 (doc. no. 18) at 56.

In her R & R, the Magistrate Judge states that the record shows that petitioner's trial counsel "contacted at least two potential fire experts."  However, in its decision on petitioner's direct appeal, the court of appeals stated that the defense "neither attempted to retain an expert" nor filed a claim for reimbursement of funds paid to an expert.  Michigan Court of Appeals Unpublished Decision (doc. no. 30) at 3.  Although it is apparent that petitioner's trial counsel authored letters to at least two different experts, one of these letters seems to have gone unanswered and the other might never even have been sent.

The first letter, included as an exhibit to the petition, was written by defense counsel on August 2, 1996 to Adolf Wolf of Wolf & McVicker Consulting Engineers in Holland, Michigan.  Exhibit J (doc. no. 2).  In her letter, defense counsel indicated a desire "to hire an expert to review the case and to testify for the defense."  However, she also indicated that "I believe the records show the owner had a motive to burn the house for insurance funds, but this was completely overlooked by investigators."  In a letter to petitioner dated August 28, 1996 (included as part of this same exhibit to the petition), defense counsel informed her client that "[t]he man I wrote to in Holland, Michigan never wrote back or called."  Defense counsel further wrote to her client that she was considering hiring Richard Harris, "an arson expert that I have

---

[5](...continued)
211.  If the couch had been a point of origin, it would have burned lower and longer and not left a portion unburned beneath it.  Id. at 211.  He did not believe that the couch was a point of origin.  Id.  He noted that there was no fire damage in basement, including to the electrical panel, hot water heater, and furnace, thereby eliminating these as accidental causes.  Id. at 216.

worked with in the past and he is highly recommended."  In this same letter, defense counsel

stated that an arson expert "will be very helpful to help us prove that the home owner had a

motive to burn the house for insurance money and to help us in many other ways."

Although petitioner – through newly obtained counsel– filed a motion for new trial, he

did not do so on the basis of ineffective assistance of trial counsel or for any reason having to do

with an alleged inability to procure funds necessary to hire an expert.  As a result, the record

contains no indication that petitioner ever requested the evidentiary hearing required by People

v. Ginther, 390 Mich. 436, 212 N.W.2d 922 (1973) or subsequent cases.[6]  However, in a *pro se*

brief which he filed in the Michigan Supreme Court, petitioner stated that his appellate counsel

had hired actually hired Richard Harris.  (Presumably, this Richard Harris is the same Richard

Harris whom trial counsel had informed petitioner she planned to contact in her August 28, 1996

letter.)  Defendant's Reply to Plaintiff's Motion to Reconsider at 1 (included with doc. no. 31).

---

[6]In its 1973 decision in Ginther, the Michigan Supreme Court established the procedural
requirements for preserving a claim of ineffective assistance of counsel on direct appeal:

> If the record made before a defendant is convicted does not factually support
> claims he wishes to urge on appeal, he should move in the trial court for a new
> trial or, where the conviction is on a plea of guilty, to set aside the plea, and seek
> to make a separate record factually supporting the claims.  . . .   Without record
> evidence supporting the claims, neither the Court of Appeals nor we have a basis
> for considering them.

People v. Ginther, 390 Mich. 436, 443, 212 N.W.2d 922, 925 (1973).  Where the defendant does
not move for a new trial at the trial court level  nor request that the trial court conduct an
evidentiary hearing in support of his claim, he may, before filing a brief on the merits, file a
motion for a remand in the Court of Appeals, which will be granted if the motion reveals that a
testimonial record must be developed.  People v. Moore, 129 Mich. App. 354, 357-358, 341
N.W.2d 149, 151 (1983).

As part of an appendix to this brief, petitioner also provided a copy of a letter to written by

"Consultant" Richard Harris to petitioner's appellate counsel, dated March 12, 1998.  In his

letter, Harris specifically states as follows:

> I have reviewed the materials sent to me by Mr. Tom Keith, who I understand was retained by your office to investigate this case.  Unfortunately I am not able to come to any type of opinion related to this fire.  I would need to at least view good photographs of the scene documenting all areas of the in question residence especially the proposed point of origin area and/or I would need to see the actual scene.
>
> I would, however, say that I may still be unable to determine a cause even after viewing these items. . . . [7]

Id., Appendix D.  By this time, the house had been torn down; it had been torn down even before

the trial.  Transcript of Jury Trial, Vol. 4 (doc. no. 20) at 13.  Any photographs of the scene

which were either used at trial or which may have been provided to Harris have not been

provided as part of the record on this petition or as part of the petitioner's supporting materials.

As an additional exhibit to the *pro se* brief which he filed in the Michigan Supreme

Court, petitioner also provided a copy of what appears to have been a second letter authored by

his trial counsel to an expert.  The letter, a handwritten draft, is directed to Robert Trenkle.

Defendant's Reply to Plaintiff's Motion to Reconsider (included with doc. no. 31), Appendix I.

(The copy provided with the Rule 5 materials is incomplete, unsigned, and undated.  However,

because of its similarities to the Wolf letter described above, it appears to have been written by

---

[7]Petitioner also appears to have submitted a copy of the Harris letter to the Michigan Supreme Court as an exhibit to his Delayed Application for Leave to Appeal dated September 29, 1999.  In his *pro se* brief filed in support of that application, petitioner admitted that "the defense did follow through with contacting experts," an apparent reference to appellate counsel's contact with Harris.  Delayed Application for Leave to Appeal (doc. no. 31) at 7.  The Harris letter is attached as part of Exhibit E to this brief.

petitioner's trial counsel.)  It is not known whether petitioner's trial counsel actually sent the letter, or, if so, when she did so and whether she received a reply.  However, what is known is that the Michigan Supreme Court would have had all of these letters when it first reviewed petitioner's case.

In his motion for relief from judgment filed in the trial court, petitioner did include, at the conclusion of his motion, a brief request for an evidentiary hearing.  Motion for Relief from Judgment (doc. no. 71) at 41.[8]  The final exhibit which petitioner attached to this motion was another copy of Richard Harris' March 12, 1998 letter to appellate counsel.  The trial court therefore would have known that petitioner's appellate counsel had consulted with an arson expert who was not able to offer an opinion helpful to the defense.  The trial court denied petitioner's motion without an evidentiary hearing.


## II

## Issues

The respondent objects to the Magistrate Judge's recommendation that the petition be conditionally granted on the grounds of ineffective assistance of trial counsel and prosecutorial misconduct.  The respondent also objects to the Magistrate Judge's conclusion that petitioner established cause and prejudice to excuse the procedural default on his ineffective assistance claim and one of his prosecutorial misconduct claims.  Respondent further objects that even if petitioner established sufficient cause for his procedural default, the Magistrate Judge's

---

[8]Petitioner also included with his motion a "Notice of Hearing" which he appears to have drafted himself.

recommendations on these claims are nonetheless without merit because petitioner has failed to establish prejudice resulting from either defense counsel's or the prosecutor's actions.

Because, as discussed below, the court concludes that these claims fail on their merits, the court does not separately address any issues of procedural default.

## A.  Ineffective Assistance of Counsel

Petitioner claims that his trial counsel rendered constitutionally ineffective assistance in a number of respects.  The Magistrate Judge agreed with petitioner as to two of these claims: (1) that trial counsel should have hired an arson expert, and (2) that trial counsel should have obtained a copy of a television schedule in order to discredit the testimony of prosecution witness Belinda Sutton regarding the timing of petitioner's second visit to the house.  The respondent objects to these conclusions that defense counsel was ineffective.

### 1.  Arson Expert

Regarding trial counsel's apparent attempts to contact experts, it is unclear why the Magistrate Judge would conclude that these amounted to ineffective assistance, given that she recognizes that "at least two potential fire experts" were contacted.  R & R at 22.  Assuming that trial counsel did contact two different experts, she did not necessarily act unreasonably simply because she failed to locate an expert who was both willing and able to testify for her client.  (It seems that the Magistrate Judge's conclusion that trial counsel was ineffective in this respect was also colored by her conclusion that trial counsel was intimidated by a letter she received from the prosecution – but more about this below in Section II.B of this decision.)   On an

insufficient factual record, the Magistrate Judge nonetheless concludes that trial counsel acted unreasonably and therefore did not make a proper strategic choice not to call an arson expert because she did not adequately investigate the option of pursuing a "not arson" defense.  The Magistrate Judge relies principally on a First Circuit case, Dugas v. Coplan, 428 F.3d 317 (1st Cir. 2005) in reaching the conclusion that trial counsel's conduct was constitutionally deficient.

Dugas does not provide a basis on which to grant the writ in this case.  Assuming that this First Circuit case may be relied upon as controlling authority in determining whether a habeas petitioner is in custody "in violation of the Constitution" of the United States as required by 28 U.S.C. § 2254(a), Dugas is simply not on point.  In Dugas, unlike in this case, facts supporting the petitioner's claim of ineffective assistance of trial counsel were  developed in the state court.  Specifically, the petitioner had filed a motion for new trial on the basis that his trial counsel had been ineffective by inadequately pursuing the "not arson" defense, particularly due to the lack of expert consultation.  429 F.3d at 325.  Defense counsel, who testified at the hearing on the motion, admitted that he had not given sufficient consideration to the "not arson" defense. In support of his motion, the petitioner had also offered the report of a proposed forensic expert, who identified several issues that a forensic consultant could have identified in pretrial investigation.  The petitioner also moved for discovery, so that he could develop a more detailed expert analysis.  A separate hearing was held on the motion for discovery, during which the proposed expert testified and addressed the issues raised in his report.  Id. at 325.

In this case, in contrast to Dugas, petitioner has not met his burden of overcoming the presumption that his counsel's conduct was the product of a reasonable strategy to pursue a sole defense of petitioner's lack of involvement in the fire – an innocence defense – and not to pursue

a defense of petitioner's accidental sparking of the conflagration – a "not arson" defense. Petitioner did not move for a new trial or hearing on the basis of ineffective assistance, nor does there appear to be any reason why he would have done so, insofar as his appellate counsel had consulted with an expert who was unable to provide him with an opinion favorable to the defense regarding cause and origin.  In addition, petitioner has not produced affidavits from either his trial or appellate counsel to explain the bases for their decisions not to produce expert testimony.

In Dugas, trial counsel who testified at the post-trial hearing acknowledged that he lacked any knowledge of arson investigation and had never tried an arson case.  Id. at 329.  In this case, however, petitioner's trial counsel – if her letter to her client is accurate – had both previously participated in other arson cases and previously consulted with experts, including Richard Harris, the expert ultimately consulted by petitioner's appellate counsel.  In addition, even in Dugas the court recognized that the petitioner faced a hurdle in establishing prejudice; in fact, the case was remanded  for additional evidentiary development.  Id. at 342-342.[9]  The court therefore fails to discern any controlling factual similarity between Dugas and this case, and certainly none which would justify relying on that case to conditionally grant the writ in favor of petitioner.

To prevail on a claim of ineffective assistance, the petitioner must satisfy two requirements. First, he must demonstrate that his counsel's performance was constitutionally

---

[9]On remand in Dugas, the district court determined that the petitioner had not established prejudice, and denied the writ.  Dugas v. Warden, No. 03-CV-376-JD, 2006 WL 2463670 (D.N.H. Aug. 24, 2006).  That decision was affirmed on appeal.  Dugas v. Coplan, 506 F.3d 1 (1st Cir. 2007).

deficient, i.e., that it fell below an objective standard of reasonableness.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 2064 (1984).  To make this showing, petitioner must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance [that] 'might be considered sound trial strategy.' " <u>Id</u>. at 689, 104 S.Ct. at 2065 (citation omitted).  Second, the petitioner must "affirmatively prove prejudice."  <u>Id</u>. at 693, 104 S.Ct. at 2067.   This requires him to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id</u>. at 694, 104 S.Ct. at 2068.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  <u>Id</u>. at 690-691, 104 S.Ct. at 2066.  Here, the Magistrate Judge concludes that trial counsel's failure to investigate the "not arson" defense and retain an arson expert was objectively unreasonable.  In reaching this conclusion, the Magistrate Judge appears to assume that trial counsel intended to advance the theory that petitioner might have started the fire accidentally; because evidence that the fire was accidental could only come from an expert, the Magistrate Judge seemingly concludes, trial counsel acted unreasonably by not retaining an expert to help her both discredit the prosecution witnesses and provide independent support for a defense "theory" of accident.

The record does contain some evidence that petitioner's trial counsel at least considered pursuing a "not arson" theory of accident.  In her motion for expert witness funds (doc. no. 72), counsel stated that "if the fire is determined to be accidental, then one of the elements of Arson

of a Dwelling House would be absent."  However,  the record does not support the conclusion

that petitioner's trial counsel pursued a theory of accident at trial.  Instead, the record indicates

that counsel pursued only the theory that her client was not the perpetrator, and that she did so

after investigating – albeit unsuccessfully –  the possibility of retaining an expert to testify.

In Strickland, which involved an ineffectiveness claim related to a duty to investigate, the

Supreme Court did not offer any specific standards concerning this duty, but did rule that

"counsel has a duty to make reasonable investigations or to make a reasonable decision that

makes particular investigations unnecessary."  Id. at 691, 104 S.Ct. at 2066.  Thus, the duty to

investigate is not absolute.  Strickland also mandated that the reasonableness of counsel's

conduct be judged "on the facts of the particular case, viewed as of the time of counsel's

conduct." Id. at 690, 104 S.Ct. at 2066.   However, such a judgment cannot be made in a factual

vacuum; instead, reasonableness

> may be determined or substantially influenced by the defendant's own statements
> or actions.  Counsel's actions are usually based, quite properly, on informed
> strategic choices made by the defendant and on information supplied by the
> defendant.  In particular, what investigation decisions are reasonable depends
> critically on such information.  For example, when the facts that support a certain
> potential line of defense are generally known to counsel because of what the
> defendant has said, the need for further investigation may be considerably
> diminished or eliminated altogether.  And when a defendant has given counsel
> reason to believe that pursuing certain investigations would be fruitless or even
> harmful, counsel's failure to pursue those investigations may not later be
> challenged as unreasonable.  In short, inquiry into counsel's conversations with
> the defendant may be critical to a proper assessment of counsel's investigation
> decisions, just as it may be critical to a proper assessment of counsel's other
> litigation decisions.

Id. at 691, 104 S.Ct. at 2066.

Here, the record does not indicate what discussions, if any, petitioner had with his trial

17

counsel regarding his responsibility for the fire.  If petitioner insisted to counsel that he had played no role in starting the fire, either accidentally or otherwise (and it is important to bear in mind that we do know that during police questioning petitioner vehemently denied having started the fire), then counsel would have had little reason to use extraordinary efforts to produce a witness willing to testify that the fire was accidental, particularly in view of her knowledge that the prosecution was likely to produce "at least three experts" in cause and origin.  Motion for Expert Witness Funds (doc. no. 72).

Although the Magistrate Judge appears to conclude that part of the defense's trial strategy was to pursue a theory of accident, there is simply nothing in the trial transcript which supports this conclusion.  There are, in fact, strong indications to the contrary.  Petitioner's counsel objected during the trial testimony of petitioner's 12-year-old niece, Holly Mony, who was asked by the prosecution about testimony she had given during an earlier proceeding stating that she had overheard her uncle saying that he might have caused the fire by dropping a cigarette.[10]  Trial counsel also did not request that the jury be given an instruction on

---

[10]During her closing argument at trial, petitioner's counsel argued that Mony's testimony about overhearing her uncle on the night of the fire was "simply unbelievable[.]"  Transcript of Jury Trial, Vol. 6 (doc. no. 23), at 53.  Notably, Mony's testimony forms the basis for petitioner's claim in Ground II of the petition, even though elsewhere he implies that Mony's testimony supports a theory of accident.  The Magistrate Judge concluded that the admission of Mony's testimony did not rise to the level of a due process violation, R & R at 71-72, and petitioner has not objected to that conclusion.

In his initial supporting brief, petitioner argues that Mony testified at a fire marshal inquiry that she overheard petitioner tell his wife that "he may be responsible for the fire by accidentally dropping a lit cigarette."  Memorandum of Law in Support of Petition (doc. no. 2) at 4.  Petitioner provides no record cite to support his argument that Mony used the word "accidentally" in describing the conversation she overheard about a dropped cigarette.  In addition, the court notes that at the preliminary examination, petitioner's counsel unsuccessfully objected to Mony's testimony on the basis that it revealed "confidential" marital

(continued...)

intoxication, which might have operated to suggest to the jury that petitioner set the fire but did so while intoxicated.[11]  In addition, petitioner's trial counsel could reasonably have concluded that pursuing a theory of accident might be harmful to her client's defense because it could confuse jurors, who could believe that petitioner did not dispute having started the fire.  Finally, defense counsel's closing argument makes no mention of a defense theory of accident.

We can therefore be reasonably certain that although petitioner's trial counsel considered

---

[10](...continued)
communications between petitioner and his wife.  Transcript of Preliminary Examination, Vol. 1 (doc. no. 14) at 69-71.  This objection tends to indicate that petitioner's counsel believed that Mony's testimony was not beneficial to petitioner.  Later, while cross-examining Mony, petitioner's counsel attempted to establish that Mony was tired and likely did not hear what she believed she had heard when she testified before the fire marshal.  Id. at 111-112, 116-117, 121-122.

Still later, at trial, defense counsel once again pursued a line of cross-examination which sought to establish that Mony was tired when she overheard petitioner and his wife, and that Mony might not have heard what she had originally testified to hearing that night.  Transcript of Jury Trial, Vol. 5 (doc. no. 22) at 38-44.  Defense counsel also attempted to establish that Mony was angry at petitioner and had not told the truth at the fire marshal inquiry.  Id. at 47-53.  This hardly suggests that defense counsel hoped to rely on Mony's testimony as an indication that the fire was accidental.  Petitioner himself at one point makes the argument that Mony's fire marshal testimony was "unreliable" and should not have come out during the trial.  Memorandum of Law in Support of Petition (doc. no. 2) at 20, 50. Under the circumstances, it is unclear why the Magistrate Judge would believe that part of the defense strategy was to pursue a theory of accident.  Perhaps she was persuaded by Justice Kelly's unsupported statement, contained in her solo dissenting opinion, that petitioner had claimed "that the fire was set accidentally."  People v. Babick, 462 Mich. 863 (2000) (Kelly, J., dissenting).  For the reasons stated here and in Section II.B below, Justice Kelly's statement is not supported by the record.

[11]The trial court's failure to give the jury an instruction that intoxication was a defense to the crime of arson of a dwelling forms the basis for petitioner's claim in Ground IV of the petition.  In addressing this claim, the Magistrate Judge concluded, among other things, that defense counsel's decision not to request an intoxication instruction fell within the range of permissible strategy options.  R & R at 77.  Petitioner has not objected to this conclusion.  As the Magistrate Judge properly recognized, defense counsel "may have wanted to avoid the suggestion that Petitioner committed the arson and would be guilty of the offenses but for the fact of his intoxication."  Id.

having an expert testify, she had abandoned that as an option by the time of trial.  However,

whether she did so because she could not find an expert willing to testify, or because she decided

against this strategy, or for some other reason or combination of reasons, we do not know.  What

we do know is that the trial record reflects a defense strategy that depended on creating a

reasonable doubt that petitioner was the perpetrator by convincing the jurors that others –

whether the home's owner or its occupants, or the occupants' drug-buying customers other than

petitioner – had a motive and opportunity to set the fire.   Trial counsel could reasonably have

concluded, even without having actually consulted with an expert, that she could create the

necessary reasonable doubt by having the jury hear petitioner's denials during his police

interview.  Cf. Towns v. Smith, 395 F.3d 251, 259 (6th Cir. 2005) (trial counsel's failure to even

attempt to interview potential defense witness who had implicated himself in the crime was

objectively unreasonable).  Because the record suggests that trial counsel's decision not to retain

an expert was consistent with a strategy to avoid implying that he might have accidentally started

the fire, and no facts have been developed to date which tend to overcome the strong

presumption that counsel acted reasonably by pursuing a single theory of acquittal limited to

innocence, petitioner's claims fails.

However, even if petitioner could show that his trial counsel's decision not to retain an

expert fell below an objective standard of reasonableness, his claim of ineffective assistance still

fails.  The second prong of Strickland requires a consideration of the effect of counsel's

professional errors.  Here, petitioner has failed to establish that but for trial counsel's omission,

the outcome of the trial would have been different.  The record shows that petitioner's appellate

counsel did in fact consult with Richard Harris, one of the experts whom trial counsel at one

point considered hiring.  Harris, however, indicated that he was not able to express any opinions on the cause of the fire.  Given this evidence, it is not possible to conclude that petitioner would have been acquitted if his trial counsel had retained either Mr. Harris or some other unnamed expert.

The record does not permit a determination that but for counsel's alleged error, there is a reasonable probability that the outcome of the trial would have been different.  Moreover, it is not apparent to the court, nor has petitioner indicated, what helpful testimony would have been provided by some unnamed expert witness other than Mr. Harris.  The Sixth Circuit has held that "a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material."  Hutchison v. Bell, 303 F.3d 720, 748 (6th Cir. 2002); see also Horsley v. State of Alabama, 45 F.3d 1486, 1495 (11th Cir. 1995) ("to prove prejudice by failure to investigate and failure to produce a certain kind of expert witness, a habeas petitioner must demonstrate a reasonable likelihood that an ordinarily competent attorney conducting a reasonable investigation would have found an expert similar to the one eventually produced. . . . In the absence of such a probability, the petitioner is not injured by the failure to investigate").  Although "[c]ourts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client[,]" Towns, 395 F.3d at 258, such ineffective assistance claims depend heavily on the facts, because the conduct comprising the claim allegedly occurred outside the courtroom.  In Towns, the facts showed that trial counsel failed to contact a known, important witness who had

21

consistently maintained the defendant's innocence.  395 F.3d at 259-260.  That is not the case here.[12]

With his brief, filed on his behalf by appointed counsel, petitioner includes three internet articles, one of which addresses the use of accelerant detection canines and two of which address the cases of two men convicted of arson murders in Texas (one of whom was later executed), based on allegedly faulty prosecution arson testimony.  The court fails to see how these exhibits, which are not part of the record in state court, provide a basis for habeas relief.  Internet articles are not competent evidence in a federal habeas proceeding.  Petitioner himself apparently senses there is a problem with the record on this issue, for he states that "[i]f the court does not feel that the record is fully complete to decide this case, it should be set for evidentiary hearing and appointment of an arson expert who can further, [sic] analyze the theories used to convict [him]." Brief of Petitioner (docket no. 57) at 27.

The AEDPA greatly curtailed federal habeas court discretion to conduct evidentiary hearings.  "AEDPA generally prohibits federal habeas courts from granting evidentiary hearings when applicants have failed to develop the factual bases for their claims in state courts."  Schriro

---

[12]Although it is true that the failure to investigate or call a particular witness can constitute ineffective assistance, cases which have found a Sixth Amendment violation under such circumstances have generally done so only where a showing has been made that the witness or witnesses whom counsel failed to investigate actually had favorable testimony to offer.  See Townes, 395 F.3d at 259; Stewart v. Wolfenbarger, 468 F.3d 338, 357 (6th Cir. 2006) (witness testified at state trial court evidentiary hearing (1) contradicting testimony by key prosecution witness; and (2) confirming that he was never contacted by petitioner's trial counsel); Clinkscale v. Carter, 375 F.3d 430, 444-445 (6th Cir. 2004) (prejudice established based on counsel's failure to notice alibi witnesses, where one alibi witness provided affidavit indicating that he had been and continued to be willing to testify, and record contained other evidence, including investigator's report and written investigative report, providing indication of facts to which alibi witnesses would have testified if called).

v. Landrigan, 127 S.Ct. 1933, 1939 n.1 (2007) (citing 28 U.S.C. § 2254(e)(2)).  "If a habeas

petitioner has 'failed to develop the factual basis of a claim in State court proceedings,' he can

only get an evidentiary hearing in federal district court on that claim in extremely narrow

circumstances."  Alley v. Bell, 307 F.3d 380, 389 (6th Cir. 2002).  Specifically,

> If the applicant has failed to develop the factual basis of a claim in State court
> proceedings, the court shall not hold an evidentiary hearing on the claim unless
> the applicant shows that-
>
>> (A) the claim relies on-
>>
>>> (I) a new rule of constitutional law, made
>>> retroactive to cases on collateral review by the Supreme
>>> Court, that was previously unavailable; or
>>>
>>> (ii) a factual predicate that could not have been
>>> previously discovered through the exercise of due
>>> diligence; and
>>
>> (B) the facts underlying the claim would be sufficient to establish
>> by clear and convincing evidence that but for constitutional error, no
>> reasonable fact-finder would have found the applicant guilty of the
>> underlying offense.

28 U.S.C. § 2254(e)(2).

"Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a

claim is not established unless there is lack of diligence, or some greater fault, attributable to the

prisoner or the prisoner's counsel."  Williams v. Taylor, 529 U.S. 420, 432, 120 S.Ct. 1479, 1488

(2000).  Accordingly, a petitioner need not meet the strict requirements for an evidentiary

hearing set out in § 2554(e)(2) in cases where the failure to develop the necessary factual basis

of a claim in state court was not due to a lack of diligence on the petitioner's part.  Id., 529 U.S.

at 437, 120 S.Ct. at 1491.  Whether a petitioner has exercised the diligence necessary to preserve

a claim "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court[.]"  Id. at 435, 120 S.Ct. at 1490.

The burden is on a habeas petitioner to demonstrate the requisite diligence to support his request for an evidentiary hearing.  Hutchison, 303 F.3d at 747.  These "same restrictions apply when a prisoner seeks relief based on new evidence *without* an evidentiary hearing."  Holland v. Jackson, 542 U.S. 649, 653, 124 S.Ct. 2736, 2738 (2004).  A federal court errs in adjudicating a habeas claim by relying on evidence that was not properly presented to the state habeas courts without determining (1) whether the prisoner was at fault for failing to develop the factual bases for his claims in state court, or (2) whether the prisoner has satisfied the criteria established by 28 U.S.C. § 2254(e)(2).  Bradshaw v. Richey, 546 U.S. 74, 79, 126 S.Ct. 602, 605 (2006), reh'g denied, 546 U.S. 1146, 126 S.Ct. 1163 (2006), on remand, Richey v. Bradshaw, 498 F.3d 344 (6th Cir. 2007).

Here, petitioner does not contend that he can fulfill the legal requirements for an evidentiary hearing; he has utterly failed to even address the applicable legal principles under § 2254(e)(2).  Cf. Richey, 498 F.3d at 351-352 (concluding that it was proper to rely on evidence newly developed in federal district court, where petitioner did attempt to develop factual basis for claims in state court, and state did not object).  The court's effort to examine these principles – absent appropriate input from petitioner – leads to the conclusion that petitioner is not entitled to a hearing.

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations,

24

which, if true, would entitle the applicant to federal habeas relief. . . .  Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." Schriro, 127 S.Ct. at 1940 (citation omitted).  The Court in Schriro held that one of the reasons the lower court erred in granting the habeas petitioner an evidentiary hearing in that case was that the petitioner's allegations of ineffective assistance failed to demonstrate that he had suffered prejudice under Strickland.  Schriro, 127 S.Ct. at 1942.  Although the alleged factual grounds for counsel's ineffectiveness in the present case differ from those in Schriro, the same result is required here.

Petitioner's ineffective-assistance-of-counsel claim fails because he cannot demonstrate that the allegedly deficient performance prejudiced him under Strickland.  Petitioner's appellate counsel did consult with an expert; that expert was unable to offer an opinion on causation favorable to petitioner.   Because no competent evidence suggests that further factual development would demonstrate prejudice, an evidentiary hearing is unwarranted.

An additional basis for rejecting petitioner's request for an evidentiary hearing is presented by petitioner's failure to make a claim of Strickland prejudice in the state courts.  In his motion for relief from judgment filed in the trial court, petitioner did not argue that he could establish prejudice based on his trial counsel's failure to retain an expert.  Instead, he argued the prejudice was presumed because the prosecution "interfered" with defense counsel's plans to hire an expert.  See Motion for Relief from Judgment (doc. no. 71) at 35.  Although petitioner made a nominal request for a hearing in the trial court, he did not identify any particular reason why such a hearing was necessary, and it is apparent – based on his argument that prejudice was

presumed – that no hearing was necessary.[13]  Under the circumstances, petitioner cannot show

diligence in developing the factual basis of his claim in state court, and on this record the court

cannot say that petitioner's appellate counsel was ineffective for failing to engage additional

experts.

When petitioner's trial counsel chose to focus on a defense that petitioner was innocent

of setting the fire, and not to pursue a defense that he accidentally did so, she made a reasonable

strategic decision.  In addition, petitioner has failed to establish that, but for counsel's failure to

retain an arson expert, the outcome of the state court trial would have been different; the record

shows that petitioner's appellate counsel consulted with such an expert, who was unable to opine

---

[13]"In certain Sixth Amendment contexts, prejudice is presumed."  Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067 (1984).  A "per se" ineffective assistance of counsel rule was established by the Supreme Court in United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039 (1984).  "Cronic recognized a narrow exception to Strickland's holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." Florida v. Nixon, 543 U.S. 175, 190, 125 S.Ct. 551, 562 (2004).  "If a claim is governed by Strickland, a defendant must typically demonstrate that specific errors made by trial counsel affected the ability of the defendant to receive a fair trial.  If a claim is governed by Cronic, however, the defendant need not demonstrate any prejudice resulting from the lack of effective counsel."  Mitchell v. Mason, 325 F.3d 732, 741-742 (6th Cir.2003).  Three types of cases can lead to a presumption of prejudice:  (1) a complete denial of counsel; (2) the utter failure of counsel to subject the prosecution's case to meaningful adversarial testing; and (3) a placement of counsel into circumstances in which competent counsel very likely could not render assistance.  Id., 325 F.3d at 742.
        In his motion for relief from judgment filed in the state court, petitioner expressly argued that "this is a case where prejudice is presumed as the State interfered with counsel's assistance." In making this argument, petitioner specifically cited to Strickland's quotation of Cronic. Motion for Relief from Judgment (doc. no. 71) at 35.  Petitioner did not argue that he needed to develop a factual record of prejudice.  This is likely because the final exhibit to his motion was the letter from consultant Richard Harris to petitioner's appellate counsel, in which Harris indicated that he could not could not come to any type of opinion related to the fire.  In seeking relief in this court, petitioner does not repeat his argument that prejudice is presumed.  Based on the established law, it is apparent that any such argument would not succeed.

that the fire was an accident.  Thus, the court concludes that petitioner's claim of ineffective assistance of counsel must be rejected on the merits.


### 2.  Television schedule

According to petitioner's brief, had his trial counsel obtained a television schedule indicating when a particular television show was on, she could have discredited prosecution testimony by Belinda Sutton which placed petitioner at the site of the fire close to the time at which it was allegedly started.  The Magistrate Judge concluded that counsel's failure to obtain the television schedule fell below an objective standard of reasonableness and prejudiced petitioner because "the time line was crucial in this case."  R & R at 48-49.  The respondent objects to the  conclusion that trial counsel's failure to investigate the prosecution's time line was prejudicial to the defense.

Once again, to prevail on his claim of ineffective assistance, petitioner must show that his counsel's conduct fell beyond the wide range of assistance that might be considered sound trial strategy.  Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.  Here, trial counsel's decision not to fully explore a particular inconsistency in Belinda Sutton's testimony appears to be a reasonable strategic one.  "It is not . . . always the best trial strategy to exploit every inconsistency in the statements of a witness, even a witness called by opposing counsel."  Cannon v. Mullin, 383 F.3d 1152, 1164 (10th Cir. 2004).  Belinda Sutton was not the only source of evidence on the time line of the fire.  Petitioner's trial counsel clearly tried to discredit her testimony in other respects.  It is not possible to conclude, absent a record more fully developed than what we now

27

have, that trial counsel's decision was an unreasonable one.

However, even if counsel's decision not to question Sutton about the television schedule was not a reasonable strategy, petitioner must still show prejudice.  Strickland, 466 U.S. at 693, 104 S.Ct. at 2067.  Because the court concludes that petitioner cannot show that he was prejudiced by what he has alleged was a failure by his trial counsel to investigate the prosecution's time line by procuring a television schedule, this claim of ineffective assistance fails.

In his petition, petitioner claims that Belinda Sutton's testimony regarding the time he was present at the crime scene went unrebutted because his trial counsel failed to obtain a copy of the television schedule for the night in question.  Of course, this particular claim is based not on a mere contention that counsel should have performed the mechanical act of obtaining a copy the television schedule, but rather on the use to which counsel could have put the information contained in the schedule.   However, assuming that petitioner's trial counsel in fact failed to obtain a copy of the television schedule for the night in question, and assuming that she acted unreasonably in doing so, petitioner has not shown how he was prejudiced by this failure.

 Presumably, petitioner believes that his trial counsel could have used the television schedule to impeach Sutton, who testified against him both at trial and at the preliminary examination. At the preliminary examination, Sutton initially testified that petitioner came back to the house a second time at approximately 12:00 a.m.  Transcript of Preliminary Examination, Vol. 2 (doc. no. 15) at 10. After the prosecution refreshed her recollection, Sutton identified the time instead as approximately 1:30 a.m.. Id. at 12.  On cross-examination, Sutton testified that she knew the time because "I knew what was on T.V."; she slept with a television on in her

28

bedroom.  Id. at 29.  When asked what show was on when she heard petitioner's knock, Sutton identified the *Richard Bey* show on Channel 17.  Id. at 29-30.

The jury, of course, was not present at the preliminary examination and did not hear this testimony.  At trial, the jury heard Sutton testify – with uncertainty – that petitioner returned to the house at "about 12:30" a.m.  Transcript of Jury Trial, Vol. 3 (doc. no. 19) at 70.   After being shown the police report, Sutton confirmed that she told police that petitioner had returned at 1:30 a.m.  Id. at 70-71.  When asked on direct examination why she was able to tell police the time when petitioner returned, Sutton stated that she remembered what television show was on at around that time.  Id. at 71.  Sutton did not identify the name of the television show.

Sutton therefore placed petitioner on the scene at 1:30 in the morning.  More importantly, however, she also put petitioner at the scene in an angry mood.  She testified that when petitioner came back to the house at about 1:30 in the morning, he was "mad, angry" and  "loud sound, cussing" because "he said Quickie had sold him some bullshit."  Id. at 71- 72.  According to Sutton, "[petitioner] said that he was going to call the police.  He was gonna wait there until Quickie come back."  Id. at 72.

In his response to the respondent's objections to the R & R, petitioner argues that "the hardest thing for [him] to overcome was the time-line created by [Sutton]."  Petitioner's Response to Respondent's Objections to Magistrate's Report and Recommendations at 4.  Of course, this time line was not simply "created" by Sutton; it was largely established by the testimony of Detective Hurtt, who provided the details of his interview with petitioner on the evening after the fire.  Hurtt, in contrast with Sutton, provided detailed testimony regarding the timing of petitioner's activities on the night in question.  Transcript of Jury Trial, Vol. 4 (doc.

no. 20) at 47-56.  His source for most of this information was petitioner's own statements, made during the videotaped interview.   Detective Hurtt established some of the times by walking the distances petitioner claimed to have walked that night.   Id. at 49-50.

Under the circumstances, Detective Hurtt's testimony was at least as important if not more important than Sutton's testimony in establishing a time line, insofar as petitioner's own admissions made during the interview with Detective Hurtt established petitioner's presence at the scene close to if not precisely at the time the fire was believed to have started.  Because the jury later saw the defense's presentation of the videotape of Detective Hurtt's interview with petitioner, this would have largely confirmed the accuracy of the detective's testimony.

Sutton's testimony was therefore most important in establishing motive, not timing.[14] Impeaching her trial testimony regarding the time petitioner knocked on the door for a second time by asking her about the timing of the *Richard Bey* show would have served little purpose, except perhaps to highlight her uncertainty about the time.  However, Sutton had in fact already admitted that she could not remember the time without having her memory refreshed.  See Transcript of Jury Trial, Vol. 3 (doc. no. 19) at 70 ("Around then, can't remember").  The jury thus knew that Sutton's memory regarding timing was not infallible.  Later, the jury would hear from Detective Hurtt and from petitioner himself exactly what petitioner was doing, where, and at what time between approximately midnight and 3:00 a.m. on the night of the fire.

At one point before trial, petitioner's counsel appears to have considered using the television schedule in cross-examining Sutton.  In advance of the trial, petitioner's counsel wrote

_____

[14]Defense counsel observed as much in her closing argument, during which she argued that Sutton was "the only one that says [petitioner] showed up here claiming he was ripped off." Transcript of Jury Trial, Vol. 6 (doc. no. 23) at 45.

to her client that "[t]he T.V. guide will be helpful for impeaching Belinda Sutton!"  Petition,

Exhibit J (doc. no. 2) (Aug. 29, 1996 letter).  For whatever reason, petitioner's counsel decided

not to pursue this particular line of impeachment.  However, much as petitioner might now wish

to think so, the outcome of his trial did not depend on whether his trial counsel obtained a copy

of a television schedule.  Given the evidence presented at trial establishing the time line

independent of any testimony by Belinda Sutton, the court cannot conclude that petitioner was

prejudiced by his trial counsel's failure to impeach Sutton's testimony with the information on

the television schedule.  Counsel was therefore not constitutionally ineffective under the

controlling law, and petitioner's ineffective assistance claim fails.


## B.  Prosecutorial Misconduct

In his petition, petitioner claims that numerous instances of prosecutorial misconduct

worked to deny him his Fourteenth Amendment Due Process right to a fair trial.  In her R & R,

the Magistrate Judge agreed with petitioner as to two of these instances.  First, she concludes

that the prosecutor engaged in misconduct when he "interfered" with the defense by allegedly

refusing to comply with the trial court's order regarding payment for an arson expert, who – as

we know – was never retained.   According to the R & R, this purported intentional interference

had a detrimental effect on defense counsel's trial preparation.  Second, the Magistrate Judge

concludes that during closing argument, the prosecutor improperly emphasized petitioner's pre-

trial silence and assertion of his right to an attorney.  The respondent objects to each of these

conclusions.

**1. "Interference" with Defense's Retention of Arson Expert**

In her R & R, the Magistrate Judge concludes that the prosecutor engaged in misconduct by "intentionally" interfering with the defense, thereby thwarting defense counsel's trial preparation.  R & R at 59.  This purported interference consists largely if not entirely on statements made by the prosecutor in a letter which he sent in response to a letter from defense counsel.

Defense counsel successfully – and without objection from the prosecution – procured two court orders granting her motions for funds:  one for a private investigator, and one for an arson expert.  Afterward, defense counsel sent a letter to the prosecutor in the attorney general's office.  In her letter, trial counsel indicated that she was "in the process of hiring an arson expert" and would at some unspecified point be "forwarding the bills from my experts to you for reimbursement from the State of Michigan."  Letter, Oct. 9, 1996 (included with doc. no. 31).  In his letter responding to defense counsel, the prosecutor stated, among other things,  (1) that he was "unable, either or factually by law, to accept these bills for payment[,]" and (2) that "[a]ll such bills must be submitted for approval to the state administrative board by you on behalf of your client."  Petition, Exhibit K (doc. no. 2).  The prosecutor even cited to the applicable state statute, M.C.L. § 775.21.  Despite the relatively innocuous and even informative nature of this response, the Magistrate Judge concludes that the prosecutor's out-of-court remarks to defense counsel interfered with the defense's retention of an arson expert and denied petitioner a fundamentally fair trial.

As noted above, defendant's trial counsel did not retain an arson expert to testify at trial. The Magistrate Judge seemingly concludes that at least part of the explanation for this failure

was that counsel was intimidated by the prosecutor's response to her letter.  However, an examination of the record reveals no evidence that defense counsel was intimidated, and therefore any suggestion that she was intimidated is purely speculation.  In addition, the record as a whole makes such a conclusion untenable.

First, nothing in the record affirmatively indicates that petitioner's counsel was either actually intimidated or likely to be intimidated by the prosecutor's letter.  There is no dispute that the contents of the letter did not dissuade petitioner's trial counsel from hiring a private investigator, who was eventually compensated.[15]  In addition, there is no dispute that appellate counsel was not dissuaded from consulting with an arson expert, who was unable to reach a conclusion favorable to petitioner.

Second, the prosecution's letter itself cannot reasonably be read by a trained lawyer as threatening.   The prosecutor merely advised defense counsel that she should not send any future bills to him but should instead submit them to the State Administrative Board.  The State Administrative Board is a statutorily-created entity, consisting of seven state officials, including the attorney general.  M.C.L. § 17.1.  The Board is authorized by law to adopt its own procedures, and a quorum of four members is required for the transaction of any business.  M.C.L. 17.2(1).  Applicable procedures were in effect during the relevant time period.[16]

_____

[15]The Magistrate Judge finds relevance in the fact that it took more than three years for the State Administrative Board to pay the investigator's fees.  R & R at 57.  However, assuming this to be a relevant consideration, it must be noted that there is nothing in the record indicating that this lengthy administrative process was the fault of the prosecution.

[16]A state procedure issued in October, 1993 described "the structure and process for obtaining State Administrative Board approval as required by statute(s) and administrative guideline." State of Michigan, Department of Management and Budget, Getting the Job Done:

(continued...)

There is nothing whatever incorrect about the prosecutor's statement that the bills should be submitted to the State Administrative Board; this is precisely what the applicable statute, M.C.L. § 775.21, provides.[17]   Defense counsel could easily have confirmed the prosecutor's statements by reading the statute, and there is no reason to assume that she did not do so.  In addition, at the conclusion of his letter, the prosecutor advises that his response is intended "not to interfere with the defense preparation for [petitioner] but rather to protect you from being responsible for bills which the State of Michigan might refuse to pay."   This statement, combined with the fact that the prosecutor did not oppose the defense motion for funds, should have served as notice to the defense that the prosecutor, who was simply an employee of the attorney general's office, was in no position to either approve or disallow payment of any defense bills submitted to his office.

The Magistrate Judge seems unduly influenced by a sentence within the prosecutor's letter to defense counsel in which he informs her what her recourse would be in the event that the

---

[16](...continued)
The Administrative Guide to State Government, Procedures 0620.01-2 (issued Oct. 4, 1993). Revisions to the procedure were made effective in September, 1996.  Memo from Kathe Rushford Carter, Director, Office of Support Services, State of Michigan Department of Management and Budget (Jan. 6, 1997); Memo from George Boersma, Deputy Director, Office of Management and Budget (Aug. 28, 1996).  The current version of the procedure, issued in August, 2000, is available online at http://www.michigan.gov/doingbusiness (follow "State Administrative Board" hyperlink; then follow procedure 0620.01 and 0620.02 under "Ad Board Ad Guide Procedures").

[17]M.C.L. § 775.21 provides in its entirety as follows:

Whenever the attorney general shall institute criminal proceedings in any county in this state, all costs incurred in such proceedings, except the pay of circuit judges, prosecuting attorneys, and circuit court stenographers, may be paid by the state with the approval of the state administrative board.

State Administrative Board were to disallow payment of any bills:  filing suit in the state's Court of Claims.[18]   The Magistrate Judge deems this simple statement – which has not been shown to be inaccurate – to be a "gratuitous threat."  R & R at 58.  The characterization of this rather innocuous statement as a "threat" appears to have its origin in Justice Kelly's dissenting opinion accompanying the Michigan Supreme Court's order granting the prosecution's motion to partially vacate its order denying petitioner's delayed application for leave to appeal.  People v. Babick, 462 Mich. 863, 610 N.W.2d 916, vacated in part, 462 Mich. 919, 614 N.W.2d 588 (2000).  Justice Kelly was clearly critical of the prosecutor's letter; the R & R in fact quotes Justice Kelly's use of the words "gratuitous" and "threat" in describing the contents of the letter. R & R at 58; see Babick, 614 N.W.2d at 588 (referring to prosecutor's "gratuitous warning"); see also id. at 589 (referring to "assistant attorney general's threat that he would not authorize payment for the order submitted").

However, there are two serious problems with relying on Justice Kelly's conclusions. First, this court is bound not by what this lone justice said in her dissenting decision, nor even by dicta included by the majority in its earlier, vacated decision, 462 Mich. 863, 610 N.W.2d 916. Justice Kelly's conclusion – that "[s]uch threats deter defense counsel from making proper trial

---

[18]The sentence of the prosecutor's letter reads as follows:

> You should be warned, however, that there is recent precedent where a judge ordered the State of Michigan to pay funds under this provision and the bill was submitted to the state administrative board, which then disallowed the payments. Where such a situation develops, your only recourse is to sue the State of Michigan in the Court of Claims.

Petition, Exhibit K.  The prosecutor was therefore forewarning defense counsel of legal precedent and what to do in the event of nonpayment; he was not threatening to impede or obstruct the process.

preparation" – is factually unsupported.   614 N.W.2d at 589.  There is nothing in the record indicating that either that a "threat" was made or that defense counsel was subjectively deterred. And certainly, none of Justice Kelly's colleagues on the court expressed any agreement with her conclusion.  As we know, the majority of her colleagues had already determined that the conduct of the prosecution did not rise to the level of state interference with the petitioner's right to effective assistance of counsel.  610 N.W.2d at 916.

In addition, Justice Kelly is simply wrong as a matter of law in assessing that "it was within the [assistant attorney general]'s discretion whether to allow payment."  614 N.W.2d at 589.  Michigan law does not bestow upon single employees of the attorney general's office the discretion to allow or disallow payment of bills which may not be paid by the state without the approval of the State Administrative Board.   Although Justice Kelly cites to language contained in the Court of Claims jurisdictional statute giving the Board "discretionary authority" to approve claims less than $1,000 "upon the advice of the attorney general" and to provide certification of such allowed claims to the Court of Claims, M.C.L. § 600.6419(1), nothing in this statute gives assistants to the attorney general the discretion to allow payment.[19]   Under

---

[19]Section 600.6419(1) provides in pertinent part as follows:

> **Power and jurisdiction.** Except as provided in sections 6419a and 6440, the jurisdiction of the court of claims, as conferred upon it by this chapter, shall be exclusive. The state administrative board is hereby vested with discretionary authority upon the advice of the attorney general, to hear, consider, determine, and allow any claim against the state in an amount less than $1,000.00. Any claim so allowed by the state administrative board shall be paid in the same manner as judgments are paid under section 6458 upon certification of the allowed claim by the secretary of the state administrative board to the clerk of the court of claims.

M.C.L. § 600.6419(1) (footnotes omitted).

either M.C.L. § 775.21 or § 600.6419(1), that discretion lies solely in the State Administrative Board, of which the attorney general is but one member who cannot act alone. Moreover, nothing in the prosecutor's letter can be construed as threatening that the attorney general's office would give "advice" to the Board not to pay any defense bills which might be submitted to the Board in the future.

Despite what petitioner's trial counsel said in her letter to the prosecutor about being "in the process of hiring an arson expert," we know that she did not in fact retain an expert. As the Michigan Court of Appeals panel determined in petitioner's appeal of right, the defense "neither attempted to retain an expert nor filed a claim with the administrative law board for reimbursement[.]" People v. Babick, No. 207638, 1999 WL 33437948, *2 (Mich.Ct.App. Aug. 13, 1999). That court also rejected as " unsubstantiated" petitioner's arguments that both the state and county "erected 'roadblock after roadblock' to prevent his attorney from securing an expert." Id. Therefore, assuming that the prosecutor's purported "threat" to deny payment for the expert was one such "roadblock" described by petitioner in the Court of Appeals, a majority of the Michigan Supreme Court allowed that decision to stand. This determination is presumed to be correct, absent clear and convincing evidence to the contrary. 28 U.S.C. §2254(e)(1). This court concludes that it is bound by the findings of the Michigan Court of Appeals both (1) that trial counsel did not attempt to retain an expert, and (2) that petitioner's arguments that trial counsel was prevented by prosecutorial roadblocks from doing so were unsubstantiated. Babick, 1999 WL 33437948, *2.

The Magistrate Judge errs in failing to give deference to the state appellate' court's determination that petitioner's claims of prosecutorial roadblocks prevented the hiring of a

defense expert were unsubstantiated.  Under the AEDPA, a writ of habeas corpus may not be

granted on any claim adjudicated on the merits in State court proceedings unless the State court's

adjudication of the claim "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. § 2254(d)(2).  The Magistrate Judge appears to assess that she is not bound by the

Michigan Court of Appeals' finding because that court concluded that petitioner's claim – that

he was denied his right to an expert witness because of the prosecution's refusal to consent to the

payment of such an expense – was not preserved for appellate review.  Babick, 1999 WL

33437948, *2.  However, the Michigan Court of Appeals concluded that the claim was not

preserved because petitioner neither attempted to retain an expert nor filed a claim with the State

Administrative Board for reimbursement as provided by M.C.L. § 600.6419(1).  Babick, 1999

WL 33437948, *2.  Therefore, the finding that petitioner had not attempted to retain an expert or

file a claim for reimbursement with the State Administrative Board was essential to the court's

conclusion that the issue was not preserved.

          The Magistrate Judge also errs in the source of law which she applies to this claim.  She

analyzed petitioner's claim that the prosecution interfered with the defense's retention of an

expert by ostensibly applying two sources of law.  First, she applied law relevant to claims of

prosecutorial misconduct arising from conduct during trial.  R & R at 56.  As she correctly noted,

the relevant question in analyzing such a claim of prosecutorial misconduct on habeas review is

"whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting

conviction a denial of due process.' "  Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464,

2471 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868 (1974)).  In

38

Darden, the Supreme Court considered whether a prosecutor's inappropriate comments during closing argument constituted a due process violation.  See id. at 179-82, 106 S.Ct. at 2470-2472. However, Darden does not offer any guidance on what constitutes interference with the defense's presentation of witnesses.

Second, the Magistrate Judge also applied law which she appears to have believed stands for the proposition that "[a] prosecutor may violate a defendant's due process rights if he interferes with the defense's presentation of witnesses."  R & R at 56.  However, the only Supreme Court case to which she cites in support of this proposition is Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038 (1973).  The R & R borrows a quote from Chambers stating that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense."  410 U.S. at 302, 93 S.Ct. at 1049.

In Chambers, the Supreme Court considered whether Mississippi's rules of evidence operated to deprive a defendant of a fair trial on charges of murdering a police officer, by denying the defendant the opportunity to cross-examine a hostile witness who had confessed to shooting the officer, but later recanted.  The trial court in that case also excluded, on hearsay grounds, testimony of three other witnesses who could corroborate the out-of-court confession made by the purported shooter.  The court concluded that the exclusion of this testimony, coupled with the court's refusal to permit the defendant to cross-examine the admitted shooter, denied the defendant a trial in accord with fundamental standards of due process.  410 U.S. at 302, 93 S.Ct. at 1049.

The facts of this case are not like those of Chambers or its progeny.  See Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150 (1979) (trial court's exclusion during penalty phase of death

penalty trial of defense witness' testimony regarding co-defendant's confession pursuant to Georgia's hearsay rule violated petitioner's due process right to fair trial).  The Supreme Court has characterized <u>Chambers</u> as "an exercise in highly case-specific error correction."  <u>Montana v. Egelhoff</u>, 518 U.S. 37, 52, 116 S. Ct. 2013, 2022 (1996).  In <u>Chambers</u>, the court itself stressed that in reaching its decision, "we establish no new principles of constitutional law. . . . Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived [the defendant] of a fair trial. "  410 U.S. at 302, 93 S. Ct. at 1049.  <u>Chambers</u> does not stand for the proposition that a petitioner's due process rights are violated whenever the state takes action which interferes with an indigent defendant's ability to pay expert witness fees.  Because <u>Chambers</u> is not on point insofar as the trial court did not exclude evidence or prevent the defense from cross-examining witnesses, it is difficult to see how <u>Chambers</u> supplies the constitutional law necessary to support issuance of the writ in this case.[20]

_____

[20]The Magistrate Judge also quoted from the Sixth Circuit decision in <u>United States v. Foster</u>, 128 F.3d 949, 953 (6th Cir.1997), stating, specifically: "This Court has found that governmental conduct which amounts to a substantial interference with a witness' free and unhampered determination to testify will violate due process."  R & R at 56.  In <u>Foster</u>, the Assistant United States Attorney admitted contacting the attorney of a defense witness who had been granted immunity and informing the attorney that his client's immunity would be revoked if he testified at the defendant's trial. The witness had already given testimony before a grand jury in which he denied the defendant's involvement in the crime. At that grand jury hearing, the government repeatedly made it clear to the witness that it believed he was lying and that his testimony could subject him to perjury charges. Nonetheless, the witness continued to deny any knowledge of the defendant's involvement.  The court held that the government's "warning" to the witness' attorney, a few days before the defendant's trial, "was at best ill-advised and at worst a possible attempt to intimidate" the witness.  128 F.3d at 954.  However, even though court concluded that the government's conduct in the case was clearly improper, it believed that the factual record was insufficient to permit a conclusion that the government's misconduct "substantially interfered" with the witness' free determination to testify, particularly because it was not clear whether the witness' attorney relayed to his client the government's threat to revoke immunity.  Because the court concluded that the defendant was entitled to a new trial on

(continued...)

Far more relevant to petitioner's claim than cases involving the exclusion of evidence are cases addressing the rights of indigent defendants.  The court does not have to look very far to find the law applicable to petitioner's claim; it is provided elsewhere in the R & R.  In his petition, petitioner asserted a claim that the failure to provide public funds for the defense to obtain an arson expert denied him his Due Process right to a fair trial.   The Magistrate Judge correctly analyzed this claim under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087 (1985), recommending that the claim, although defaulted, be rejected on the merits.  Petitioner has not objected to this recommendation.  The court concludes that the Magistrate Judge's analysis of that claim is correct, and that the same analysis also advises the court on how to proceed on petitioner's claim that the prosecution interfered with his ability to obtain payment for an expert witness.

Petitioner's request for funds to hire an arson expert was approved by the trial court. Petitioner has not claimed that the $500 amount approved was insufficient, and he has failed to show or even allege that an expert could not be hired for this amount.   Petitioner has likewise failed to claim or show that the state procedure counsel was required to follow in order to obtain reimbursement for funds paid to an expert was constitutionally defective.

Ake holds that the Due Process Clause requires that the state provide indigent defendants with access to expert assistance only under certain circumstances.  Under Sixth Circuit precedent interpreting Ake,

_____

[20](...continued)
a separate claim of error, it did not have to remand the case for an evidentiary hearing.  Foster is therefore distinguishable, involving an allegation of witness intimidation.

> the constitution only requires the government to furnish an indigent criminal
> defendant psychiatric or psychological assistance during the sentencing phase of a
> trial if 1) the defendant's sanity was a significant issue during the trial, or 2)
> defendant is on trial for his life and the state first presents psychiatric evidence of
> future dangerousness.

United States v. Osoba, 213 F.3d 913, 917 (6th Cir. 2000).  However, even if Ake could be

extended to the circumstances which were present in this case (to require provision of funds for

expert testimony not pertaining to the defendant's sanity in a non-capital case), petitioner's

motion for expert witness funds was granted, and he has neither claimed nor shown that the

amount approved by the trial court was insufficient to permit his counsel to retain an expert of

her choosing.  Petitioner has likewise neither claimed nor shown that the procedure for obtaining

reimbursement was insufficient, and therefore the court can discern no improper conduct by the

prosecution in insisting that this procedure be followed.  Having no basis on which to do so, the

court cannot conclude that the prosecutor's actions in this case violated petitioner's Due Process

rights under applicable federal law.

### 2.  Closing Argument Reference to Petitioner's Invocation of Rights

In her R & R, the Magistrate Judge concludes that the prosecutor's references during his

closing argument to petitioner's post-Miranda invocation of his right to counsel were a "blatant

and egregious violation" of the rule of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240 (1976).

R & R at 66.  The Magistrate Judge also concludes that she is unable to conclude that this error

was harmless.  R & R at 67.  In her objections to the R & R, the respondent argues that (1)  this

case is distinguishable from <u>Doyle</u> because petitioner agreed to speak to police after receiving <u>Miranda</u> warnings; (2) petitioner's entire videotaped interview – which included his invocations of  his right to counsel – was placed in evidence on the specific request of the defense; and (3) accordingly, there was no misconduct, nor was petitioner prejudiced by the prosecutor's argument.  The respondent is correct; there was no violation of <u>Doyle</u>, and certainly none which warrants habeas relief under applicable Supreme Court standards.

     "The question in <u>Doyle v. Ohio</u>, as stated by Justice Powell writing for the Court was 'whether a state prosecutor may seek to impeach a defendant's exculpatory story, *told for the first time at trial,* by cross-examining the defendant about his failure to have told the story after receiving <u>Miranda</u> warnings at the time of his arrest.'"  <u>United States v. Crowder</u>, 719 F.2d 166, 170 (6th Cir. 1983) (citation omitted; emphasis in citing case); <u>see</u> <u>Billinglea v. Jackson</u>, No. 02-1225, 2003 WL 22905326, **6 (6th Cir. Nov. 21, 2003) ("the Doyle exception has three requirements: (1) a defendant must have testified (2) to an exculpatory version of events (3) that the defendant told police at the time of arrest").  Stated another way, <u>Doyle</u> applies only to the improper impeachment of subsequent exculpatory explanations provided by the defendant at trial.  Here, petitioner did not testify and therefore did not provide an exculpatory story for the first time at trial.   The prosecution's remarks during closing argument were therefore not an attempt to impeach trial testimony to which <u>Doyle</u> applies.

     As the defense indicated during its own closing arguments at trial, petitioner voluntarily talked to the police after he was Mirandized.  Transcript of Jury Trial, Vol. 6 (doc. no. 23) at 63.  Where the defendant does not in fact remain silent, as in this case, the situation is controlled by <u>Anderson v. Charles</u>, 447 U.S. 404, 100 S.Ct. 2180 (1980).  When the defendant voluntarily

speaks after receiving Miranda warnings, "[a]s to the subject matter of his statements, the defendant has not remained silent at all."  Id., 447 U.S. at 408, 100 S.Ct. at 2182.  The Court held that under these circumstances, "Doyle does not apply to cross-examination [of the defendant] that merely inquires into prior inconsistent statements."  Id.

Specifically, the Sixth Circuit has also stated that with respect to Doyle,

> What Anderson v. Charles teaches is that the Doyle rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the Miranda warnings. Here there was no silence and the prosecutor never implied that [the defendant]'s testimony was recently fabricated.

Crowder, 719 F.2d at 172.  Under this factual scenario, no Doyle situation is presented "as that decision has been interpreted and limited by subsequent Supreme Court decisions."  Crowder, 719 F.2d at 172.  Instead, where the defendant chooses not to remain silent, the rationale of Doyle is inapplicable, as it was in Charles.  Hockenbury v. Sowders, 718 F.2d 155, 159 (6th Cir. 1983).  This remains true, even where the defendant – after making a statement –  indicates that he does not wish to say any more.  See Haberek v.Maloney, 81 F. Supp.2d 202, 209 (D. Mass. 2000) (prosecution's use of petitioner's statement "I don't think I want to say any more" in prosecution's case and closing argument was not contrary to rule announced in Doyle).[21]

---

[21]Other cases have held that where the defendant does not testify, comment on the defendant's refusal to answer questions after waiving his right to remain silent is not improper. See Scillion v. O'Dea, No. 93-5869, 1994 WL 20223 (6th Cir. Jan. 26, 1994) (petitioner not entitled to habeas relief on claim of prosecutorial misconduct, where prosecution brought out during examination of interrogating officer and closing argument that petitioner had waived his rights, answered questions, and then later stated" that he was not going to tell the police

(continued...)

In his response to the respondent's objections to the R & R, petitioner argues that the prosecutor "intentionally emphasized Petitioner's request for an attorney, by stating that it was the most important thing that Petitioner said during his entire interview."  Petitioner's Response to Respondent's Objections to Magistrate's Report and Recommendations at 12.  Although petitioner appears to concede that it was proper for the prosecutor to comment on petitioner's statements of concern that the police "were not buying his story," id. at 12-13, he argues that the "line of fundamental fairness" was crossed when the prosecutor mentioned petitioner's request for an attorney.  Id. at 13.  However, as noted above, because the jury had already heard petitioner's requests on the videotape, the prosecution's argument was merely cumulative.[22]

Moreover, petitioner takes the closing remarks out of context when he argues that the prosecutor deemed petitioner's request for counsel "the most important thing" petitioner said during the interview.  What the prosecutor emphasized as the "[v]ery most important thing out of

_____

[21](...continued)
anything"); see also United States v. Harris, 956 F.2d 177, 181 (8th Cir.1992) (prosecutor's commentary during closing arguments that defendant had concluded police interview after stating "You got me, what else can I say," was permissible; prosecution may note defendant's refusal to answer further questions "because it now constitutes part of an otherwise admissible conversation between the police and the accused").

[22]In his response to the respondent's objections to the R & R, petitioner also argues that the police violated Miranda when they asked petitioner whether they could ask him "one more question" after he indicated he needed a lawyer.  Petitioner's Response to Respondent's Objections to Magistrate's Report and Recommendation at 13; see Petition, Exhibit N (doc. no. 2) at 20.  Of course, Miranda violations "occur, if at all, only upon the admission of unwarned statements into evidence at trial."  United States v. Patane, 542 U.S. 630, 641, 124 S.Ct. 2620, 2629 (2004).  "[A]t that point, '[t]he exclusion of unwarned statements ... is a complete and sufficient remedy' for any perceived Miranda violation."  Id., 542 U.S. at 641-642, 124 S.Ct. at 2629 (citation omitted).  Because – as noted above – it was petitioner's counsel who made a strategic decision to seek admission of the entire videotape of the interview at trial, and not the prosecution who sought to introduce the evidence against petitioner, Miranda is not the issue here.

everything" petitioner said was "I need a lawyer, quote, ***because you guys ain't listening to me,*** unquote."   Transcript of Jury Trial, Vol. 6 (doc. no. 23) at 27 (emphasis supplied).   After a defense objection and sidebar, the prosecutor repeated, "What's so important about that statement, I want a lawyer.  Why?  ***Because you guys ain't listening to me.***"   Id. (emphasis supplied).  Later, the prosecutor again emphasized the latter statement:  "Once [petitioner] realized he was not going to talk his way out of trouble, that's when he pushed the button.  He said so, ***'cause you guys ain't listening to me.***"   Id. at 28 (emphasis supplied).  Given the defense's strategic decision to use petitioner's uncross-examined denials as evidence in its case, the prosecution argument was one part of a fair response to the defense; it suggested that the police were ready to listen to petitioner, despite his insistence that they were not.

Moreover, even assuming, *arguendo*, that a controlling court would find that a Doyle violation occurred in this case, inappropriate prosecutorial comments, standing alone, do not justify relief from a criminal conviction obtained in an otherwise fair proceeding.  United States v. Young, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044 (1985).  Instead, "the remarks must be examined within the context of the trial" to determine the prejudicial effect of the prosecutor's behavior. Id. 470 U.S. at 12, 105 S.Ct. at 1044; see also United States v. Robinson, 485 U.S. 25, 33, 108 S.Ct. 864, 869 (1988) (recognizing "[t]he principle that prosecutorial comment must be examined in context").   The court must consider the probable effect the prosecutor's comments would have on the jury's ability to judge the evidence fairly, and in this context, the defense's conduct, in addition to the prosecutor's conduct, is relevant.  See id., 485 U.S. at 34, 108 S.Ct. at 870 ("It is one thing to hold . . . that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as

46

defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence").  "In examining prosecutorial misconduct, it is necessary to view the conduct at issue within the context of the trial as a whole." United States v. Beverly, 369 F.3d 516, 543 (6th Cir. 2004).  In addition, and more specifically, a Doyle violation only warrants relief on collateral review where it had a "substantial or injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637-638, 113 S.Ct. 1710, 1722 (1993) (internal quotation marks and citation omitted).  A "reasonable possibility" that the error influenced the outcome is not enough to warrant habeas relief. Id. 113 S.Ct. at 1721.  This rule applies even when the "federal habeas court is the first to review for harmless error." Gilliam v. Mitchell, 179 F.3d 990, 995 (6th Cir.1999).

  Here, as in Brecht, the prosecution's comments did not substantially influence the jury's decision.  By the time the prosecutor referenced petitioner's termination of the interview and invocation of his right to counsel – during closing arguments – the jury was already well aware of petitioner's assertion of his rights; the videotape of petitioner's police interview had been shown to the jury by the defense.  The prosecutor's comments comprise less than two pages of the trial transcript, and given the defense's presentation of the entire videotaped interview, near the conclusion of which petitioner invokes his rights multiple times, the prosecution's argument was merely cumulative.  In addition, the evidence presented at trial pointed to petitioner's guilt. Evidence excluded accidental causes for the fire, and placed petitioner at the scene three times that night, twice before the fire and once after the fire started.  See United States v. Corona, 108 F.3d 565, 576 (5th Cir. 1997) (evidence that defendant committed arson was "overwhelming"

47

where experts explained their reasons for concluding that property had been burned

intentionally, evidence placed defendant at the scene within a minute of the fire, and defendant

showed up at the property the following morning).   Moreover, other circumstantial evidence,

including a motive (consisting of petitioner's anger at a drug dealer whom petitioner believed

lived at the house), also pointed to petitioner's guilt.

Evidence of arson is usually circumstantial, and this case was therefore hardly unusual.

See People v. Nowack, 462 Mich. 392, 402-403, 614 N.W.2d 78, 83 (2000), stating, "In arson

cases, the trier of fact usually draws inferences from circumstantial evidence:

> '[T]here is rarely direct evidence of the actual lighting of a fire by an arsonist;
> rather, the evidence of arson is usually circumstantial. Such evidence is often of a
> negative character; that is, the criminal agency is shown by the absence of
> circumstances, conditions, and surroundings indicating that the fire resulted from
> an accidental cause.'

Id. (quoting Fox v. State, 179 Ind.App. 267, 277, 384 N.E.2d 1159 (1979)) (footnote omitted).

Under the circumstances, the court finds that the Magistrate Judge erred in concluding that  any

purported Doyle violation substantially influenced the jury's verdict.  This procedurally

defaulted claim therefore fails.

### Conclusion

The court will enter judgment denying the petition.

Entered this 29th day of January, 2008.

 /s/ Wendell A. Miles
Wendell A. Miles, Senior Judge

48